# EXHIBIT 1

Certified Final Award in *Omega Engineering LLC and Mr. Oscar Rivera v. Republic of Panama* (ICSID Case No. ARB/16/42), dated October 14, 2022

(Redacted by party agreement)

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# CERTIFICATE

### OMEGA ENGINEERING LLC AND OSCAR RIVERA

### v.

### REPUBLIC OF PANAMA

### (ICSID CASE NO. ARB/16/42)

I hereby certify that the attached document is a true copy of the Tribunal's Award dated October 14, 2022 containing redactions agreed by the parties.

The certified copy of the Award was first dispatched electronically to the parties on October 14, 2022. Therefore, pursuant to Article 49(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, the Award is deemed to have been rendered on October 14, 2022.

Meg Kinnear
Secretary-General

Washington, D.C., March 12, 2024

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

### OMEGA ENGINEERING LLC AND OSCAR RIVERA

Claimants

and

### REPUBLIC OF PANAMA

Respondent

### ICSID Case No. ARB/16/42

---

## AWARD

---

***Members of the Tribunal***
Mr. Laurence Shore, President
Dr. Horacio A. Grigera Naón, Co-Arbitrator
Professor Zachary Douglas KC, Co-Arbitrator

***Secretary of the Tribunal***
Ms. Catherine Kettlewell

*Date of dispatch to the Parties:* October 14, 2022

## REPRESENTATION OF THE PARTIES

*Representing Omega Engineering LLC and Mr. Oscar Rivera:*

c/o Ms. Melissa Stear Gorsline
Mr. Charles T. Kotuby Jr.
Mr. James Egerton-Vernon
Ms. Maria I. Pradilla Picas
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
United States of America

  And
c/o Mr. Lee Coffey
Jones Day
21 Tudor St.
London EC4Y 0DJ
United Kingdom

  And
Mr. Ricardo Ampudia
Mr. Frank Cruz-Alvarez
Mr. John Barkett
Shook, Hardy & Bacon L.L.P.
Citigroup Center
201 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
United States of America

  And
Mr. Carlos F. Concepcion
Concepcion Disputes PA
Citigroup Center
201 S. Biscayne Blvd., Suite 2800
Miami, Florida 33131
United States of America

*Representing the Republic of Panama:*

Mr. Henry Weisburg
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
United States of America

  And
Mr. Christopher Ryan
Ms. Anna Stockamore
Shearman & Sterling LLP
401 9th Street, N.W.
Washington, D.C. 20004
United States of America

  And
Mr. Aristides Valdonedo
Ms. Germaine Perret
Ministerio de Economía y Finanzas
Vía España y Calle 52 E
Edificio Ogawa, Torre 1, Piso 2
Apartado Postal 0816-02886
Panama City
Panama

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................. 1

II.   PROCEDURAL HISTORY ........................................................................... 5

III.  OUTLINE OF THE DISPUTE ................................................................... 21

      A.  The Relevant Treaty Provisions .......................................................... 21

          (1) The BIT's Provisions ................................................................... 23

          (2) The TPA Provisions .................................................................... 31

      B.  The Parties' Respective Cases ............................................................ 41

          (1) Summary of the Claimants' Claims .......................................... 42

              i.   The Claimants' Claims ......................................................... 42

              ii.  Damages ............................................................................... 48

          (2) Panama's Jurisdictional Objections .......................................... 49

              i.   Corruption precludes treaty relief ....................................... 51

              ii.  The Claimants have advanced commercial claims and have not
                   demonstrated that Panama acted in a sovereign capacity; commercial claims
                   are not protected under the Treaties ................................... 52

              iii. The BIT claims must be resolved under the project contracts' dispute
                   resolution provisions ........................................................... 53

              iv.  There is no jurisdiction over claims relating to Panama's criminal
                   investigation of Mr. Rivera ................................................. 54

          (3) Panama's Defenses to the Claimants' Four Heads of Claims ...................... 54

              i.   Indirect Expropriation ......................................................... 54

              ii.  Fair and Equitable Treatment ............................................... 55

              iii. Full Protection and Security ................................................. 57

              iv.  Umbrella Clause ................................................................... 57

          (4) Panama's Response to Claimants' Damages Requests ................................ 57

              i.   Response to Head 1 – Losses on Existing Contracts ............................ 57

              ii.  Response to Head 2 – Fair Market Value of Future Contracts .............. 58

              iii. Response to Head 3 – Moral Damages .................................. 59

          (5) The Claimants' Responses to Panama's Four Jurisdictional Objections ...... 60

              i.   Response to "Corruption precludes treaty relief" ................................. 60

              ii.  Response to "Claimants have advanced commercial claims; they have
                   not proved sovereign intent" ............................................... 60

iii. Response to "the BIT claims must be resolved under the project contracts' dispute resolution provisions" ................................................. 62

iv. Response to "there is no jurisdiction over claims relating to the criminal investigation of Mr. Rivera" ...................................................................... 62

C. The Six Consortium Projects and the Corruption Investigation ......................... 63

(1) The Six Projects ........................................................................................... 66

    i.   The CDLA Project ............................................................................. 66

    ii.  The MINSA CAPSI Project ............................................................... 83

    iii. The La Chorrera Project ................................................................... 97

    iv. The Municipality of Colón Project (or The Municipal Palace Project).106

    v.   The Mercado Público de Colón Project ("Cold Chain Market" Project) 112

    vi. The Markets Project ........................................................................117

(2) The Tribunal's Conclusion: The Cause of the Consortium's Failed Project Contracts ....................................................................................................122

IV. **THE CORRUPTION INVESTIGATION** ...................................................127

A. Introduction – The Relevant Issue in This Arbitration .....................................127

B. The Background to Examining the "Tonosí Land Deal" ....................................131

C. The Tribunal's Analysis of the "Tonosí Land Deal" Hearing Testimony ..........134

(1) The Parties' Written Submissions on the Tonosí Land Deal ......................144

(2) The Tribunal's Decision:  The Tonosí Land Deal and the Corruption Investigation ...............................................................................................145

V. **RESOLUTION OF THE RESPONDENT'S JURISDICTIONAL OBJECTIONS AND THE CLAIMANTS' CLAIMS** ...........................................................................149

A. Panama's Jurisdictional Objections ..................................................................149

(1) Corruption precludes treaty relief................................................................150

(2) The Claimants Have Asserted Commercial Claims That Are Not Protected by the Two Treaties ........................................................................................151

(3) The BIT Claims Must Be Resolved Under the Project Contracts' Dispute Resolution Provisions ..................................................................................153

(4) There Is No Jurisdiction Over Claims Relating to Panama's Criminal Investigation of Mr. Rivera.........................................................................155

B. The Claimants' Four Heads of Claims...............................................................156

(1) Unlawful (Indirect) Creeping Expropriation...............................................156

(2) Denial of Fair and Equitable Treatment......................................................157

(3)  Denial of Full Protection and Security ......................................................158

(4)  Umbrella Clause .........................................................................................159

(5)  No Recovery of Economic or Moral Damages .........................................159

VI.  ALLOCATION OF COSTS ...........................................................................160

A.  The Applicable Rules .........................................................................................160

B.  The Parties' Positions in Their Respective Costs Submissions .........................161

C.  The Tribunal's Analysis and Decision on Costs ...............................................164

VII. AWARD ...............................................................................................................169

TABLE OF SELECT ABBREVIATIONS/SELECT DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| BIT | Treaty between the United States of America and the Republic of Panama Concerning the Treatment and Protection of Investment, signed on October 27, 1982 and entered into force on May 30, 1991 |
| CDLA | Ciudad de las Artes |
| CDLA Project | Ciudad De Las Artes, led by the National Institute of Culture |
| Claimants | Mr. Oscar Iván Rivera Rivera and Omega Engineering LLC |
| C-[#] | Claimants' Exhibit |
| Cl. Costs | Claimants' Submission on Costs, dated January 21, 2021 |
| Cl. Mem. | Claimants' Memorial on the Merits, dated June 25, 2018 |
| Cl. PHB | Claimants' Post Hearing Brief, dated January 8, 2021 (Including "VarelaLeaks" Annex) |
| Cl. Rej. | Claimants' Rejoinder on Preliminary Objections, dated January 20, 2020 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Preliminary Objections, dated May 30, 2019 |
| Cl. Response to U.S. Submission | Claimants' Response to the U.S. Submission as a non-disputing party, dated June 30, 2020 |
| CL-[#] | Claimants' Legal Authority |
| Cold Chain Markets Project | Mercado Público de Colón, led by Ministry of the Presidency |

| Colón Projects | Cold Chain Markets Project and Municipal Palace Project |
| --- | --- |
| CPP | Partial Payment Account |
| FET | Fair and equitable treatment |
| FPS | Full protection and security |
| First Week Hearing | Hearing on Preliminary Objections, Merits and Quantum, held from February 24 to 28, 2020 |
| Hearing | First Week Hearing and Second Week Hearing |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| INAC | National Institute for the Arts |
| Institution Rules | ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings |
| La Chorrera Project | La Chorrera, led by the Judicial Authority |
| Markets Project | Pacora and Juan Díaz Markets, led by the Municipality of Panama |
| MEF | Ministry of Economy and Finance |
| MFN | Most favored nation |
| MINSA or Ministry | Ministry of Health |
| MINSA Capsi Project or MINSA Project | MINSA Capsi, led by the Ministry of Health |
| MoP | Ministry of the Presidency |
| Municipal Palace Project | Municipal Palace of Colón, led by the Municipality of Colón |
| Mr. Rivera | Mr. Oscar Iván Rivera |

| Omega Consortium (or Consortium) | Omega US and Omega Panama |
|---|---|
| Omega Panama | Omega Engineering Inc. |
| Omega US | Omega Engineering LLC |
| Request | Request for Arbitration, dated November 30, 2016, from Mr. Oscar Rivera and Omega Engineering LLC against the Republic of Panama |
| Respondent or Panama or the State | Republic of Panama |
| R-[#] | Respondent's Exhibit |
| Resp. Costs | Respondent's Submission on Costs, dated January 21, 2021 |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits and Memorial on Preliminary Objections, dated January 7, 2019 |
| Resp. PHB | Respondent's Post Hearing Brief, dated January 8, 2021 (Including "VarelaLeaks" Annex) |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Preliminary Objections, dated November 18, 2019 |
| Resp. Response to U.S. Submission | Respondent's Response to the U.S. Submission as a non-disputing party, dated June 30, 2020 |
| RL-[#] | Respondent's Legal Authority |
| Six Projects | (a) CDLA Project;<br>(b) MINSA Capsi Project or MINSA Project;<br>(c) La Chorrera Project;<br>(d) Municipal Palace Project;<br>(e) Cold Chain Market Project and together with the Municipal Palace Project, the Colón Projects); and<br>(f) Markets Project. |

| Second Week Hearing | Hearing on Preliminary Objections, Merits and Quantum, held from October 13 to 16, 2020 |
|---|---|
| Termination Resolution | Resolution No. 391-14/DG-DAJ dated December 23, 2014 (C-0044) |
| TPA | United States – Panama Trade Promotion Agreement signed on June 28, 2007, which entered into force on October 31, 2012 |
| Tr. Day [#] [Speaker(s)] [page:line] | Transcript of the Hearing |
| Transmittal Letter | Letter of Transmittal of the BIT to the President on February 20, 1986 |
| Treaties | BIT and the TPA |
| Tribunal | Arbitral Tribunal constituted on May 1, 2017 |

## LIST OF CASES

| | |
|---|---|
| *Parkerings v. Lithuania* | *Parkerings-Compagniet AS v. Republic of Lithuania* (ICSID Case No. ARB/05/8), Award, September 11, 2007 **(CL-0041)** |
| *Saluka v. Czech Republic* | *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March, 17, 2006 **(CL-0038)** |
| *Impregilo v. Pakistan* | *Impregilo S.p.A. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/3), Decision on Jurisdiction, April 22, 2005 **(RL-0030)** |
| *Waste Management v. Mexico* | *Waste Management, Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award, April 30, 2004 **(CL-0033)** |
| *Eastern Sugar v. Czech Republic* | *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, March 27, 2007 **(RL-0032)** |
| *Continental Casualty v. Argentina* | *Continental Casualty Company v. Argentine Republic* (ICSID Case No. ARB/03/9), Award, September 5, 2008 **(CL-0110)** |
| *Noble Ventures v. Romania* | *Noble Ventures, Inc. v. Romania* (ICSID Case No. ARB/01/11), Award, October 12, 2005 **(CL-0078)** |
| *Pac Rim Cayman LLC v. El Salvador* | *Pac Rim Cayman LLC v. Republic of El Salvador* (ICSID Case No. ARB/09/12), Decision on Respondent's Jurisdictional Objections, June 1, 2012 **(CL-0185)** |
| *Azurix v. Argentina* | *Azurix Corp. v. Argentine Republic* (ICSID Case No. ARB/01/12), Award, July 14, 2006 **(CL-0025)** |
| *Siemens v. Argentina* | *Siemens A.G. v. Argentine Republic* (ICSID Case No. ARB/02/8), Award, February 6, 2007 **(CL-0008)** |
| *Biwater Gauff v. Tanzania* | *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania* (ICSID Case No. ARB/05/22), Award, July 24, 2008 **(CL-0054)** |
| *World Duty Free v. Kenya* | *World Duty Free Company Limited v. Republic of Kenya* (ICSID Case No. ARB/00/7), Award, October 4, 2006 **(RL-0003)** |
| *Spentex v. Uzbekistan* | *Spentex Netherlands, B.V. v. Republic of Uzbekistan* (ICSID Case No. ARB/13/26), Award, December 27, 2016 **(RL-0004)** |
| *Hamester v. Ghana* | *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana* (ICSID Case No. ARB/07/24), Award, June 18, 2010 **(RL-0006)** |
| *Inceysa v. El Salvador* | *Inceysa Vallisoletana S.L. v. Republic of El Salvador* (ICSID Case No. ARB/03/26), Award, Agosto 2, 2006 **(CL-0067)** |

| Plama v. Bulgaria | *Plama Consortium Limited v. Republic of Bulgaria* (ICSID Case No. ARB/03/24), Award, August 27, 2008 **(RL-0008)** |
|---|---|
| Churchill Mining v. Indonesia | *Churchill Mining Plc and Planet Mining Pty Ltd, formerly ARB/12/40 v. Republic of Indonesia* (ICSID Case No. ARB/12/40 and 12/14), Award, December 6, 2016 **(RL-0010)** |
| Vivendi Annulment | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No: ARB/97/3), Decision on Annulment, July 3, 2002 **(RL-0019)** |
| El Paso v. Argentina | *El Paso Energy International Company v. Argentine Republic* (ICSID Case No. ARB/03/15), Decision on Jurisdiction, April 27, 2006 **(RL-0020)** |
| SGS v. Philippines | *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines* (ICSID Case No. ARB/02/6), Decision of the Tribunal on Objections to Jurisdiction, January 29, 2004 **(RL-0022)** |
| Getma v. Guinea | *Getma International and others v. Republic of Guinea* (ICSID Case No. ARB/11/29), Decision Regarding Jurisdiction, December 29, 2012 **(RL-0050)** |
| Klöckner v. Cameroon | *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais* (ICSID Case No. ARB/81/2), Award **(RL-0051)** |
| Alvarez y Marin v. Panama | *Álvarez y Marín Corporación S.A. and others v. Republic of Panama* (ICSID Case No. ARB/15/14), Award, October 12, 2018 **(CL-0146)** |
| Wena Hotels v. Egypt | *Wena Hotels Limited v. Arab Republic of Egypt* (ICSID Case No. ARB/98/4), Award, December 8, 2000 **(CL-0010)** |
| Rompetrol v. Romania | *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Award, May 6, 2013 **(CL-0126)** |
| Impregilo v. Argentina | *Impregilo S.p.A. v. Argentine Republic* (ICSID Case No. ARB/07/17), Award, June 21, 2011 **(CL-0083)** |
| Phoenix Action v. Czech Republic | *Phoenix Action Ltd v. Czech Republic* (ICSID Case No. ARB/06/5), Award, April 15, 2009 **(RL-0005)** |
| AWG v. Argentina | *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A v. Argentine Republic* (ICSID Case No. ARB/03/19), Decision on Liability, July 30, 2010 **(CL-0011)** |
| Duke Energy v. Ecuador | *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador* (ICSID Case No. ARB/04/19), Award, August 18, 2008 **(CL-0037)** |

| *Spyridon Roussalis v. Romania* | *Spyridon Roussalis v. Romania* (ICSID Case No. ARB/06/1), Award, December 7, 2011 **(RL-0035)** |
|---|---|
| *Enron v. Argentina* | *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic* (ICSID Case No. ARB/01/3), Award, May 22, 2007 **(CL-0094)** |

## I.   INTRODUCTION AND PARTIES

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of three treaties: (i) the Treaty between the United States of America and the Republic of Panama Concerning the Treatment and Protection of Investment signed on October 27, 1982, which entered into force on May 30, 1991 (the "BIT"),[1] (ii) the United States – Panama Trade Promotion Agreement signed on June 28, 2007, which entered into force on October 31, 2012 ("TPA" and together with the BIT, the "Treaties"), and (iii) the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "ICSID Convention").

2.   The Claimants are Mr. Oscar Iván Rivera Rivera ("Mr. Rivera"), a natural person who is a national of the United States of America, and Omega Engineering LLC ("Omega" or "Omega US"),[2] a company incorporated in the Commonwealth of Puerto Rico, United States of America (together, the "Claimants").

3.   The Respondent is the Republic of Panama ("Panama" or the "Respondent" or the "State").

4.   The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.   This dispute relates to a series of measures taken by the Panamanian government that included the termination of project contracts, the failure to pay invoices, the failure to issue permits, and the initiation of criminal investigations against Mr. Rivera.

---

[1] The BIT was amended by the Protocol between the Government of the United States of America and the Republic of Panama Amending the Treaty Concerning the Treatment and Protection of Investments of October 27, 1982, signed on June 1, 2000, entered into force on May 14, 2001.

[2] Omega US was originally incorporated as Omega Engineering Corp. (C-0002) and eventually reorganized as a limited liability company (C-0012).

6. According to the Claimants, Mr. Rivera, the owner of a successful construction business based principally in the Puerto Rican public works sector, decided to move the focus of his operations to Panama beginning in autumn 2009. He established a local Panamanian company, "Omega Panama," which he paired with his experienced and thriving United States company, Omega US, to form the "Omega Consortium" (also referred to in this Award as the "Consortium"). Mr. Rivera's plan was to develop Omega Panama into a major public works contractor on its own, while initially winning bids on the strength of the know-how and reputation of Omega US.

7. As the Claimants recount it, the plan was proceeding apace; the Omega Consortium won ten bids in Panama between 2010 and 2013. By mid-2014, the Consortium had completed one project and eight contracts were ongoing. However, in 2012, a friend of Mr. Rivera introduced him to the then Vice-President of Panama, Juan Carlos Varela, who was preparing to stand for the Presidency. Mr. Rivera testifies that later in 2012, probably November, after a collegial dinner, Mr. Varela took Mr. Rivera aside and, in a one-to-one meeting, solicited a US $600,000 campaign contribution from him. Mr. Rivera declined to make the contribution. When Mr. Varela became President in July 2014, the Claimants' case is that he quickly retaliated against Mr. Rivera for refusing to contribute to his campaign: President Varela turned the power of the State against Mr. Rivera and the Omega Consortium.

8. The Claimants contend that several State organs implemented President Varela's retaliation desire. Agencies responsible for project payments to the Consortium for its ongoing work as contractor delayed payments and manoeuvred to terminate the eight ongoing Project contracts without valid justification. The Varela Administration then acted against Mr. Rivera, personally. The State falsely implicated him in a scheme to bribe a judge for the purposes of winning a public works contract (concerning the La Chorrera Project) for the Consortium. The State launched investigations into alleged corruption and money laundering, which caused Mr. Rivera to abandon Panama completely and remain at his home in the United States. Panama issued an arrest warrant and sought his extradition, but the United States authorities denied the extradition petition for lack of evidence. While the investigation did not result in the

2

formal prosecution of Mr. Rivera, Panama's actions – even if not motivated by President Varela's desire for retaliation – ruined Mr. Rivera's entire business and his reputation.

9. On the basis of their factual allegations, the Claimants submit that Panama's actions violated the BIT and TPA's provisions on fair and equitable treatment ("FET"), full protection and security ("FPS"), creeping expropriation, and umbrella clause. The Claimants seek damages in the amount of US ▮▮▮▮▮▮▮, plus interest, for (i) losses on the eight contracts wrongfully terminated; (ii) losses on future contracts that Omega Panama was barred from bidding on; and (iii) moral damages in relation to the mistreatment of Mr. Rivera, personally.

10. The State advances a very different narrative at every step. Panama argues that Mr. Rivera had an unimpressive contractor record in Puerto Rico, which included numerous lawsuits. When the Puerto Rican public works program slowed, he decided to move his business focus to Panama to take advantage of an anticipated boom in public works projects. However, Mr. Rivera did not intend the Panamanian move to be permanent; it was simply a short-term opportunity before moving to the next Latin American country with a burgeoning public works program.

11. The bids that the Omega Consortium won in Panama did not, according to the State, bespeak a bright future for Omega Panama. By the time that Mr. Varela became President in Summer 2014, the Omega Consortium lacked the financial wherewithal to survive the standard, slow pace of government payments that all construction companies in the Panamanian public works sector faced. Poor performance and financial weakness, not any retaliation directed by President Varela, ended the Consortium's project contracts. The Consortium's abandonment of projects was broadly aligned with Mr. Rivera's personal abandonment of Panama.

12. The State rejects the allegation that President Varela directed a campaign of retaliation against Mr. Rivera; it contends that there is no reliable evidence that President Varela solicited a campaign contribution, as well as no evidence of a subsequent intent to damage Mr. Rivera and his business. Rather, Panama states that in 2012 Mr. Rivera

3

participated in a scheme to bribe the then Chief Justice Alejandro Moncada Luna to obtain the La Chorrera Courthouse project. When the scheme came to light – Justice Moncada Luna eventually pleaded guilty to unjust enrichment and falsifying documents – the State seized Omega Panama's bank accounts and launched criminal investigations of Mr. Rivera, who, as of early 2015, remained in the United States and would no longer appear in Panama.

13.   In response to the Claimants' treaty claims, Panama lodges several jurisdictional objections: (i) corruption (the alleged bribery of Moncada Luna) precludes treaty relief; (ii) the Claimants' claims are commercial rather than treaty-based; (iii) the BIT claims must be resolved under the dispute resolution provisions in the project contracts; and (iv) the Tribunal has no jurisdiction over claims that rest on Panama's criminal investigation of Mr. Rivera. Apart from the jurisdictional barriers, Panama argues that its alleged liability has not been proved: (a) it did not engage in a campaign of harassment against Omega Consortium; (b) no "taking" of an investment occurred; (c) under the correct FET "minimum standard," the Claimants have not made a case; and (d) even under the Claimants' incorrect FET standard, they have failed to show denial of legitimate expectations or unreasonable /arbitrary treatment.

14.   Even if liability were established, the State says that (a) the amount claimed for works allegedly performed on project contracts is overstated; (b) the amount claimed for alleged losses on potential future contracts should be completely rejected, because, *inter alia*, the Claimants' expert wrongly provided a valuation of the Consortium instead of Omega Panama; and (c) even if Mr. Rivera's moral damages claim were cognizable, the only amount that could properly be attached to it is zero.

15.   Finally, the Parties have each made costs submissions, and the figures are quite different: the Claimants' total costs claim is US ███████. The Respondent's total costs claim is US ██████.

## II.   PROCEDURAL HISTORY

16.   On November 30, 2016, ICSID received a Request for Arbitration dated November 30, 2016, from Mr. Oscar Rivera and Omega Engineering LLC against the Republic of Panama (the "Request").

17.   On December 30, 2016, the Acting Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal ("Tribunal") as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "Institution Rules").

18.   The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention, as follows: the Tribunal would consist of three arbitrators, one to be appointed by the Claimants and one by the Respondent, with the third, presiding arbitrator, to be appointed by agreement of the Parties.

19.   The Tribunal is composed of Laurence Shore, a national of Great Britain and the United States, President, appointed by agreement of the Parties; Dr. Horacio Grigera Naón, a national of Argentina, Co-arbitrator, appointed by the Claimants; and Professor Zachary Douglas KC, a national of Australia, Co-arbitrator, appointed by the Respondent.

20.   On May 1, 2017, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Natalí Sequeira, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

21.   In accordance with Arbitration Rule 13(1), the Tribunal held a first session with the Parties on June 9, 2017, by teleconference.

5

22.     Following the first session, on June 22, 2017, the Tribunal issued Procedural Order
        No. 1, recording the agreement of the Parties on procedural matters. Procedural Order
        No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect
        from April 10, 2006, that the procedural language would be English, and that the place
        of proceedings would be Washington, D.C. Procedural Order No. 1 also sets out a
        schedule for the jurisdictional/merits phase of the proceedings. The Parties agreed to
        the publication of the award, decisions, orders and pleadings, in accordance with
        Article 10.21 of the TPA.

23.     On July 30, 2017, the Parties were informed that ICSID would proceed to publish the
        Request and its accompanying documentation, the Claimants' letter dated
        December 21, 2016 and its enclosures (Nos. 1 to 5), and Procedural Order No. 1 dated
        June 22, 2017.

24.     On August 4, 2017, the Centre informed the Parties that Ms. Natalí Sequeira, ICSID
        Legal Counsel, would be taking maternity leave, and that during her absence,
        Ms. Luisa Fernanda Torres, ICSID Legal Counsel, would serve as Secretary of the
        Tribunal.

25.     In relation to the Centre's communication of July 30, 2017, on August 5, 2017, the
        Claimants submitted redacted versions of several exhibits related to their Request.

26.     By letter dated August 9, 2017, ICSID conveyed to the Parties Mr. Shore's disclosure
        in which he informed the Parties that he was resigning from Herbert Smith Freehills
        to join the BonelliErede law firm as a partner in its Milan office, and of said law firm's
        involvement as counsel in an ICC arbitration against the Panama Canal Authority.
        The Parties subsequently took note of the disclosure without observations.

27.     By email dated October 18, 2017, the Claimants informed the Tribunal that the Parties
        agreed to extend the submission deadline of the Claimants' Memorial on the Merits
        ("Cl. Mem.") until April 20, 2018 and submitted a proposed revised procedural
        calendar. The Tribunal approved the revised procedural calendar on October 24, 2017.

28.   On January 12, 2018, the Centre informed the Parties that Ms. Natalí Sequeira, ICSID Legal Counsel, resumed her functions as Secretary of the Tribunal.

29.   On January 19, 2018, the Tribunal informed the Parties that, due to a scheduling conflict, the dates reserved for the hearing on Preliminary Objections in one of the scenarios of Annex A of Procedural Order No. 1 would need to be modified and invited the Parties to confer and confirm their availability for the new dates proposed.

30.   The Parties informed the Tribunal of their availability, and, on February 6, 2018, a second revised procedural calendar was adopted.

31.   By email dated April 14, 2018, the Claimants informed the Tribunal of the Parties' agreement to extend the submission deadline of the Cl. Mem. until June 25, 2018. The Tribunal approved the extension on April 19, 2018, and later invited the Parties to submit a joint proposal for the remainder of the procedural timetable.

32.   On May 14, 2018, the Claimants submitted the Parties' agreed revised procedural calendar. The Tribunal and the Parties had further exchanges relating to the procedural calendar on May 23 and 24, 2018, and on June 5, 2018 the Tribunal issued a further revised procedural calendar.

33.   On June 25, 2018, the Claimants filed the Cl. Mem., together with the witness statement of Mr. Oscar Rivera; the expert report of Messrs. Pablo López Zadicoff and Sebastián Zuccon; the expert opinion of Mr. Greg A. McKinnon; Exhibits C-109 through C-409; and Legal Authorities CL-6 through CL-122. The Centre subsequently published the redacted submission on ICSID's website.

34.   On October 2, 2018, the Claimants requested that the Tribunal clarify that the procedural calendar would follow "Scenario 1," as the Respondent had not submitted a request for bifurcation. By letter dated October 5, 2018, the Tribunal informed the Parties that the case would proceed under Scenario 1 of the revised procedural calendar.

35. On January 7, 2019, the Respondent filed its Counter-Memorial on the Merits and Memorial on Preliminary Objections ("Resp. C-Mem."), together with the witness statements of Mr. Jorge Villalba, Dr. James Bernard, Ms. Vielsa Ríos, Mr. Nessim Barsallo Abrego, Ms. Carmen Chen, Mr. Eric Díaz; the expert report of Dr. Daniel Flores; Exhibits R-1 through R-110; and Legal Authorities RL-1 through RL-43. The Centre subsequently published the redacted submission on ICSID's website.

36. On January 22, 2019, Mr. Ricardo Ampudia and Mr. Carlos F. Concepción, counsel for the Claimants, notified the ICSID Secretariat that they had moved law firms and were now at Shook Hardy Bacon, LLP.

37. On January 29, 2019, the Respondent requested an extension of time for the document production phase in the procedural calendar. The extension was subsequently granted by the Tribunal.

38. On February 26, 2019, following exchanges between the Parties, and in accordance with Procedural Order No. 1, the Parties submitted their respective Redfern Schedules for the Tribunal to decide on production of documents.

39. On March 8, 2019, the Claimants requested leave for the Parties to resubmit exhibits already in the record for which translations or native files were missing. The request was subsequently granted by the Tribunal.

40. On March 11 and 12, 2019, the Parties filed their respective resubmitted exhibits.

41. On March 14, 2019, the Tribunal informed the Parties that it was reviewing their respective Redfern Schedules and would issue its decision on March 19, 2019.

42. On March 19, 2019, the Tribunal issued its decision concerning the Parties' respective document production requests.

43. On May 24, 2019, the Claimants informed the Tribunal of the Parties' agreement on a three-day extension of the deadline for the filing of the Claimants' Reply on the Merits and Counter-Memorial on Preliminary Objections ("Cl. Reply") and the

amended procedural calendar. The request and amended procedural calendar were subsequently approved by the Tribunal.

44.    On May 30, 2019, the Claimants filed the Cl. Reply, together with the witness statements of Mr. Oscar Rivera, Mr. Frankie J. López, Ms. Karina Mirones, Mr. Tony Burke, Ms. María Eugenia Herrera; the expert reports of Ms. Alison Jiménez of Bates Group, Mr. Orlando J. Pérez, Mr. Greg A. McKinnon of Hemming Morse, Messrs. Pablo López Zadicoff and Sebastián Zuccon of Compass Lexecon, Messrs. José María Gimeno and José Antonio Moreno, Messrs. Fidel Ponce and Arturo Chong of ARC Consulting; Exhibits C-410 through C-750; and Legal Authorities CL-123 through CL-221. The Centre subsequently published the redacted submission on ICSID's website.

45.    On June 14, 2019, the Respondent submitted an agreed amended procedural calendar for the remaining submissions. The amended procedural calendar was subsequently granted by the Tribunal on June 18, 2019.

46.    On September 6, 2019, the Claimants submitted the Cl. Reply and Resp. C-Mem. with the corresponding redactions for publication on ICSID's website pursuant to Section 24 of Procedural Order No. 1. The Centre published the documents on September 13, 2019.

47.    On September 12, 2019, the Respondent requested additional days be set aside for the hearing on the Merits and Jurisdiction.

48.    Following the Tribunal's invitation to file observations, on September 18, 2019, the Claimants responded to the Respondent's request for additional hearing days, indicating that it was premature, and asked to defer the discussion of additional hearing days until after the final pleading had been filed. The Respondent sent a letter later the same day in response to the Claimants' observations.

49.    On September 23, 2019, the Tribunal informed the Parties that it would be prudent to provisionally set aside three additional hearing days and asked the Parties to confirm their availability for the dates of March 18-20, 2020.

50.   Following the Claimants' unavailability for the dates proposed, on October 31, 2019, the Tribunal proposed to the Parties to reserve 3 additional hearing days during the period of March 30, 2020, through April 2, 2020.

51.   On November 4, 6 and 7, 2019, the Parties submitted correspondence regarding (a) their availability on the provisional hearing dates identified by the Tribunal, (b) Panama's damages expert Dr. Flores' schedule, (c) the number of provisional days, and (d) the issues to be addressed during the hearing.

52.   On November 8, 2019, the Tribunal confirmed the additional dates and asked the Parties to reserve the provisional period (*i.e.,* March 30 through April 2, 2020).

53.   On November 11, 2019, the Claimants filed further observations in response to the Respondent's proposal of November 7, 2019, on issues to be addressed during the hearing.

54.   On November 18, 2019, the Respondent filed its Rejoinder on the Merits and Reply on Preliminary Objections ("Resp. Rej."), together with the witness statements of Messrs. Fernando Duque, Ivan Zarak, Juan Carlos Varela, Jorge Villalba, Eric Díaz, Nessim Barsallo Abrego, Ms. Vielsa Ríos, Ms. Yadisel Buendía; the expert reports of Dr. Daniel Flores, Mr. Adán Arjona, Mr. Roy Pollitt; Exhibits R-111 through R-147; and Legal Authorities RL-44 through RL-73. The Centre published the documents on ICSID's website on February 6, 2020.

55.   On November 21, 2019, the Respondent filed a response to the Claimants' letter of November 11, 2019. At the Tribunal's invitation, the Claimants submitted further observations on November 25, 2019.

56.   On December 3, 2019, the Tribunal directed the Parties to confer and identify the witnesses for cross-examination at the hearing.

57.   On December 9, 2019, the Centre informed the Parties that Ms. Catherine Kettlewell, ICSID Legal Counsel, would now serve as Secretary of the Tribunal.

58.   On December 9, 2019, the Claimants wrote in response to the corruption report filed by Mr. Roy Pollitt on behalf of the Respondent. The Claimants requested that the Tribunal order the Respondent to produce all the documents and other materials used by Mr. Pollitt for purposes of preparing his Report. The Claimants asserted that the Respondent and their corruption expert had accesses to documents relating to the criminal investigation of the Claimants and Omega Panama, as well as documents from the Moncada Luna investigation file relating to the same entities/individual.

59.   On December 12, 2019, the Respondent affirmed that it had produced all the necessary documentation during the document production phase and that its expert, Mr. Pollitt, did not have access to the files ascertained by the Claimants, but only to "relevant portions."

60.   On December 13, 2019, the Claimants filed a reply to the Respondent's letter of December 12, 2019.

61.   On December 18, 2019, the Tribunal issued Procedural Order No. 2 deciding that "all documents provided to and reviewed by Mr. Pollitt shall be expeditiously produced to Claimants."

62.   On December 30, 2019, the Tribunal requested that the Parties submit their respective lists of witnesses and experts to call for cross-examination at the hearing and confirm their availability for a pre-hearing organizational meeting.

63.   By email dated December 30, 2019, the Respondent requested an extension to submit the witnesses and experts list. On January 2, 2020, the Tribunal denied the Respondent's request and invited the Parties to submit by January 31, 2020, any additional witnesses or experts that each Party wished to add to their list.

64.   On January 6, 2020, the United States informed the Tribunal that it intended to file a Non-Disputing Party submission by February 3, 2020. The Tribunal subsequently confirmed the date.

11

65. Following the Parties' exchanges regarding the date for the pre-hearing organizational meeting, on January 8, 2020, the Tribunal informed the Parties that the pre-hearing organizational meeting would take place on January 13, 2020 and transmitted the draft agenda for the Parties' consideration.

66. On January 12, 2020, the Parties submitted their agreed comments and respective positions where no agreement was reached on the agenda for the pre-hearing conference call.

67. On January 13, 2020, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference. On the same date, the Parties transmitted their respective list of witnesses and experts to be called for cross-examination during the hearing, and the Tribunal Secretary informed the representatives of the United States government of the time and place of the hearing.

68. On January 20, 2020, the Claimants filed their Rejoinder on Preliminary Objections ("Cl. Rej."), together with the witness statements of Messrs. Oscar Rivera, and Frankie López; the expert reports of Ms. Alison Jiménez, Messrs. Fidel Ponce and Arturo Chong of ARC Consulting, Mr. José A. Troyano; Exhibits C-752 through C-942; and Legal Authorities CL-222 through CL-268. The Centre published the documents on February 20, 2020.

69. On January 31, 2020, the Parties submitted to the Tribunal the final list of witnesses and experts to be called for cross-examination.

70. On February 3, 2020, the United States of America presented its Submission as a Non-Disputing Party pursuant to Article 10.20.2 of the TPA.

71. As instructed by the Tribunal, on February 5, 2020, the Parties submitted a proposed agenda for the hearing.

72. On February 6, 2020, the Tribunal issued Procedural Order No. 3, recording the agreement of the Parties on procedural matters for the hearing. Procedural Order No. 3 provided, *inter alia*, for (a) a two-part hearing divided in two separate weeks, (b) the

allocation of time between the parties, (c) the form of examination of witnesses and experts, (d) the Submission of the Non-Disputing Party and the observations of the Parties, and (e) the protocol for protected information during the public hearing.

73.    On February 11, 2020, the Respondent raised an objection on the introduction of certain documents and information submitted by the Claimants in the Cl. Rej. On February 12, 2020, as invited by the Tribunal, the Claimants submitted their observations on the Respondent's objection, together with Annexes 1 through 11. On February 13, 2020, as invited by the Tribunal, the Respondent submitted a final response in support of its application. On February 14, 2020, the Tribunal rendered its decision, dismissing the Respondent's objection.

74.    On February 11, 2020, the Parties requested clarification on certain items contained in Procedural Order No. 3. The Tribunal provided further instructions on February 12, 2020.

75.    On February 19, 2020, the Parties submitted a final order and timing for the witnesses and experts to be examined during the Hearing.

76.    On February 22, 2020, the Respondent raised an issue regarding the use and disclosure of protected information at the hearing. On February 23, 2020, the Claimants submitted their observations on the Respondent's communication of February 22, 2020. On the same date, the Tribunal decided that the opening presentations of both Parties would be fully moderated. The Tribunal further addressed this issue at the beginning of the hearing.

77.    A hearing on Preliminary Objections, Merits and Quantum was held in Washington, D.C., from February 24 to February 28, 2020 (the "First Week Hearing"). The following persons were present at the First Week Hearing:

*Tribunal*:
Mr. Laurence Shore                      President
Dr. Horacio A. Grigera Naón             Co-Arbitrator
Prof. Zachary Douglas KC                Co-Arbitrator

13

*ICSID Secretariat*:
  Ms. Catherine Kettlewell                    Secretary of the Tribunal

*For the Claimants*:
  Ms. Melissa Gorsline                     Jones Day
  Mr. Charles Kotuby                       Jones Day
  Mr. Thomas Cullen, Jr.                  Jones Day
  Mr. Lee Coffey                         Jones Day
  Mr. Fahad Habib                       Jones Day
  Mr. Paul Hines                         Jones Day
  Mr. James Egerton Vernon             Jones Day
  Mr. Michael Daly                     Jones Day
  Ms. Maria Pradilla Picas               Jones Day
  Ms. Carla Gharibian                  Jones Day
  Ms. Paloma Cipolla Moguilevsky      Jones Day
  Ms. Kelsey Shroyer                  Jones Day
  Ms. Lorna Strachan                  Jones Day
  Mr. Janai Orina                      Jones Day
  Mr. Carlos F. Concepción           Shook, Hardy & Bacon
  Mr. Ricardo Ampudia              Shook, Hardy & Bacon
  Mr. Oscar Rivera                  Claimant & Witness, Omega Engineering
  Mr. Sebastián Zuccon             Compass Lexecon
  Mr. Diego de la Vega              Compass Lexecon

*For the Respondent*:
  Mr. Henry Weisburg                Shearman & Sterling LLP
  Mr. Christopher Ryan             Shearman & Sterling LLP
  Mr. Ricardo Alarcón              Shearman & Sterling LLP
  Ms. Anna Stockamore            Shearman & Sterling LLP
  Mr. Carlton Mosley              Shearman & Sterling LLP
  Mr. Adrian Stoute               Shearman & Sterling LLP
  Ms. Laura Castro                Republic of Panama
  Mr. Francisco Olivardia           Republic of Panama
  Mr. Ryan McCann               Quadrant Economics
  Mr. Tomas Arocha Silva            Quadrant Economics

*Court Reporter(s)*:
  Ms. Elizabeth Cicoria              Spanish-Language Court Reporter
  Mr. Dionisio Rinaldi              Spanish-Language Court Reporter
  Ms. Dawn Larson               English-Language Court Reporter

14

*Interpreters*:
    Ms. Silvia Colla              English-Spanish Interpreter
    Mr. Daniel Giglio          English-Spanish Interpreter
    Mr. Charles Roberts       English-Spanish Interpreter

*Non-Disputing Party (United States of America)*:
    Ms. Nicole Thornton       U.S. Department of State
    Mr. John Blanck           U.S. Department of State

78. During the First Week Hearing, the following persons were examined:

*On behalf of the Claimants*:
  **Witnesses**
    Mr. Oscar Rivera          Claimant & Witness, Omega Engineering
    Mr. Frankie López        Formerly Employed by Omega Engineering
  **Experts**
    Mr. Pablo López Zadicoff    Compass Lexecon

*On behalf of the Respondent*:
  **Witnesses**
    Mr. Jorge Villalba         Republic of Panama
    Mr. Nessim Barsallo       Republic of Panama
    Ms. Yadisel Buendía      Republic of Panama
  **Experts**
    Dr. Daniel Flores          Quadrant Economics

79. At the end of the First Week Hearing, the Tribunal instructed the Parties to provide a proposed schedule for the Second Week Hearing, to be held from March 30, 2020, to April 2, 2020. On March 3, 2020, the Parties submitted the agreed schedule. The Parties also agreed that the Second Week Hearing would be fully moderated, and that non-protected information would be released after the hearings were completed and materials properly redacted.

80. On March 10, 2020, the Tribunal invited the Parties to indicate whether the Second Week Hearing could be held by video-conference in light of the restrictions to travel due to COVID-19. One of the Parties did not agree to the possibility of video-conferencing. In light of this, the Tribunal decided to postpone the Second Week

Hearing to be held within the period of October 12 to 27, 2020. The Parties were invited to indicate their availability within this period. On March 16, 2020, the Claimants confirmed their availability for the entire proposed period. On March 18, 2020, the Tribunal invited the Parties to block October 13 to 16, 2020. The Respondent confirmed its availability for the proposed dates on April 30, 2020.

81.　On June 30, 2020, the Parties filed simultaneous comments on the Non-Disputing Party's written Submission ("Cl. Response to U.S. Submission" and "Resp. Response to U.S. Submission").

82.　On August 14, 2020, the Tribunal proposed to the Parties to hold the Second Week Hearing remotely. On August 20, 2020, both Parties confirmed their agreement and availability of witnesses and experts to hold the Second Week Hearing by virtual modality.

83.　On September 22, 2020, the Tribunal invited the Parties to comment on a proposed procedural order to organise the Second Week Hearing. On October 2, 2020, the Parties filed their revisions and agreements to the proposed procedural order. On October 4, 2020, the Parties submitted further agreed changes. On October 6, 2020, the Tribunal issued Procedural Order No. 4, which contained the agreement of the Parties on procedural matters for the Second Week Hearing.

84.　On September 24, 2020, the Claimants submitted a request to introduce new evidence into the record. On September 29, 2020, the Respondent filed observations to the Claimants' request. The Claimants submitted further arguments in support of their request on October 1, 2020.

85.　On October 1, 2020, the Respondent informed the Tribunal that Mr. Juan Carlos Varela would not be able to testify at the Second Week Hearing. On October 7, 2020, the Claimants submitted their comments to the Respondent's October 1 communication.

86.　On October 4, 2020, the Claimants requested the Tribunal leave for the Panamanian law experts to address a new factual development during their testimony in the Second

Week Hearing. The Respondent filed comments on October 6, 2020. The Claimants filed further comments on October 7, 2020.

87. On October 7, 2020, the Tribunal Secretary informed the representatives of the United States Government of the time and modality of the Second Week Hearing.

88. On October 8, 2020, the Tribunal issued Procedural Order No. 5, which addressed the Claimants' request to introduce new documents, the matter of Mr. Varela not attending to testify during the hearing, and the Claimants' request to introduce a new factual development into the record.

89. On October 9, 2020, as ordered by the Tribunal in Procedural Order No. 5, the Claimants submitted into the record Exhibits C-742 SPA resubmitted 2, C-0059 SPA resubmitted 2, C-0617 SPA resubmitted, C-0949 SPA to C-953 SPA.

90. On the same date, October 9, 2020, the Parties submitted their proposals for a hearing time schedule. The following day, October 10, 2020, having heard the Parties' arguments, the Tribunal transmitted to the Parties the finalised schedule for the Second Week Hearing.

91. On October 12, 2020, the Tribunal, the Parties and the ICSID Secretariat held a final testing of virtual connections in preparation for the Second Week Hearing.

92. The second part of the Hearing on Jurisdiction, Merits and Quantum was held in Washington, D.C. from October 13 to 16, 2020 (the "Second Week Hearing"). The following persons were in attendance in virtual modality at the Second Week Hearing:

*Tribunal*:
Mr. Laurence Shore                                    President
Dr. Horacio A. Grigera Naón                     Co-Arbitrator
Prof. Zachary Douglas KC                         Co-Arbitrator

*ICSID Secretariat*:
Ms. Catherine Kettlewell                          Secretary of the Tribunal
Ms. Ivania Fernández                               ICSID Paralegal

17

*For the Claimants*:

| | |
|---|---|
| Ms. Melissa Gorsline | Jones Day |
| Ms. Maria Pradilla Picas | Jones Day |
| Mr. Lee Coffey | Jones Day |
| Mr. Charles Kotuby | Jones Day |
| Mr. Michael Daly | Jones Day |
| Ms. Paloma Cipolla Moguilevsky | Jones Day |
| Ms. Kelsey Shroyer | Jones Day |
| Mr. Fahad Habib | Jones Day |
| Mr. Paul Hines | Jones Day |
| Mr. Carlos F. Concepción | Shook, Hardy & Bacon |
| Mr. Ricardo Ampudia | Shook, Hardy & Bacon |
| Ms. Lorna Strachan | Jones Day |
| Mr. Matthew Brewer | Jones Day |
| Mr. David Voltaggio | Jones Day |
| Mr. Andrew Youngman | Jones Day |
| Mr. Erick Rodríguez | Shook, Hardy & Bacon |
| Mr. Mario Lao | Shook, Hardy & Bacon |
| Mr. Raphael Hagos | Shook, Hardy & Bacon |
| Mr. Oscar Rivera | Claimant & Witness, Omega Engineering |
| Ms. Tania Troyano | Troyano & Troyano Abogados |

*The Claimants' Witness / Expert Observers*:

| | |
|---|---|
| Mr. David Mizrachi | MDU Legal |
| Mr. Donald Saez | MDU Legal |

*For the Respondent*:

| | |
|---|---|
| Mr. Henry Weisburg | Shearman & Sterling LLP |
| Mr. Christopher Ryan | Shearman & Sterling LLP |
| Ms. Anna Stockamore | Shearman & Sterling LLP |
| Mr. Carlton Mosley | Shearman & Sterling LLP |
| Mr. Adrian Stoute | Shearman & Sterling LLP |
| Mr. Kevin Bryant | Shearman & Sterling LLP |
| Mr. Frank Johnson | Shearman & Sterling LLP |
| Mr. Jonathan Bonds | Shearman & Sterling LLP |
| Mr. Eduardo Snape | Shearman & Sterling LLP |
| Mr. Aristides Valdonedo | Ministry of Economy and Finance of the Republic of Panama |
| Ms. Germaine Perret | Ministry of Economy and Finance of the Republic of Panama |
| Mr. Miguel Clare | Ministry of Economy and Finance of the Republic of Panama |

18

| Mr. Aristides Barnett | Ministry of Economy and Finance of the Republic of Panama |
| Ms. Anais Guerra | Ministry of Economy and Finance of the Republic of Panama |
| Mr. Jorge Chamorro | Ministry of Economy and Finance of the Republic of Panama |
| Ms. Michelle Ferrara | GALA Law Firm |
| Mr. Diego Herrera | GALA Law Firm |
| Ms. Skyler Chi | Exiger |

*Court Reporter(s)*:
| Mr. Dante Rinaldi | Spanish-Language Court Reporter |
| Ms. Dawn Larson | English-Language Court Reporter |

*Interpreters*:
| Ms. Silvia Colla | English-Spanish Interpreter |
| Mr. Daniel Giglio | English-Spanish Interpreter |
| Mr. Charles Roberts | English-Spanish Interpreter |

*Platform Support*:
| Mr. Steve Schwartz | FTI Consulting |
| Mr. TJ Loebbaka | FTI Consulting |

*Non-Disputing Party (United States of America)*:
| Ms. Nicole Thornton | U.S. Department of State |
| Mr. John Blanck | U.S. Department of State |

93.   During the Second Week Hearing, the following persons were examined:

*On behalf of the Claimants*:
**Experts**
| Ms. Alison Jiménez | Bates Group |
| Justice José A. Troyano | Troyano & Troyano Abogados |
| Mr. Fidel Ponce | ARC Consulting |

*On behalf of the Respondent*:
**Witness**
| Mr. Iván Zarak | Former Vice Minister of Economy and Finance of the Republic of Panama |

**Experts**
Justice Adán Arjona

19

Mr. Roy Pollitt                          Exiger

94.     On October 26, 2020, the Tribunal informed the Parties of its decision to deny (i) the Claimants' request to strike the written testimony of Mr. Juan Carlos Varela, and (ii) the Respondent's application to strike certain exhibits from the record, sections of the ARC Consulting Report and parts of Mr. Ponce's oral testimony provided during the hearing.

95.     On November 10, 2020, as indicated by the Tribunal during the Second Week Hearing, the Tribunal communicated to the Parties a list of additional questions to be addressed in their post-hearing briefs.

96.     On December 4, 2020, the Claimants requested from the Tribunal a clarification on a prior ruling regarding evidence introduced into the record and sought for leave to introduce a new document into the record. On December 7, 2020, the Respondent commented on the Claimants' requests. The Tribunal issued its decision on both matters on December 11, 2020 and extended the deadline to submit post-hearing briefs until January 8, 2021.

97.     On December 16, 2020, the Parties submitted a joint request to extend the deadline for the Parties' cost submissions. On December 22, 2020, the Tribunal confirmed the Parties' agreement to extend the aforementioned deadline.

98.     The Parties filed simultaneous post-hearing briefs on January 8, 2021.

99.     In accordance with the transparency requirements of Article 10.21 of the US-Panama TPA, the pleadings and documents of the Parties, hearing transcripts, orders, awards and decisions of the Tribunal have been published on the ICSID website, save only as regards protected information designated by a Party, in this case concerning limited sensitive personal and commercial information.

100.    The Parties filed their costs submissions on January 21, 2021 ("Cl. Costs" and "Resp. Costs").

20

101.    The arbitral proceeding was closed on September 28, 2022.

## III.    OUTLINE OF THE DISPUTE

### A.    THE RELEVANT TREATY PROVISIONS

102.    As indicated in the "Introduction and Parties" section, above (paragraphs 7-9), the Claimants have brought claims under the BIT and the TPA based on their alleged investment in eight public works contracts and Panama's alleged violation of its treaty obligations regarding these contracts. The Claimants' claims also include Panama's pursuit of criminal charges against Mr. Rivera personally, arising from the Claimants' successful bid for one of these contracts (the La Chorrera Project contract). Five of the contracts are said, by the Claimants, to be covered by the provisions of the BIT, while three were entered into after the TPA entered into force and come under the TPA's provisions.[3] According to the Claimants, the relevant substantive protections provided by the two Treaties are effectively the same (*see, e.g.*, Cl. Reply, pages 205-255).[4]

103.    The Tribunal discusses in detail, in a separate section below ("The Corruption Investigation," Section IV), the Parties' differing factual accounts of how each of the eight contracts (one project comprised three contracts) came to an end, and whether the circumstances surrounding the termination of the projects constitute violations of the BIT and the TPA. The Parties have devoted the bulk of their memorials and hearing time to explaining the causes of the six project failures, as well as examining

---

[3] *See, e.g.*, Cl. Reply, fn 936: "The Contracts for the three MINSA CAPSI projects, Mercado Público de aa Ciudad Colón, and Ciudad de las Artes were executed prior to the TPA entering into force. Only the Órgano Judicial La Chorrera, Palacio Municipal, and Mercados Periféricos' Contracts were executed after the entry into force of the TPA"; *see also*, Cl. Rej. para. 324.

[4] The Claimants also argue, Cl. Rej., para. 325, that the Tribunal may exercise jurisdiction over the "BIT claims" under the TPA, which "does not textually exclude from its temporal application preexisting investments where – as here – the dispute manifests (*years*) after the TPA entered into force. . . . So even if this Tribunal were to find that the "dispute-settlement procedures upon which [the parties] have previously agreed" prevented it from exercising jurisdiction over the earlier Contracts under the BIT, it would *still* be able to exercise jurisdiction over *all of those claims* under Article 10.16 of the TPA" (emphasis in the original) (Article 10.16 is the arbitration provision in the TPA). *See also* Cl. PHB, para. 175 ("It is *undisputed* that the entire TPA applies to the *entire* investment and the *entirety* of these claims, and it is *common ground* that the TPA contains *no such restriction*" (emphasis in the original).

the bases for Panama's investigation into the Claimants' successful bid on the La Chorrera Project. Resolving those issues leads to the resolution of the claims that the Claimants have brought in this arbitration.

104.   While Panama has raised a series of jurisdictional objections, outlined below, Panama did not seek bifurcation of the proceedings for its objections to be considered as preliminary issues. Bifurcation, in any event, would have been unhelpful, since facts and legal issues relevant to the most significant jurisdictional objections merge with Panama's merits defenses. Panama also recognizes this by, for example, relying on ICSID jurisdictional decisions that, it says, are "equally valid" in the "context of a merits assessment."[5] Moreover, under the terms of the BIT and the TPA (and the ICSID Convention), as a matter of jurisdiction *ratione personae, ratione materiae,*[6] *ratione temporis,* and *ratione voluntatis,* it is apparent that the Claimants are *prima facie* entitled to bring their claims and have them assessed by this Tribunal.[7] Panama's jurisdictional objections are not principally directed to those four factors. Whether the claims qualify for the protections provided by the BIT and the TPA turns on the correct characterization, upon an assessment of the evidence, of Panama's conduct. That is, in relation to the Project contracts, should Panama's conduct be characterized as "commercial" or "sovereign."

105.   As for Panama's criminal investigation of the Claimants, the question for the Tribunal is whether there was a reasonable, factual basis for Panama's conduct, which was clearly undertaken as part of its police powers (*i.e.*, Panama was acting in a sovereign capacity). Pursuant to the provisions of the BIT (Article II(2)) and the TPA (Articles 10.5, 10.7, 22(1), and Annexes 10-A and 10-B), the Tribunal's mandate is to apply international law; the Tribunal has no authority to make determinations pursuant to

---

[5] Resp. C-Mem., para. 287, discussed in the subsection below on Panama's defenses to the Claimants' claims.

[6] The Tribunal considers, as discussed further below, that all claims advanced in this arbitration arise directly out of an "investment," as that term is defined under both the BIT and the TPA, and as required by Article 25 of the ICSID Convention.

[7] *See* Cl. Reply, para. 276, on *ratione personae, ratione temporis,* and *ratione voluntatis.*

domestic criminal law standards for conviction of alleged offenses – which, in any event, neither side presented to the Tribunal.

**(1)    The BIT's Provisions**

106.    The BIT does not contain a definition of "investor" or even use the term "investor." The BIT refers in Article 1 to "national of a Party" and "company of a Party." The term "investment" is expressly defined in Article 1, which reads in full as follows:

"ARTICLE I

For the purposes of this Treaty:

(a) "national of a Party" means a natural person who is a national or citizen of that Party under its laws:

(b) "company" means any kind of juridical entity, including any corporation, company, association, or other organization, that is duly incorporated, constituted, or otherwise duly organized, regardless of whether or not the entity is organized for pecuniary gain, privately or publicly owned, or organized with limited or unlimited liability;

(c) "company of a Party" means a company duly incorporated, constituted or otherwise duly organized under the applicable laws and regulations of a Party or a political subdivision thereof in which:

(i) natural persons who are nationals of such Party, or

(ii) such Party or political subdivision thereof or their agencies or instrumentalities have a substantial interest as determined by such Party.

The juridical status of a company of a Party shall be recognized by the other Party and its political subdivisions.

23

Each Party reserves the right to deny any of its own companies or to a company of the other Party the advantages of this Treaty, except with respect to recognition of juridical access to courts, if nationals of any third country own or control such company; provided that whenever one Party concludes that the benefits of this Treaty should not be extended to a company of the other Party for this reason, it shall consult with the other Party to seek a mutually satisfactory resolution to this matter;

(d) "investment" means every kind of investment, owned or controlled directly or indirectly, including equity, debt, and service and investment contracts, and includes:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value and associated with an investment;

(iv) intellectual and industrial property rights, including rights with respect to copyrights, patents, trademarks, trade names, industrial designs, trade secrets and know-how; and goodwill;

(v) licenses and permits issued pursuant to law, including those issued for manufacture and sale of products;

(vi) any right conferred by law or contract, including rights to search for or utilize natural resources, and rights to manufacture, use and sell products; and

(vii) returns which are reinvested. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment;

(e) "own or control" means ownership or control that is exercised through subsidiaries or affiliates, wherever located; and

(f) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee; and return in kind."

107. In its February 20, 1986, Letter of Transmittal of the BIT to the President ("Transmittal Letter"), the Department of State, after noting that international law is the BIT's governing law, commented on the meaning of "investment":

"The BIT concept of "investment" is broad and designed to be flexible; although numerous types of economic interests are enumerated, the intent is to include all legitimate interests in the territory of either Party, whether directly or indirectly controlled by nationals of the other, having economic value or "associated" with an investment. Protected "companies of a Party" are those incorporated or otherwise organized under the laws of a Party in which nationals of that Party have a substantial interest."

108. The Claimants assert (Cl. PHB, para. 11; Cl. Mem., para.124) that their "investment plainly falls within" the BIT's Article 1(d) definition: "Omega Panama is a local "company" capitalized and owned by Mr. Rivera. Omega U.S. invested its "know-how" and "goodwill" (among other intangible assets) in the Omega Consortium in Panama, and Mr. Rivera provided his personal guarantees to secure the Consortium's bonding. And the Contracts won by the Omega Consortium are "right[s] conferred by law or contract," "claims to money or ...performance" and other "rights." Each of these, separately or together, meet the BIT's definition of investment." (The Claimants' "investment" position under the TPA's definition of the term is discussed below.) While Panama argues that the Claimants procured their "alleged

25

"investment"" through corruption, in contravention of Panamanian law (*see, e.g.*, Resp. Objections, para. 184), it does not contest (in any sustained way) that the Claimants' asserted investment would otherwise qualify as such under the BIT (or the TPA). Panama also does not contest that the Claimants meet the BIT's (and TPA's) nationality requirements (*ratione personae*).

109.   Article II(2) of the BIT contains three of the four substantive protections that the Claimants rely on as the bases for their claims: FET, FPS, and umbrella clause (*see, e.g.*, Cl. Reply, pages 217-252). Article II, in full, provides as follows:

> "1. Each Party shall maintain favorable conditions for investment in its territory by nationals and companies of the other Party. Each Party shall permit and treat such investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the more favorable, subject to the right of each Party to make or to maintain exceptions falling within one of the sectors or matters listed in the Annex to this Treaty, or resulting from laws and regulations in effect on the date that this Treaty enters into force. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Annex, and to maintain the number of such exceptions to a minimum. Any exception, other than with respect to ownership of real property, shall be on a basis according treatment no less favorable than that accorded in like situations to investment, or associated activities, of nationals or companies of any third country. Moreover, any future exception by either Party shall not apply to investment of nationals or companies of the other Party existing in that sector at the time the exception becomes effective.
>
> 2. Investment of nationals and companies of either Party shall at all times be accorded fair and equitable treatment [*FET*] and shall enjoy full protection and

security [*FPS*] in the territory of the other Party. The treatment, protection and security of investment shall be in accordance with applicable national laws and international law. Neither Party shall in any way impair by arbitrary and discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investment made by nationals or companies of the other Party. Each Party shall observe any obligation it may have entered in with regard to investment of nationals or companies of the other Party [*umbrella clause*].

3. Each Party agrees to provide fair and equitable treatment and, in particular, the treatment provided for in paragraph 1 of this Article, to privately owned or controlled investment of nationals or companies of the other Party, where such investment is in competition, within the territory of the first Party, with investment owned or controlled by the first Party on its agencies or instrumentalities. In no case shall such treatment differ from that provided to any privately owned or controlled investment of nationals or companies of the first Party which is also in competition with investment owned or controlled by the Party or its agencies or instrumentalities.

4. Neither Party shall impose performance requirements as a condition for the establishment of investment owned by nationals or companies of the other Party, which require or enforce commitments to export good produced, or which specify that goods or services must be purchased locally, or which impose any other similar requirements."

110.   Article II(2) appears, on its face, to accord protection to investments of nationals rather than the protection of nationals (*i.e.*, Mr. Rivera and Omega US) themselves. Panama, deriving support in this regard from the Submission of the United States of America,[8] paras. 46-47, considers that this limits the ambit of the Claimants' claims (*see, e.g.*, Resp. PHB, para. 228). The Claimants argue that the BIT's wording poses no such limitations; such "a distinction is immaterial with respect to" the claims that they have

---

[8] U.S. Submission, dated February 3, 2020.  *See* paragraph 123, below.

advanced and the damages sought, including with respect to Panama's criminal investigations of Mr. Rivera and Omega Panama (*see, e.g.*, Cl. PHB, paras. 17-20, also cited below). The Tribunal agrees with the Claimants that the alleged wrongful acts, including the criminal investigations, are capable for satisfying the requisite nexus to the Claimants' investments. The Tribunal does not, however, have jurisdiction to adjudicate matters relating solely to Mr. Rivera and Omega Panama in the absence of such nexus.

111. Article IV of the BIT contains the remaining substantive protection, indirect expropriation, on which the Claimants base their claims:

> "1. Investment of a national or a company of either Party shall not be expropriated, nationalized, or subjected to any other direct or indirect measure having an effect equivalent to expropriation of nationalization ("expropriation") in the territory of the other Party, except for a public or social purpose; in a non-discriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process and the general principles of treatment laid down in Article II(2). Such compensation shall amount to the full value of the expropriated investment immediately before the expropriatory action became known; include interest at a commercially reasonable rate; be paid without delay; be effectively realizable; and be freely transferable.
>
> 2. Consistent with Article I(d), if either Party expropriates the investment of any company duly incorporated, constituted or otherwise duly organized in its territory, and if nationals or companies of the other Party, directly or indirectly, own, hold or have other rights with respect to the equity of such company, then the Party within whose territory the expropriation occurs shall ensure that such nationals or companies of the other Party receive compensation in accordance with the provisions of the preceding paragraph."

The Transmittal Letter includes a further explanation of Article IV:

"The model BIT also confers protection from unlawful interference of property interests and assures compensation in accordance with international law standards. It provides that any direct or indirect taking must be: for a public purpose; nondiscriminatory; accompanied by the payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general standards of treatment discussed above. The BIT's definition of "expropriation" is broad and flexible; essentially "any measure" regardless of form, which has the effect of depriving an investor of his management, control or economic value in a project can constitute expropriation requiring compensation equal to the "fair market value." Such compensation, which "shall not reflect any reduction in such fair market value due to . . . the expropriatory action," must be "without delay," "effectively realizable," "freely transferable" and "bear current interest from the date of the expropriation at a rate equal to current international rates." The BIT grants the right to "prompt review" by the relevant judicial or administrative authorities in order to determine whether the compensation offered is consistent with these principles. It also extends national and MFN treatment to investors in cases of loss due to war or other civil disturbance. The BIT does not provide, however, a specific valuation method for compensating such losses."

112. Finally, in relation to the BIT, both Parties focus on Article VII's definition of "investment dispute" and what such a dispute may entail (*see, e.g.*, Cl. PHB, paras. 15-20; Cl. Reply, paras. 340-350; Cl. Rej., paras. 327-335: Resp. PHB, paras. 119-124; Resp. Objections, paras. 228-233).   The Tribunal considers that the Claimants are correct in arguing that the Article VII(2) phrase, "in accordance with the applicable dispute settlement procedures upon which they have previously agreed," does not limit the Claimants to referring disputes under the Project contracts to the particular dispute resolution provisions in the individual contracts.  Paragraphs 1 and 2 of Article VII read as follows:

"1. For purposes of this Article, an investment dispute is defined as a dispute involving: (a) the interpretation or application of an investment agreement

29

between a Party and a national or company of the other Party; (b) the interpretation or application of any investment authorization granted by its foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of an investment dispute between a Party and a national or company of the other Party with respect to an investment of such national or company in the territory of the first Party, the parties to the dispute shall initially seek to resolve it by consultation and negotiation. The parties may, upon the initiative of either of them and as a part of their consultation and negotiation, agree to rely upon non-binding, third-party procedures, such as the fact-finding facility available under the Rules of the Additional Facility ("Additional Facility") of the International Centre for the Settlement of Investment Disputes ("Centre"). If the dispute cannot be resolved through consultation and negotiation, then the dispute shall be submitted for settlement in accordance with the applicable dispute settlement procedures upon which they have previously agreed. Such procedures may provide for recourse to international arbitration using a forum such as the Inter-American Commercial Arbitration Commission. With respect to expropriation by either Party, any dispute-settlement procedures specified in an investment agreement between such Party and such national or company shall remain binding and shall be enforceable in accordance with, inter alia, the terms of the investment agreement, relevant provisions of the domestic laws of such Party and treaties and other international agreements regarding enforcement of arbitral awards to which such Party has adhered."

113. The Tribunal notes that the term "investment agreement" in Article VII(1)(a) is not defined but would appear to have a much broader scope than the same term in the TPA (cited below), which contains a specific (and relatively narrow) definition. On the other hand, the term "investment dispute," which is defined in BIT Article VII(1)

and used but undefined in the TPA (see below, Article 10.16(1)), would appear to have the same meaning in both Treaties, as the Claimants argue (*see, e.g.*, Cl. PHB, fn 23).

**(2)    The TPA Provisions**

114.   Chapter 10 of the TPA, "Investment," contains the provisions that are relevant to this arbitration. The definitions are in Article 10.20; the pertinent provisions are at pages 10-23 to 10-24 (CL-0003):

> "**investment** means every asset that an investor owns or controls, directly or indirectly, that has the characteristics as the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk.  Forms that an investment may take include:
>
> (a) an enterprise;
>
> (b) shares, stock, and other forms of equity participation in an enterprise; …
>
> (e) turnkey, construction, management, production, concession, revenue-sharing, and other similar contracts; … and
>
> (h) other tangible and intangible, movable or immovable property, …"
>
> **investment agreement** means a written agreement that takes effect on or after the date of entry into force of this Agreement between a national authority of a Party and a covered investment or an investor of the other Party that grants the covered investment or investor rights: (a) with respect to natural resources or other assets that a national authority controls: and (b) upon which the covered investment or the investor relies in establishing or acquiring a covered investment other than the written agreement itself."
>
> **investor of a Party** means a Party or state enterprise thereof, or a national or an enterprise of a Party, that attempts to make, is making, or has made an investment in the territory of the other Party; provided, however, that a natural person who is a dual national shall be deemed to be exclusively a national of the State of his or her dominant and effective nationality;

31

**national** means a natural person who has the nationality of a Party according to Annex 2.1 ....

**non-disputing Party** means the Party that is not a party to an investment dispute; ...."

115. The Claimants assert that their investment "plainly falls within" the TPA's definition at (Cl. PHB para. 12): "Mr. Rivera and Omega US committed tangible and intangible resources in Panama – *i.e.*, financial resources, human resources, know-how, goodwill, and others – at great risk, and with the expectation of profit. Mr. Rivera's ownership of Omega Panama constitutes ownership of 'an enterprise' in Panama. And the Omega Consortium's Contracts are "turnkey, construction . . . contracts," which are expressly protected by the TPA. Each of these, separately or together, meet the TPA's definition of investment." The Claimants also observe (Cl. PHB, paras. 13-14) that the Project contracts do not constitute "investment agreements," since they do not grant rights "with respect to natural resources or other assets that a national authority controls. Investment Agreements [under the TPA] are more akin to a mining concession or a port operation agreement, . . .than to construction contracts which are delivered to the contracting authority, once completed." The significance is that "investment agreements" under the TPA attract different dispute resolution provisions. The Tribunal agrees with the Claimants that the eight Project contracts constitute "investments" under both Treaties but not "investment agreements" under the TPA's definition of that term.

116. Article 1.3(2) and (3) of the TPA explain the relationship between the arbitration provisions in the two Treaties. Article 1.3(2) states that Articles VII and VIII of the BIT "shall be suspended on the date of entry into force of this Agreement." This is qualified by Article 1.3(3), which states as follows:

"Notwithstanding paragraph 2, (a) for a period of ten years beginning on the date of entry into force of this Agreement, Articles VII and VIII of the Treaty shall not be suspended: (i) in the case of investments covered by the Treaty as of the date of entry into force of this Agreement; or (ii) in the case of a dispute

32

that arose prior to the date of entry into force of this Agreement and that is otherwise eligible to be submitted for settlement under Article VII or VIII of the Treaty; ...."

As noted above, the Claimants' position is that five of the Project contracts were concluded before the TPA's entry into force, and three were signed after the TPA entered into force (Cl. Rej., para. 324).

117.   Unlike the BIT, the TPA does not contain an umbrella clause.  The Claimants rely on Article 10.4 of the TPA, "Most-Favored-Nation Treatment," for importation of an umbrella clause into the TPA from third-party BITs with Panama.[9]  Separately, and more controversially, the Claimants contend (Cl. Reply, paras. 378-388), as discussed further below, that the umbrella clause can also be used to import "a more generous FET provision" than the customary law/minimum standard specified in Article 10.5 of the TPA (quoted below).  Article 10.4 reads as follows:

> "1. Each Party shall accord to investors of the other Party treatment no less favorable than that it accords, in like circumstances, to investors of any non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments in its territory.
>
> 2. Each Party shall accord to covered investments treatment no less favorable than that it accords, in like circumstances, to investments in its territory of investors of any non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments."

118.   TPA Article 10.5, "Minimum Standard of Treatment," contains the FET and FPS substantive protections that are counterparts (and which the Claimants regard as substantially similar, potentially through the Article 10.4 MFN mechanism) to the BIT

---

[9] *See* Cl. Rej., para. 304 and fn 1025: "This would include, for example, the Netherlands-Panama BIT .... ("Each Contracting Party shall observe any obligation it may have entered into with regard to investments of investors of the other Contracting Party."); *see also* Cl. Reply, para. 327; CL-0163; Cl. Mem., fn 468.

Article II protections.  Importantly, there is a footnote to this Article: "Article 10.5 shall be interpreted in accordance with Annex 10-A."  Article 10.5 and Annex 10-A read as follows:

"1. Each Party shall accord to covered investments treatment in accordance with customary international law, including fair and equitable treatment and full protection and security.

2. For greater certainty, paragraph 1 prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to covered investments. The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by that standard, and do not create additional substantive rights. The obligation in paragraph 1 to provide:

(a)  "fair and equitable treatment" includes the obligation not to deny justice in criminal, civil, or administrative adjudicatory proceedings in accordance with the principle of due process embodied in the principal legal systems of the world; and

(b)  "full protection and security" requires each Party to provide the level of police protection required under customary international law.

3.  A determination that there has been a breach of another provision of this Agreement, or of a separate international agreement, does not establish that there has been a breach of this Article."

"Annex 10-A

Customary International Law

The Parties confirm their shared understanding that "customary international law" generally and as specifically referenced in Articles 10.5, 10.6, and Annex 10-B results from a general and consistent practice of

34

States that they follow from a sense of legal obligation. With regard to Article 10.5, the customary international law minimum standard of treatment of aliens refers to all customary international law principles that protect the economic rights and interests of aliens."

119.    Article 10.7 is the TPA's indirect expropriation counterpart to Article 4 in the BIT. Article 10.7 also has a footnote reference, which states that "Article 10.7 shall be interpreted in accordance with Annexes 10-A and 10-B." Article 10.7 and Annex-B read as follows:

"1. Neither Party may expropriate or nationalize a covered investment either directly or indirectly through measures equivalent to expropriation or nationalization ("expropriation"), except:

(a) for a public purpose;

(b) in a non-discriminatory manner;

(c) on payment of prompt, adequate, and effective compensation in accordance with paragraphs 2 through 4; and

(d) in accordance with due process of law and Article 10.5.

2. Compensation shall:

(a) be paid without delay;

(b) be equivalent to the fair market value of the expropriated investment immediately before the expropriation took place ("the date of expropriation");

(c) not reflect any change in value occurring because the intended expropriation had become known earlier; and

(d) be fully realizable and freely transferable.

35

3. If the fair market value is denominated in a freely usable currency, the compensation paid shall be no less than the fair market value on the date of expropriation, plus interest at a commercially reasonable rate for that currency, accrued from the date of expropriation until the date of payment.

4. If the fair market value is denominated in a currency that is not freely usable, the compensation paid – converted into the currency of payment at the market rate of exchange prevailing on the date of payment – shall be no less than:

(a) the fair market value on the date of expropriation, converted into a freely usable currency at the market rate of exchange prevailing on that date, plus

(b) interest, at a commercially reasonable rate for that freely usable currency, accrued from the date of expropriation until the date of payment.

5. This Article does not apply to the issuance of compulsory licenses granted in relation to intellectual property rights in accordance with the TRIPS Agreement, or to the revocation, limitation, or creation of intellectual property rights, to the extent that such issuance, revocation, limitation, or creation is consistent with Chapter Fifteen (Intellectual Property Rights)."

"Annex 10-B

Expropriation

The Parties confirm their shared understanding that:

1. Article 10.7.1 is intended to reflect customary international law concerning the obligation of States with respect to expropriation.

36

2. An action or a series of actions by a Party cannot constitute an expropriation unless it interferes with a tangible or intangible property right or property interest in an investment.

3. Article 10.7.1 addresses two situations. The first is direct expropriation, where an investment is nationalized or otherwise directly expropriated through formal transfer of title or outright seizure.

4. The second situation addressed by Article 10.7.1 is indirect expropriation, where an action or series of actions by a Party has an effect equivalent to direct expropriation without formal transfer of title or outright seizure.

(a) The determination of whether an action or series of actions by a Party, in a specific fact situation, constitutes an indirect expropriation, requires a case-by-case, fact-based inquiry that considers, among other factors:

(i) the economic impact of the government action, although the fact that an action or series of actions by a Party has an adverse effect on the economic value of an investment, standing alone, does not establish that an indirect expropriation has occurred;

(ii) the extent to which the government action interferes with distinct, reasonable investment-backed expectations; and

(iii) the character of the government action.

(b) Except in rare circumstances, non-discriminatory regulatory actions by a Party that are designed and applied to protect legitimate public welfare objectives, such as public health, safety, and the environment, do not constitute indirect expropriations."

120.   Article 10.16 of the TPA provides for "Submission of a Claim to Arbitration."   In relevant part, Article 10.16 states:

"1. In the event that a disputing party considers that an investment dispute cannot be settled by consultation and negotiation:

(a) the claimant, on its own behalf, may submit to arbitration under this Section a claim

(i) that the respondent has breached

(A) an obligation under Section A,

(B) an investment authorization, or

(C) an investment agreement;

and

(ii) that the claimant has incurred loss or damage by reason of, or arising out of, that breach; …."

121. Article 10.22(1) is the TPA's governing law clause: "Subject to paragraph 3, when a claim is submitted under Article 10.16.1(a)(i)(A) or Article 10.16.1(b)(i)(A), the tribunal shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law." (Paragraph 3 concerns the Free Trade Commission and is not relevant to this proceeding.)

122. Finally, Article 10.26 of the TPA concerns arbitral awards, and reads in part:

"1. Where a tribunal makes a final award against a respondent, the tribunal may award, separately or in combination, only:

(a) monetary damages and any applicable interest;

(b) restitution of property, in which case the award shall provide that the respondent may pay monetary damages and any applicable interest in lieu of restitution.

> A tribunal may also award costs and attorney's fees in accordance with this Section and the applicable arbitration rules."

123.   The Tribunal has been assisted in its interpretations of the TPA and BIT's provisions by the U.S. Submission, made pursuant to Article 10.20.2 of the TPA.   The U.S. Submission notes that the "United States does not take a position on how the interpretations [of the two treaties] apply to the facts of this case."   The views of the United States accord with those of Panama concerning the international law standards – in particular, the (alleged) "minimum standard of treatment" relating to FET and FPS, and the narrow application of the "most favored nation" ("MFN") clause, Article 10.4 of the TPA (see Resp. PHB, paras. 185-197; Resp. Response to US Submission, June 30, 2020).   The only point of noteworthy disagreement between the two contracting States concerns the standard of proof for corruption: Panama says that it is "reasonable certainty" [Resp. Response to U.S. Submission, paras. 3-8]; the US says it is "clear and convincing."

124.   The Claimants take a more nuanced position on the U.S. Submission (Cl. Response to US Submission, June 30, 2020), with the exception that they agree wholeheartedly with the US's "clear and convincing evidence" standard for proof of corruption.   They assert that they are in "nearly full accord" with the US on the "material points of the expropriation standard."[10]   But the Claimants are quick to emphasize that under any international law standard, Panama has breached its treaty obligations.[11]   They comment that "whether Article 10.5 of the TPA and Article II(2) of the BIT represent an autonomous FET standard or one limited by customary international law [the latter

---

[10] The Claimants contend (para. 5) that the U.S. Submission's focus on regulatory measures to describe the "nature and character of governmental action" constituting expropriation  does not properly take into account "targeted breaches by sovereign fiat."   The Claimants add: "Yet, this dissonance has more to do with factual characterizations than legal principles."

[11] Cl. Response to U.S. Submission, para. 14: "In sum, Respondent's conduct breached any articulation of the FET standard that appears in the BIT and TPA—even a non-evolving IMS [international minimum standard]. Through the exercise of sovereign power Claimants' liberty was restrained, assets seized, reputations destroyed, invoices denied, project budgets slashed, contracts terminated, and future bids banned—this is precisely the sort of conduct "based on political considerations" and "unjustifiable distinctions" that would breach any FET standard. Even without a coordinated campaign of malfeasance, these acts doomed Claimants' investment and were (individually and cumulatively) manifestly arbitrary and unjustified acts that fall below the IMS."

being a more stringent test, and the one relied on by the United States and Panama] is, in this case, a distinction without a difference. Respondent has violated its FET obligations under any standard" [Cl. Response to U.S. Submission, para. 3]. The Claimants nonetheless add that "under a textual interpretation of *both* Treaties, the contemporary and autonomous FET standard should guide the resolution of the case" [Cl. Response to U.S. Submission, para. 8, emphasis in the original].

125.    On the interpretation of TPA Article 10.4, the Claimants argue that the "U.S. Submission on MFN Treatment is irrelevant to resolution of this case. None of Claimants' procedural entitlements or substantive claims depend upon the incorporation of provisions from Panama's treaties with third states. The Tribunal can adjudicate all of these claims under either the BIT or the TPA. And every substantive claim pled by Claimants can be found in either the BIT or the TPA as well, both of which are fully applicable to the Claimants' unitary investment" [Cl. Response to U.S. Submission, para. 15, emphasis omitted]. The Claimants add in a footnote that their "discussion of the MFN provision as a means to import autonomous FET and FPS provisions . . . is simply an alternative argument to support these claims. Only if the Tribunal disagrees that the BIT's autonomous provisions and umbrella clause should apply to these claims, and determines that the customary international law standards in the TPA are frozen in time and not violated by Respondent's acts . . . would Claimants advance the alternative argument that the MFN clause should incorporate more textually lenient provisions from Panama's other treaties" [Cl. Response to U.S. Submission, fn 51]. The Claimants further note (Cl. Response to U.S. Submission, para. 18) that they disagree with the US's assertion that a "tribunal has no authority to award damages that a claimant allegedly incurred in their capacity as an investor for violations of obligations that only extend to investments." According to the Claimants, the US "conflates the Treaties' provisions on liability and quantum to deviate from the *Chorzow Factory* [full reparation] standard."

126.    To the extent that conflicting interpretations of the substantive treaty standards affect any of the decisions reached by the Tribunal, these are discussed below.

B.   THE PARTIES' RESPECTIVE CASES

127.   The necessary context for the detailed factual examination of the Project contracts and
the corruption investigation is, first, to identify how, in summary, the Parties presented
their respective cases. As noted above, Panama's jurisdictional issues were not heard
as preliminary issues. The first memorial was from the Claimants, in which they set
out their claims ("Claimants' Memorial" (June 25, 2018)).   The jurisdictional
objections accompanied Panama's Counter-Memorial ("The Republic of Panama's
Objections to the Tribunal's Jurisdiction (I); The Republic of Panama's Counter-
Memorial on the Merits (II)", January 7, 2019), which the Claimants then addressed
in their "Reply on the Merits and Counter-Memorial on Preliminary Objections"
(May 30, 2019). Panama's next memorial dealt with both jurisdiction (in reply format)
and merits (as a rejoinder) ("Republic of Panama's Reply in Support of its Objections
to the Tribunal's Jurisdiction and Rejoinder on the Merits" (November 18, 2019)), and
the Claimants' final memorial nominally was a rejoinder on jurisdiction ("Claimants'
Rejoinder on Preliminary Objections" (January 20, 2020)).   In view of this pleading
approach taken by the Parties, the Tribunal considers that it would be appropriate to
follow the pattern indicated in the above Section heading, and thereby also to attempt
to minimize repetition by drawing from all the relevant memorials, including the
Parties' respective PHBs, in summarizing (in four distinct sub-sections) the claims,
jurisdictional objections, defenses, and responses to jurisdictional objections.[12]   The
summaries are not intended to be exhaustive but are intended to convey the arguments
most heavily relied on and, for particular points, the investment treaty
decisions/awards cited by the Parties.

---

[12] Repetition, however, is inevitable, since, as discussed more fully below, there is almost complete overlap
between the Claimants' four heads of claims, in the sense that they depend on the same alleged treaty breaches
(albeit that the FPS claim is directed to the criminal investigations issue, and its complete overlap is only with
the FET claim).

**(1)**     **Summary of the Claimants' Claims**

128.   There are substantial overlaps between the Claimants' four treaty claims, as discussed below.  The Claimants' foundational factual allegations to advance their treaty claims fall into two broad categories.

i.   The Claimants' Claims

129.   The first category is what the Claimants characterize as the "assault" on their eight ongoing Project contracts.  Once the Varela Administration came into power in July 2014, various Government ministries and officials, above all the Comptroller General, arbitrarily and unreasonably and/or as a matter of political retribution, took steps to prevent the Consortium from performing the contracts.  This led to administrative terminations of the largest Project contracts, above all Ciudad de las Artes, and bidding bans on future contracts.

130.   The second category is the alleged unfounded criminal persecution of Mr. Rivera and Omega Panama, which was exacerbated by Panama's leaking information about the investigations to the media (the leaking, the Claimants say, was a violation of Panamanian law).  In conjunction with the assault on the project contracts, the investigations ruined the reputations and future work opportunities of Mr. Rivera and Omega US.

131.   The Claimants depict Mr. Rivera and Omega US as being not only the investors (or nationals) bringing an investment dispute under the Treaties, but also part of the Claimants' investment interests, which has four aspects: (a) Omega Panama (the company), (b) the good will/experience/reputation of Omega US, (c) the contracts won by the Consortium (which, again, are not disqualified as TPA Art. 10.29 'investment agreements'), and (d) the personal bonding guarantees and expertise of Mr. Rivera.

132.   The Claimants contend that they must prove, by a balance of probabilities, that Panama's acts were arbitrary and/or retributory, but Panama must prove that the eight contracts were beached by Claimants.  Moreover, according to the Claimants, for there

42

to be a treaty breach, government action need only be **a cause** of the project problems; it need not be **the only or principal cause**.

133.  The Claimants emphasize that they do not need to prove the motive of retribution or subjective bad faith: they will prevail if they can prove arbitrary, unreasonable, non-transparent, and obstructive government conduct, as **a** cause of the Project failures and the persecution and harassment of Mr. Rivera.  They point, in particular, to the Varela Administration's slashing of project budgets, above all the Ciudad de las Artes budget, as internationally wrongful acts.   That one Project constituted 30% of Omega's portfolio value. The slashing was arbitrary behavior that led to defunding, terminating, and bidding bans, each of which constitutes a treaty breach.   The Comptroller General's actions in ceasing to endorse payment requests was alone sufficient to trigger liability.

134.  While the Claimants contend that they do not need to prove a retributory motive on the part of President Varela, they nonetheless give particular attention to the "VarelaLeaks documents," WhatsApp messages (2017-2018) downloaded from a phone purportedly belonging to President Varela (*see* "Claimants' VarelaLeaks Annex to Their Post-Hearing Submission").   According to the Claimants, these documents are authentic and confirm, *inter alia*:

   (i)    Mr. Rivera's account of the campaign solicitation by Juan Carlos Varela at the La Trona Restaurant in 2012;

   (ii)   President Varela's dislike of and contempt for Mr. Rivera;

   (iii)  President Varela's improper influence over the Panamanian Comptroller General (through which he could punish Mr. Rivera, as a non-ally);

   (iv)   President Varela's improper influence over the public works budgeting process (again through which he could punish Mr. Rivera); and

   (v)    President Varela's preferential treatment to other contractors, pre-eminently, Odebrecht.

43

135.   The following are summaries of the Claimants' four heads of claims, brought under both the BIT and the TPA (*see, e.g.*, Cl. Reply, pages 205-252; Cl. PHB, pages 11-38, 62-65):

### a.   Unlawful Indirect (Creeping) Expropriation

136.   The two Treaties prohibit indirect expropriation.

137.   The Comptroller General and Panama's ministries failed to issue payment approvals and withheld payments and permits.

138.   Panama stonewalled progress on projects by cutting funding.

139.   Panama terminated contracts without justification and created bidding bans.

140.   In doing the above, Panama strangled the Consortium's cash flow and destroyed the Consortium's commercial value.

141.   Panama initiated baseless criminal investigations, which also led to the destruction of the Consortium's business in Panama.

142.   There was no public purpose undertaken by Panama in committing these acts. Panama accorded no due process to the Claimants in committing these acts. Panama's actions were discriminatory – it targeted the Claimants because of President Varela's animosity toward them.   Panama failed to compensate the Claimants. In short, Panama failed to adhere to the relevant expropriation test in both Treaties, which requires host States to refrain from expropriation unless the State has fulfilled these elements (*i.e.*, the State may only expropriate a covered investment, directly or indirectly, if its measures are for a public purpose; exercised in a non-discriminatory manner; compensation paid to the investor is prompt, adequate, and effective; and the measures are in accordance with due process of law). Panama's acts were not mere contractual breaches; they were sovereign acts.[13]   Panama's collective actions were

---

[13] The Claimants accept that the acts must be taken by the State in its sovereign capacity, rather than in its commercial capacity, for the Claimants to prevail. They contend, however, that they have satisfied the *Parkerings v. Lithuania* (CL-0041) expropriation test, relied on by Panama, to the extent that the test is applicable. That is,

44

therefore "a creeping expropriation of Claimants' *entire* investment in Panama" [emphasis in the original]: "an incremental but cumulative encroachment on one or more of the range of recognized ownership rights until the measures involved lead to the effective negation of the owner's interest in the property."[14]

### b. *Denial of Fair and Equitable Treatment*

143.   The manner in which the Project contracts were abrogated is the basis of the FET claim (see Cl. Reply, pages 217-244). The applicable standard is broad and flexible, rather than the customary international law minimum – the BIT does not limit the FET obligation to the customary law minimum (it simply refers to international law). While TPA Article 10.5 refers to customary law, Article 10.4 permits the importation of a more generous FET provision, from, for example, the Panama-Netherlands BIT. In any event, the customary standard is evolving, and the facts of the present case establish Panama's FET violation under any standard.

144.   Panama arbitrarily and unreasonably altered the foundational legal framework governing the Claimants' investment and reneged on the assurances that drew the Claimants to invest in the public works sector.

145.   Panama arbitrarily frustrated the Claimants' legitimate expectations that the Project contracts would be performed by Panama in good faith. In particular, in the Ciudad de las Artes project, Panama failed to give due notice to the Claimants of proceedings affecting their rights, and otherwise subjected the Claimants to unreasonable and inconsistent treatment in the conduct of the Project contracts. Panama acted without transparency in taking decisions against the Claimants and their investment.

146.   Panama's official decisions also manifested bias against the Claimants as foreign investors. Panama illegally harassed the Claimants by abusing their police powers and

---

the Claimants agree that they must show that the State's breaches were the direct result of an exercise of sovereign authority and that this also resulted in a substantial deprivation of their investment – and they say they have shown this. They disagree that they must establish that a breach of domestic law has occurred. *See* Cl. Reply, paras. 364-372; Resp. C-Mem., paras. 257-263.

[14] Cl. Reply, fn 1033, Schreuer, Expropriation under the ECT (CL-0013) (quoting the World Investment Report, United Nations Conference on Trade and Development, 110 (2003)).

initiating groundless investigations against them, leading to an INTERPOL red notice against Mr. Rivera.

147.   As the Claimants discussed under the indirect expropriation head, Panama's actions were sovereign acts, not simply commercial.  Moreover, under *Continental Casualty v. Argentina* (CL-0110) and *Noble Ventures v. Romania* (CL-0078), a State's obligation to uphold an investor's contractual rights is part of the more general FET standard.

148.   Even if Panama's acts did not individually violate its FET obligations, "all of the acts together certainly constituted a combined creeping violation of the FET standard" (Cl. Reply, pages 240-244, relying, in part, on *Pac Rim Cayman LLC v. El Salvador* (CL-0185).

149.   On the criminal side, the Claimants, however, have shown, by balance of probabilities, that Panama's actions were illegitimate. Panama, on the other hand, failed to demonstrate by clear and convincing evidence that Omega was guilty of corruption:

   o   The investigation was open for years, and accounts were frozen and detention orders issued, while nothing was proved.
   o   Panama publicly disclosed the investigations to deliberately damage Mr. Rivera.
   o   Panama's extradition request was refused by the US for lack of evidence.
   o   The investigations have led to nothing but could be revived.

150.   According to the Claimants, the criminal investigations were arbitrary and shock the conscience. They offend due process and were an abuse of rights. They were a grossly disproportionate use of State power and a violation of international law.

### c.  *Denial of Full Protection and Security*[15]

151.  As in the case of the FET standard, the FPS standard is not the customary law minimum: "the BIT's FPS clause is not limited by international law standards. Neither is the TPA's, because of its MFN clause" (Cl. Reply, para. 423).

152.  The points made above in the FET claim summary regarding the criminal investigations apply as well to the Claimants' FPS claim. Additionally, investigators engaged in a "superficial consideration of the real estate transaction supposedly linking the Claimants to bribery" [of Justice Moncada Luna], and the investigations infringed Mr. Rivera's physical safety. Panama ignored exculpatory evidence. The investigations were not a legitimate use of police power.

153.  The points made above in the FET claim summary regarding the assault on the Claimants' Project contracts also apply to the FPS violation; Panama "withdrew the entire legal framework intended to protect Claimants' investments" (Cl. Reply, para. 421).

154.  The FPS reaches beyond physical violence; it requires legal protection for the investor. The Claimants rely on *Azurix v. Argentina* (CL-0025) and *Siemens v. Argentina* (CL-0008).

155.  Again, Panama's actions went beyond mere commercial acts.  "In any event, arbitral tribunals have held that "full protection" implies a "State's guarantee to stability in a secure environment," which includes both "physical," as well as "commercial and legal" protection" (Cl. Reply, para. 432, quoting *Biwater Gauff v. Tanzania*, CL-0054).

### d.  *Umbrella Clause*[16]

156.  The State failed to observe its obligations regarding the project contracts. (A stabilization obligation or the like is not needed.)

---

[15] *See* Cl. Reply, pages 244-251.
[16] Cl. Reply, pages 252-254.

157.    The State's breaches were international law violations, not simple breaches of contract.

158.    Panama raises jurisdictional objections, but it fails to counter the merits of the umbrella clause case that the Claimants have brought.

### e.  Summary of the Alleged Treaty Breaches

159.    Slide 69, accompanying the Claimants' February 24, 2020, opening statement at the First Hearing, usefully identifies ten alleged "key treaty breaches" and indicates where they fall in the four heads of claim:

    i.      Agencies' failure to sign Project change orders and payment applications;
    ii.     Comptroller General's failure to endorse payments;
    iii.    Comptroller General's failure to endorse change orders;
    iv.     Ministry's slashing of the Ciudad de las Artes budget;
    v.      Administrative termination of the Ciudad de las Artes budget, together with a ban on future bidding (without notice);
    vi.     The Municipality of Panama's administrative termination of the Consortium's contract, with a further three-year bidding ban;
    vii.    Panama's initiation of bogus criminal investigations;
    viii.   Panama's freezing of the Claimants' bank accounts;
    ix.     Panama's issuance of detention orders;
    x.      Panama's issuance of an extradition request and Interpol Red Notice.

160.    The Claimants state that breach numbers 1 through 8 concern indirect expropriation; numbers 1 through 10 support their FET claim; numbers 8 through 10 support their FPS claim; and numbers 1 through 6 come under their umbrella clause claim.  Thus, the complete overlap between FET and the other three claims, in particular indirect expropriation, is apparent.

        ii.    Damages

161.    The Claimants seek three heads of damages, plus compound pre-award and post-award interest at 11.65% (amounts attributable to interest are not included in the amounts stated under the three heads, below).

48

### a.    *Head 1 – Losses on Existing Contracts*

162.    The Claimants seek US ███████, based in part on discounting of advance contract payments at an 11.65% discount rate, and include calculation of unendorsed payment applications.

### b.    *Head 2 – Fair Market Value of Future Contracts*

163.    The Claimants seek US ███████. This is on the basis that the Omega Consortium should be made whole. The alleged unlawful administrative terminations destroyed the Omega Consortium's ability to win new contracts, and the totality of the Omega Consortium must be valued. The calculation is therefore the future contracts in Panama that the Omega Consortium could have secured absent Panama's breaches; the Claimants have not valued Omega Panama as a standalone entity. The Claimants' calculation applies a 21.4% success rate in obtaining future contracts and 13.2% profit margin on those contracts.

### c.    *Head 3 – Moral Damages*

164.    The Claimants seek at least US ███████, on the basis that the Treaties protect both investments and investors, and the Claimants' intangible assets as well as corporate and personal reputations which they allege were part of the harmed investment. In particular, the Claimants say that Panama's egregious actions in breaching the Treaties, including a baseless criminal investigation, caused significant reputational harm – the destruction of Omega US's commercial reputation, and preventing Mr. Rivera from operating his own construction company "and fully providing for his family" (Cl. PHB, para. 166). This head is separate from economic damages.

### (2)    Panama's Jurisdictional Objections

165.    Panama's starting answer to the two categories of facts advanced by the Claimants is the absence of a predicate – *i.e.*, there is no reliable evidence of President Varela's motive for the alleged campaign of harassment. Panama contends that there can be no reaction where there is no initial action; the existence and substance of the Varela-Rivera solicitation meeting in 2012 is unproved. There is no contemporaneous

evidence of a threat issued by President Varela to Mr. Rivera.  There are only Mr. Rivera's bare allegations.  Panama's discussion of the VarelaLeaks documents in its VarelaLeaks Annex to its PHB argues, *inter alia*:

> (i)     The WhatsApp messages were not created during the time period in dispute (2012-2016);
>
> (ii)    Only four messages actually refer to the Claimants or their Projects, and President Varela made those references (in messages dated October 5, 2018) only after he learned of the allegations that the Claimants had lodged against him in this arbitration;
>
> (iii)   President Varela denied the Claimants' allegations in his messages; and
>
> (iv)    President Varela's actions in relation to public works budgeting simply reflected normal government workings; as president he was always constrained by the approvals process.

166.  Panama denies any assault on the Consortium's Projects: the Consortium lacked resources and suffered from performance deficiencies.  There is no evidence of President Varela targeting the Projects. The Claimants' assertion of budget-slashing was nothing more than ordinary Government decision-making to preserve funds.  The Claimants bear the burden of proving that "targeted harassment" was the only reason that their contracts were cancelled, and they have failed to meet that burden.

167.  On the matter of criminal investigations, Panama emphasizes that an investigation into the Claimants' "Tonosí land deal"[17] was reasonable (*i.e.*, there was something to investigate), and the evidence points to Mr. Rivera's involvement in a scheme to bribe Moncada Luna to win the La Chorrera project contract.  To prove corruption, the "reasonable certainty" or "balance of probabilities" standard applies, and Panama has met that standard.

---

[17] *See* below Section IV.B, for the Tribunal's discussion of the Tonosí land deal.  Panama alleges that Mr. Rivera arranged this land deal as a way to facilitate the Claimants' alleged participation in the bribery of Justice Moncada Luna to obtain the La Chorrera public works contract.  *See, e.g.*, Resp. PHB, pages 23-40.

168.   As noted above, Panama has lodged a series of jurisdictional objections, the most substantive of which are intertwined with its merits defenses.   The Tribunal first separates out, as Panama has presented them, Panama's four specific objections to the Tribunal's jurisdiction to decide the claims submitted by the Claimants.[18] The Tribunal then summarizes Panama's defenses to the Claimants' four heads of claims on the merits, followed by Panama's responses to the Claimants' three heads of damages.   A further section summarizes, at the risk of some repetition, the Claimants' responses to Panama's four specific jurisdictional objections, as that is the way this case was pleaded by the Parties: *i.e.*, despite the lack of a bifurcated procedure, the Respondent's jurisdictional objections were separately identified and separately replied to by the Claimants a final memorial submission (Claimants' Rejoinder on Preliminary Objections (January 20, 2020)).

i.   Corruption precludes treaty relief

169.   Panama alleges that the Claimants obtained the La Chorrera project contract for the Omega Consortium through bribery of Justice Moncada Luna.

- Justice Moncada Luna personally awarded the contract to the Omega Consortium.
- The foundation for the bribery was the Tonosí land deal.
- The land deal was an obvious sham, used to disguise Claimants' bribery of Moncada Luna.  One of many pieces of evidence demonstrating this is the evidence of the Claimants' real estate expert, who testified that real estate prices in the region had not changed drastically between 2009 and 2014, but the plot purchased by Mr. Rivera rose from US $30,000 in 2008 to US $1 million in 2013.  In conjunction with this circumstance, there were comprehensive defects in the land sale documentation that are inconsistent with reasonable standards of diligence.
- Corruption deprives the investor of treaty protections, as a matter of jurisdiction or admissibility. For support, Panama relies on, *inter alia*, *World Duty Free v. Kenya* (RL-0003), *Spentex v. Uzbekistan* (RL-0004), *Hamester v. Ghana* (RL-0006), *Inceysa v. El Salvador* (CL-0067), *Plama v. Bulgaria* (RL-0008), and *Churchill Mining v.*

---

[18] *See, e.g.*, Resp. C-Mem., pages 69-89; Resp. Reply, pages 6-83; Resp. PHB, pages 23-50.

51

*Indonesia* (RL-0010). Since the La Chorrera Project contract was procured through corruption, the La Chorrera claim must be dismissed and, further, all claims must be dismissed. It does not matter if the corruption occurred as a means of procuring an investment or after an investment was in operation. Corruption in procuring one investment clearly violates others. The Claimants should not be permitted to claim that each Project contract is different while also claiming that the Tribunal should have jurisdiction over all their claims by treating the contracts as a unitary investment.

ii. The Claimants have advanced commercial claims and have not demonstrated that Panama acted in a sovereign capacity; commercial claims are not protected under the Treaties

170. There is nothing inherently sovereign about late or non-payment of invoices under some contracts or refusing to provide change orders; the alleged improper termination of contracts is also fundamentally commercial.

- Each of the Projects had commercial problems – issues with subcontractors, changes in work scope, floods, strikes, electricity outages, and all contractors faced these challenges. The problems were the same under President Martinelli's administration (the predecessor to President Varela), including the Comptroller General's refusal to approve contract addenda; yet, the Claimants do not take issue with events during that prior period.

- Government agencies had legitimate concerns about the Omega Consortium's performance. Whether the Agencies were right or wrong does not matter; there is no jurisdiction over commercial claims. Panama refers to *Saluka v. Czech Republic* (CL-0038) and *Impregilo v. Pakistan* (RL-0030): governments cannot be held liable for each and every breach of the rules and regulations to which they are subject.

- The Claimants have not demonstrated a coordinated campaign not to pay under the Project contracts or a targeted campaign of harassment against the Claimants.

- The Claimants cannot salvage their non-sovereign defect through an umbrella clause claim. The TPA does not contain an umbrella clause, which cannot be imported into it. Further, the mere presence of an umbrella clause in the BIT does

not automatically transform a contract breach into a treaty breach. Breaches of an ordinary commercial contract do not attract umbrella protection. Panama relies on *Vivendi Annulment* (RL-0019) and *El Paso v. Argentina* (RL-0020). Additionally, pursuant to *SGS v. Philippines* (RL-0022), general provisions of BITs should not, unless clearly expressed to do so, override a dispute provision in the investment contract itself. Each of the Claimants' contracts contain dispute resolution provisions, and Article VII(2) of the BIT states that investment disputes shall be submitted for resolution in accordance with these contractual dispute resolution processes.

      iii.   The BIT claims must be resolved under the project contracts' dispute resolution provisions

171. Alternatively, the Claimants' BIT claims must be dismissed because of the terms of Article VII(2) of the BIT, referring to dispute-settlement procedures upon which the Parties previously agreed. Five contracts of the eight at issue were signed prior to October 31, 2012, when the BIT was in effect.

- The Claimants cannot avoid the operation of Article VII(2) by arguing that the parties to the contracts are different from the Parties to the arbitration:

  - o Mr. Rivera and Omega US were integral to the Omega Consortium and therefore are bound to the Project contracts; they cannot separate themselves out as a basis for establishing treaty jurisdiction.

  - o Further or alternatively, Mr. Rivera is the alter ego of each Omega entity, and the corporate veil may be lifted to prevent misuse of the privileges of legal personality.

  - o The 'group of companies' doctrine also binds Claimants to the five BIT contracts. Panama relies on See *Getma v. Guinea* (RL-0050) and *Klöckner v. Cameroon* (RL-0051).

  - o The Claimants contend that the "unity of investment" concept applies, such that the five BIT-governed contracts should not be treated differently from the three TPA-governed contracts. Here, the contracts are not

interdependent. They are stand-alone. The concept therefore does not apply.

    iv.    There is no jurisdiction over claims relating to Panama's criminal investigation of Mr. Rivera

172.    Claims relating to Panama's criminal investigation of Mr. Rivera do not arise directly out of an investment, and the two Treaties only cover investment disputes. ICSID Convention Article 25 also requires a close connection between the investment and the dispute. The investigations arose out of the investigation of Justice Moncada Luna and his bank transactions. Panama initially investigated Moncada Luna based on complaints filed by Panamanian bar associations; the specific investigation into Claimants was a by-product of the criminal investigation and did not arise directly out of Claimants' investments.

- The appropriate exercise of police powers against an individual (an investor) does not and cannot give rise to an investment dispute under the BIT or TPA.

- If the Tribunal agrees on this point but denies the broader jurisdictional objections, the Tribunal must dismiss the allegations regarding the criminal investigation and disregard them when deciding the merits.

**(3)    Panama's Defenses to the Claimants' Four Heads of Claims[19]**

    i.    Indirect Expropriation

173.    This claim depends on a violation of Article IV(1) of the BIT and Article 10.7 of the TPA.

- Indirect expropriation is expressly considered at Annex 10-B(4) of the TPA. As a legal matter, the Claimants cannot succeed on this claim. Annex 10-B(4) states that the "fact that an action or a series of actions by a Party has an adverse impact on the economic value of an investment, standing alone, does not establish that an indirect expropriation has occurred." Expropriation entails government action, but here the acts were of a commercial character. That is, Panama acted in a

---

[19] *See* Resp. PHB, pages 71-82; Resp. C-Mem., pages 93-123; Resp. Rej., pages 184-205.

commercial rather than sovereign capacity when taking decisions regarding the Claimants' Project contracts.[20]  There were legitimate contractual disputes as to whether the money Claimants seek is owed under the various contracts.  All of the acts complained of by the Claimants – *e.g.*, failure to pay invoices and refusal to issue approvals – are inherently commercial in nature.

- The Claimants have failed to show a breach of contract under domestic law.[21]

- The Claimants focus on the elements of expropriations – public purpose, due process, discrimination, compensations.  But the condition precedent to these elements is a *taking*:  In this case, the Claimants' assets were not taken.  Further, the Claimants have failed to show a substantial deprivation of the value of the investment – Omega Panama is valueless on its own. Omega US's know-how was not taken. So there has been no taking and no substantial deprivation in any event. In fact, the Omega Consortium was overpaid because of the substantial advance payments it received.

- There were no reasonable investment-based expectations of the Claimants that were undermined (this also applies to the FET claim).

### ii.   Fair and Equitable Treatment

174.   The FET standard under both Treaties is the customary international law minimum standard (Article II(2) BIT; Article 10.5 TPA).[22]  The Claimants have not shown the State's wilful neglect of its duty or insufficiency of action falling below the minimum standard.

- "Legitimate expectations" are not part of the minimum standard.  Even if "legitimate expectations" were considered, Panama made no specific promises or

---

[20] Resp. PHB, para. 181, observes that the Claimants agree that the sovereign action requirement is "[t]he most important" for distinguishing between a mere breach of contract and an expropriation, …", citing Cl. Mem, para. 144.  The Tribunal notes that Cl. Mem., para. 144, relies on CL-0013 (an article by Professor Christoph Schreuer), CL-0006 (a book by Professors Dolzer & Schreuer), and CL-0008, paras. 247-253 (*Siemens v. Argentina*) for its position – which Panama wishes to endorse – that sovereign action is the foundational requirement for a State to incur international responsibility.

[21] As noted above in the summary of the Claimants' expropriation claim, Panama relies on the "cumulative conditions" test identified in *Parkerings v. Lithuania* (CL-0041). Breach of domestic law is one of the conditions, together with action in a sovereign capacity and deprivation of investment.

[22] Panama relies in part on the reasoning  in *Saluka v. Czech Republic* (CL-0038), to support its position on the applicability of the minimum standard.  Panama also refers to *Saluka* for the explication of the content of the minimum standard.

offered any inducements to the Claimants that would have formed legitimate expectations at the time that the eight Project contracts were awarded. It is well-established that *pacta sunt servanda* is not enough to establish a "legitimate expectations" claim.

- Panama cites, *inter alia*, *Impregilo v. Pakistan* (RL-0030) for FET as well as indirect expropriation, and notes that although the *Impregilo v. Pakistan* tribunal addressed the FET issue as a matter of jurisdiction, it is "equally valid in the context of a merits assessment" (Resp. Counter-Mem., para. 287):

  > "With respect to the claimant's fair and equitable treatment claim, the tribunal held that claims alleging the breach of a contract were "not capable of constituting 'unfair or inequitable treatment' or "'unjustified or discriminatory measures'" because they "concern the implementation of the" parties' contracts and "do not involve any issue beyond the application of a contract and the conduct of the contracting parties." According to the tribunal, "the matter does not concern any exercise of '*puissance publique*' by the State" and thus, does "not enter within the purview of Article 2(2) [FET] of the BIT."[23]

- There was no targeting of Omega, and the investigations were reasonably undertaken.

- Arbitrary treatment is also not part of the FET minimum standard. Even if it were, Panama's actions did not violate due process and transparency in contract performance. Payment delays for all contractors were ordinary.

- Per the U.S. Submission, a claimant must identify third-state investors or investments to support a discrimination claim, failing which no violation of Article 10.4 of the TPA can be established. The Claimants have not identified any third-state investor as an appropriate comparator.

- The Claimants refer to a "creeping violation" of the FET standard, but the actions complained of do not constitute "composite acts," as defined by the International Law Commission's Draft Article on State Responsibility.

---

[23] *Impregilo v. Pakistan*, paras. 268-269. Panama also relies on *Waste Management v. Mexico* (CL-0033) for the proposition that even a municipality's persistent non-payment of debts is not to be equated to an FET violation, provided that it does not amount to "an outright and unjustified repudiation of the transaction and provided that some remedy is open to the creditor to address the problem" (Resp. C-Mem., para. 289, quoting *Waste Management v. Mexico*).

### iii.    Full Protection and Security

175.   The FPS provision in the Treaties applies to investments only. It concerns civil strife and physical violence and protects the physical integrity of an investment.[24] It does not protect contracts. Purely economic injuries are not covered, per the U.S. Submission, nor is "legal security" or refusal to comply with contractual obligations.

- The right to travel to manage an investment is not an FPS claim. In any event, Panama had reasonable concerns about Mr. Rivera being a flight risk and acted appropriately to mitigate that risk. Panama's use of its police powers was reasonable and encompassed necessary investigative steps.

### iv.    Umbrella Clause

176.   The Claimants have not asserted or shown a breach of contract under domestic law. Their position is therefore contradictory if they seek to argue that their Umbrella Clause claim is founded on Panama's breach of contract.

177.   In any event, there is no Umbrella Clause violation under the Claimants' flawed interpretation, which must be based on alleged "international law" breaches. The Claimants have not shown how, "in the absence of an overarching rule of international contract law, international law treats questions of contract breaches" (Resp. Rej., para. 479).

### (4)    Panama's Response to Claimants' Damages Requests[25]

### i.    Response to Head 1 – Losses on Existing Contracts

178.   In the event that liability is found, Panama' expert (Mr. Flores) calculates that the correct figure is US ███████. The Claimants' figure (the calculation of Mr. Zadicoff) is inflated for the following reasons:

- The Claimants used an inappropriate high rate to compound the money owed

---

[24] Panama cites, *inter alia*, *Saluka v. Czech Republic* (CL-0038) and *Eastern Sugar v. Czech Republic* (RL-0032).

[25] The Respondents state that interest on any compensation awarded to the Claimants should be limited to simple interest, at a risk-free rate (the yield of a six-month or one-year US Treasury bill).

through the valuation date, overstated the amount of expected cash flow, and used an incorrect discount rate (the correct rate is 20.84%, not 11.65%).

- They failed to account for the offsetting effect of advance payments for unbilled future work; the advance payments should be recognized at face value.

- They seek to include US ███████ based on addenda to three Project contracts, but the addenda were not endorsed by the Comptroller General and did not become a binding obligation.

    ii.    Response to Head 2 – Fair Market Value of Future Contracts

179.    In the event that liability is found, since the BIT and TPA require a fair market analysis of compensation for lost future contracts, the Tribunal must determine the price that an informed hypothetical willing buyer would pay an informed hypothetical willing seller of the investment as of the valuation date. The investment is Omega Panama. It is the only asset that would transfer to the buyer. The valuation date is December 23, 2014.

- The Claimants have not proffered a value for Omega Panama, which never won a contract on its own.

- There is no support provided for the proposition that intangible assets attributable to Omega US would also be available. There is no evidence that a buyer would want the continued involvement of Omega US. It is a false assumption that Omega US and Omega Panama had a parent-subsidiary relationship. Both companies are directly owned by Mr. Rivera.

- A bidding history is no guarantee of winning another bid. The only thing Omega Panama offered was the ability to bid – and anyone could register to do that. Moreover, from 2012-2014 Omega Panama submitted very few bids.

- No reasonable buyer would have paid anything of value for Omega Panama standing alone.

- Absent some contractual agreement between the hypothetical buyer and Omega US, neither Mr. Rivera nor Omega US would derive any financial benefit from

their assistance following a sale. If such an agreement were to be assumed, it would lower the value of Omega Panama. But this is all speculation.

- Leaving aside the false foundation – Omega Consortium is not the "investment" at issue in the arbitration – the Claimants' valuation is unreliable; they have inflated the size of the relevant market and the share that the Claimants could obtain. Public works spending was due to decline post-2014 in Panama.

- The correct fair market value figure is there ▮▮▮ .

### iii.    Response to Head 3 – Moral Damages

180.    The Treaties protect investments, not investors. The Claimants have no standing to seek moral damages sustained in their personal capacity.

- States will not be subjected to international liability for the legitimate exercise of their police powers. Panama had both the right and the duty to investigate Mr. Rivera and Omega Panama.

- There is a high bar for moral damages – 'exceptional circumstances' are required. No exceptional circumstances are present in this case; more extreme allegations have been raised in other cases and (even if taken as true) there was no award of moral damages.

- Omega US's alleged loss of business opportunities has not been tied to actions taken by Panama. Omega US struggled for years financially and operationally before entering the Panamanian market.

- The Claimants' evidence includes a witness statement (from Mr. Tony Burke) which shows that Mr. Rivera was not destroyed by actions of the Panamanian government. Mr. Rivera is employed and employable.

- Accordingly, Panama concludes that there is no basis to award any moral damages to the Claimants.

(5)      **The Claimants' Responses to Panama's Four Jurisdictional Objections**[26]

i.      Response to "Corruption precludes treaty relief"

181.    Panama has not carried its burden to prove illegality at the inception of the Claimants' investment by 'clear and convincing evidence'.

- Panama has never proved bribery.  Further, the US denied (Feb. 2016) Panama's request that the US arrest Mr. Rivera for the purpose of extradition so that he could stand trial in Panama for the crime of money laundering.  The US said there was insufficient factual support linking Mr. Rivera to the money laundering charge.

- The alleged bribery is linked to only one of eight contracts, which contracts are themselves only part of Claimants' broader, unitary investment.

- The La Chorrera contract was entered into years after the Claimants' investment was established.  Once the investment is made, breaches of domestic law are irrelevant at the international level. Panama itself dismissed the corruption investigation and nullified the money laundering investigation. The illegality defense is nullified by the lack of a domestic law conviction.

- Neither the BIT nor the TPA requires that investments accord with host state law as a precondition to arbitration.

- Panama's objection goes to the operation rather than the establishment of the investment; that is a merits issue, if it is an issue at all.  The question, at best, is not jurisdiction or admissibility, but proportionality or contributory fault. See *Hamester v. Ghana* (RL-0006); *Alvarez y Marin v. Panama* (CL-0146).

- Panama should be estopped from asserting its illegality objection, because its own officials found the evidence to be insufficient to support criminal charges against Mr. Rivera and Omega Panama.  *See, e.g.*, *Wena Hotels v. Egypt* (CL-0010).

ii.      Response to "Claimants have advanced commercial claims; they have not proved sovereign intent"

---

[26] *See* Cl. PHB, pages 91-97; Cl. Reply, pages 162-205; Cl. Rej. (in full).

182.  The actors implicated by the Claimants' claims are the President, several municipalities, many ministries, the Comptroller General and the Prosecutor's office. The government measures include administrative resolutions, national budget cuts, withholding of contractual endorsements, bidding bans, and bank account freezes, together with detention orders and Interpol notices.   This is not a commercial construction dispute.  There was a coordinated campaign against Claimants.

- However, a coordinated campaign is not required: collective acts on the part of Panama are an alternative theory to the Claimants' primary case of political retribution: various State arms "violated Claimants' international law rights through separate but mutually-reinforcing wrongs, each of them arbitrary and indefensible under international law" (Cl. PHB, para. 172).

- Whether the Tribunal finds a coordinated campaign, it will need to undertake a separate inquiry into whether Respondent's unlawful actions, individually or collectively, damaged the Claimants and their investments.  Individual actions in and of themselves did cause such damage and violated international law (Cl. PHB, fn 456).  The Claimants cite the approach taken in *Rompetrol v. Romania* (CL-0126). The question is whether the government was within its rights to do what it did under the particular commercial relationships.

- The project contracts are not 'investment agreements' as defined under the TPA (they are not, *e.g.*, natural resource agreements).

- The Comptroller General's office was President Varela's instrument in damaging the Claimants; President Varela threatened the Comptroller General and the Comptroller General stopped endorsing payments and change orders on virtually all Omega contracts. Other contractors were paid.

- The Omega Consortium did not abandon the Projects. The Consortium wanted to continue working almost a year after it had stopped receiving payments for the work it had performed.

- Whether Panama's use of its police powers was abusive is a merits question, not a jurisdictional question. As a jurisdictional matter, the key point is that the unlawful conduct of Respondent was undertaken by sovereign actors fulfilling sovereign roles.

61

iii.    Response to "the BIT claims must be resolved under the project contracts' dispute resolution provisions"

183.    Article VII(2) of the BIT is no bar to the Claimants' claims: if Panama operated outside its commercial rights, there is no "agreed" contractual dispute procedure that governs.

- In any event, the TPA, Article 10.16, applies to the entire investment and the entirety of the Claimants' claims; the TPA contains no Article VII restriction. The case can proceed entirely under the TPA; the BIT provision is therefore irrelevant. The dispute manifested itself years after the TPA entered into force.

- The Claimants do not seek to import the BIT umbrella clause into the TPA; rather, the Claimants seek to import an umbrella clause from one of Panama's numerous other treaties. Neither *Vivendi Annulment* nor *El Paso v. Argentina* assists Panama.

- The fundamental basis of Claimants' claims is the State's campaign of harassment. Under objection 1, corruption, Panama states that the contracts share a common core, but here Panama states they are stand-alone. The contracts are a unified investment but are only part of the Claimants' entire investment. A holistic view of the Claimants' business activities should be adopted.

iv.    Response to "there is no jurisdiction over claims relating to the criminal investigation of Mr. Rivera"

184.    Panama's criminal investigation specifically into officers and shareholders of the investor, which involved surveillance, detention, press releases, and travel bans, violated treaty obligations. Actions directed against the investor or its investments fall within the zone of protection of the BIT. In this case, Panama took actions against both Mr. Rivera and Omega Panama. The actions against Mr. Rivera alone damaged Claimants' investment through reputational harm. These are treaty breaches.

- This objection is premised on the assertion that Panama's authorities initiating the investigations could not have done so as part of an effort to destroy the Claimants' investment. But to accept this argument the Tribunal would effectively have to reject all claims relating to the criminal investigations on the merits. Whether the government pursued investigations to target Claimants and damage their investments is a substantive claim issue: requiring the Tribunal to dismiss those

allegations as a matter of jurisdiction based on an alleged lack of merit would be improper.

## C.    THE SIX CONSORTIUM PROJECTS[27] AND THE CORRUPTION INVESTIGATION

185.    To resolve this treaty dispute, the Tribunal must assess, for each of the six Projects, as defined below (MINSA Capsi comprises three construction contracts), whether the Claimants have shown that arbitrary or illegitimate State actions caused the termination or expiration of the Project contracts, or whether legitimate commercial actions taken by the State explain the Project contract failures, as asserted by the Respondent.[28]  The summaries of the Parties' respective positions in this Award's previous section demonstrate the centrality of this issue of commercial versus sovereign capacity, whether as a matter of jurisdiction and merits, for the four claim heads advanced by the Claimants – FET, indirect expropriation, umbrella clause, and FPS.[29]

186.    The Tribunal first examines the evidence presented by the Parties for each of the six Projects, in the following order:

(a) Ciudad De Las Artes ("CDLA"), led by the National Institute of Culture ("INAC") (the "CDLA Project");

---

[27] As defined above ("Table of Abbreviations/Defined Terms" and "Introduction and Parties," para. 6), the "Consortium" or the "Omega Consortium" comprises Omega Panama and Omega US.

[28] *See, e.g.*, Cl. PHB, para. 22: "Claimants' contracts were stifled and terminated either as a form of political retribution … or as mere arbitrary and obstructionist behavior"; Resp. PHB, para. 26: "where a contract is terminated according to its terms by a sovereign party acting in its commercial capacity *(i.e.,* as a counter-party to a construction contract), international liability for such termination may not attach."  The Claimants assert that the Respondent must prove that contract terminations were based solely on the Consortium's alleged contractual breaches; the Respondent assert that the "Claimants can prevail only if they can prove that political retaliation was the sole and proximate cause for termination" (Cl. PHB, para. 24; Resp. PHB, para. 25; *see also* Resp. PHB, para. 32).  As discussed further below, the Tribunal considers that its task is to assess whether the evidence weighs in favor of a legitimate, commercial explanation for the failure of each of the Consortium's Project contracts.

[29] See the discussion above of slide 69 accompanying the Claimants' opening statement, in which ten "key treaty breaches" are identified, with FET covering all ten, indirect expropriation 1-8, and umbrella clause 1-6.  The FPS claim covers 8-10, and is largely directed to the criminal investigation of Mr. Rivera.

    (b) MINSA Capsi, led by the Ministry of Health (the "MINSA Capsi Project" or "MINSA Project");

    (c) La Chorrera, led by the Judicial Authority (the "La Chorrera Project");

    (d) Municipal Palace of Colón, led by the Municipality of Colón (the "Municipal Palace Project");

    (e) Mercado Público de Colón, led by Ministry of the Presidency (the "Cold Chain Market Project" and together with the Municipal Palace Project, the "Colón Projects"); and

    (f) Pacora and Juan Díaz Markets, led by the Municipality of Panama (the "Markets Project").

187.    The Tribunal examines the Projects individually as the necessary basis for examining the Claimants' claims of State misconduct. Each side adduced evidence in presenting separate, individual narratives for the six Projects. The Parties also presented competing narratives to connect all six Consortium Projects. Each side contends that an individual Project should be understood in view of the connecting narrative (even though each side also avers that its connecting narrative does not have to be proved).[30]

188.    The Claimants argue that the Consortium's Projects did not experience any significant problems during the Martinelli Administration. That changed dramatically and suddenly when President Varela came to power. President Varela's intent was to use

---

[30] *See, e.g.*, Cl. PHB, footnote 456: "Whether the Tribunal finds a coordinated campaign, it will, of course, need to undertake a separate inquiry into whether Respondent's unlawful actions (individually or collectively) caused damage to Claimants and their investment. The record is full of individual actions that, in and of themselves, did cause such damage to Claimants and their investment and violated international law." *See* Resp. PHB, paras. 145-146: a combination of "factors left Claimants financially troubled and unable to execute eight projects simultaneously in Panama." The Respondent states that it will not repeat the connecting narrative but instead will focus on how the individual Project facts were affected by witness testimony at the hearing.

the Office of the Presidency to ruin Mr. Rivera and the Omega Consortium. Immediately upon taking Office in July 2014, he implemented an integrated plan to attack all Consortium Projects simultaneously. He thereby ensured that an individual Project, which might otherwise have survived a cash-flow interruption by obtaining funds from elsewhere in the Consortium network, could not survive because all Consortium Projects were being starved of money at the same time. Consequently, the Projects fell together. The Claimants stated that although their case does depend on proving a motive of political retribution, it was the "single common thread" that ran through the "different arms of the Panamanian State" (Cl. PHB, para. 52).

189. Panama contends, on the other hand, that Mr. Rivera implanted his failing Puerto Rican business approach into the Consortium's Panama organization. The Consortium lacked the financial strength and managerial competence of its competitors. Routine governmental delays in progress payments, reasonably extended in view of project reviews or "audits" that any incoming Administration would normally undertake, should not have had dire effects on the Consortium. However, the Consortium did not have the financial means and personnel to successfully navigate across six Projects and eight Project contracts (Resp. PHB, paras. 109, 145-146). Consequently, the Consortium failed to perform Project works with any diligence in summer/autumn 2014; it abandoned the Projects and/or the relevant State entity terminated its Project contract either by the end of 2014 or 2015. The alleged animosity of President Varela towards Mr. Rivera did not cause the Consortium's Project failures.

190. The Parties' competing general narratives guided their presentation of witness evidence and cross-examination of witnesses as they set out their respective individual Project narratives.

191. The Claimants focused on the CDLA and MINSA Capsi Projects in the Hearing and in their memorials; describing these two Projects as the largest of the six at issue and the lynchpin of the Varela Administration's plan to harm the Claimants. The La Chorrera Project also received much attention from the Parties, though that was

primarily due to the Respondent's separate allegation that the Claimants participated in a scheme to bribe Justice Moncada Luna to obtain the La Chorrera Project contract.

192.   The Tribunal notes that while Mr. Rivera's evidence was central to developing the Claimants' general, connecting narrative, his extensive witness statements and cross-examination (three witness statements; cross-examination on Day 2, First Week Hearing) were not principally directed to the details of the Consortium's individual Project activities, apart from its bidding on the Project contracts. As discussed below, the Claimants relied almost entirely on Mr. Frankie López ("Mr. López") for giving evidence on the Varela Administration's alleged mistreatment of the Claimants in the performance of the six Projects.  The evidence of Mr. Rivera (and Mr. López) is important to an assessment of the reasonableness of Panama's exercise of its police powers in pursuing a criminal investigation on the basis of the Tonosí Land Deal. The Tribunal considers this issue in a separate subsection. There is no question that Panama was, in this investigative context, acting in a sovereign capacity; the question for the Tribunal is whether there was a legitimate basis for it to undertake investigations.[31]

**(1)     The Six Projects**

i.     The CDLA Project

193.   The CDLA contract amount was the highest of the eight Project contracts. As amended, the contract amount totalled US $54.5 million. The Claimants presented their CDLA case principally through the witness statements (1st and 2nd) of Mr. López and the witness statement of Ms. María Eugenia Herrera, and information contained in the First McKinnon Report. The Claimants also conducted cross-examinations of Ms. Yadisel Buendía ("Ms. Buendía") and Mr. Iván Zarak ("Mr. Zarak").  Panama, in contesting the Claimants' position, relied heavily on the witness statements of Ms. Buendía and Mr. Zarak, and, to a very limited extent, on the witness statements of Dr. James Edward Bernard Véliz ("Dr. Bernard") and Ms. Carmen Chen ("Ms.

---

[31] The Tribunal explains more fully below why this is the only question for its consideration regarding the criminal investigations issue.

Chen"), neither of whom the Claimants called for cross-examination.[32] The Respondent also conducted a lengthy cross-examination of Mr. López.

### a.   The Claimants' Position

194.   Mr. López directed operations for the Omega Consortium. He had oversight, for Mr. Rivera, of all the Consortium's Projects,[33] including the six identified above. For the CDLA Project, Mr. López says that he was kept well-informed of developments by Mr. Luis Pacheco, the Consortium employee who was responsible for day-to-day operations on the CDLA Project. Ms. Herrera was the INAC General Director from July 2009 to July 2014. The witness statements of Mr. López and Ms. Herrera described the Claimants' role in the CDLA Project as follows:

(i)   The Project's origins were during the Administration of President Martín Torrijos, who was succeeded by President Ricardo Martinelli (who in turn was succeeded by President Juan Carlos Varela). INAC designed the CDLA to be a center comprising schools of dance, plastic arts, music, and other artistic disciplines.

(ii)   INAC eventually published a tender for the turnkey construction of CDLA in early 2012 (during the Martinelli Administration). The Consortium won the bid and signed the Project contract in July 2012.[34] The Comptroller General endorsed it in September 2012, and issued the first Order to Proceed. However, a nine-month delay then ensued, due to INAC's inexperience in leading large-scale construction projects and its difficulty in implementing the Partial Payment Accounts ("CPPs") system.

(iii)   Once the CPPs system was implemented (after the second Order to Proceed, in April 2013), the Consortium's work proceeded smoothly until July 2014. Ms.

---

[32] Dr. Bernard has been the Legal Director in the Office of the Comptroller General of Panama from 2017 onwards. His statement explains how the Comptroller General oversees commercial contracts entered into by governmental entities. Dr. Bernard asserts that the Consortium's Projects were treated "exactly like other public works project" in Panama (Bernard, para. 19). However, Dr. Bernard was not in the Comptroller General's office during the relevant time frame in this case. Ms. Chen was a legal advisor to INAC during the relevant time frame, and provides some basic factual background. However, her witness statement does not provide significant assistance for either side on the question of the cause of the Consortium's termination from the CDLA Project. She simply affirms (Chen, para. 14) that she never received any instructions to harm the Consortium in any way, and she is not aware of anyone at INAC having received such instructions. Ms. Chen also briefly discusses (paras. 13-20) the legal foundation of the CDLA Termination Resolution; see section (c.2), below.

[33] The Consortium won the bids to be the main contractor in all the Projects.

[34] The Consortium retained Arco y Asociados, S.A. ("Arco"), as its main construction subcontractor.

Herrera had approved CPPs 1 through 12, which were also endorsed by the Comptroller General (such endorsement being a prerequisite for actual progress payments to the Consortium, as the main contractor).

(iv)    Neither INAC nor Sosa Arquitectos Urbanistas Consultores, S.A. ("Sosa," the external inspector on the Project, appointed by INAC) had criticized the Consortium's performance before President Varela came to power in July 2014. However, INAC and Sosa's relationship with the Consortium declined dramatically almost immediately upon the entry of the new Administration. Ms. Mariana Nuñez replaced Ms. Herrera as INAC's general director, and Ms. Nuñez strove to hinder the progress of the Consortium's fulfillment of the Project. In particular, INAC began to withhold the approval of the CPPs, including for work that the Consortium had actually completed prior to July 1, 2014 (and for which the Consortium had submitted payment applications, but there had not been sufficient time to obtain endorsements before President Varela took office).

(v)    Mr. López observes that the inspector that Sosa assigned to CDLA, Ms. Buendía, said in her witness statement that beginning in August 2014 the Consortium's performance declined due to a relationship problem with its main subcontractor, Arco. However, there was no relationship problem. Rather, Arco informed the Consortium in the middle of 2014 that it did not wish to continue working on the Project, because "it apparently had heard that the project was going to be attacked by the Government and that problems were going to arise" (López 2nd, para. 36). The Consortium's efforts to keep Arco on the Project were unavailing, and a time-consuming transition process ensued. This entailed replacing Arco personnel with Consortium personnel. By September 2014, the Consortium had 64 of its own employees working on the Project.

(vi)    The main problem that the Consortium faced was INAC's failure to approve CPPs 13 to 20, so that the Consortium could be paid. Consequently, the Consortium and its subcontractors experienced severe cash-flow problems. The advance payment that the Consortium had received was insufficient to fund the Consortium in circumstances where, from the middle of 2014, all the Consortium's contracts with Panamanian agencies were experiencing payment approval delays, cost increases, and/or time extensions. Moreover, the delay in the commencement of the Project (noted above) meant that the Consortium had to spend money even before obtaining financing from Credit Suisse, which lessened the funding benefit from the advance payment monies.

(vii)    A simultaneous complete cessation of cash flow on all Projects raised a huge obstacle to contract completions. A temporary cash suspension that did not affect

all Project contracts could have been managed, but a coordinated campaign of harassment (López 2nd, para. 37) could never have been anticipated. Cash was withheld from the Consortium while INAC made changes to the CDLA work scope that involved an increase in cost and time. The Consortium submitted requests for extension of time and increased costs starting in mid-July 2014. After months of silence, INAC declined to act on the time extension requests and only accepted certain minimal cost increases.

(viii)   Sosa started aggressively logging so-called non-compliance issues and made recommendations to INAC (*e.g.*, to deny time extension requests) based on faulty assertions of contract breaches by the Consortium – while Sosa nonetheless acknowledged that the Consortium needed to be paid if it was to have any liquidity (C-0593, Sosa to the Consortium, Sept. 25, 2014). Sosa also stopped attending important Project meetings with INAC, though it tripled its staff numbers in meetings with the Consortium.

(ix)    In view of the pressure from Sosa, the Consortium prepared a "recovery plan" to remedy delays, but without attributing responsibilities for delays (September 2014). However, the Consortium never received a response from Sosa, which, with the commencement of President Varela's term in Office, had no interest in cooperating with the Consortium. The Varela Administration had created a list of so-called "high-risk" projects for re-evaluation, and CDLA was on that list. The Government apparently wanted to change the Project's scope, but while it was considering the way forward it also determined not to approve any payment applications.

(x)     In September 2014, INAC already knew that it would not have a 2015 budget allocation to cover its CDLA obligations, but it did not inform the Consortium about this until January 2015 (López 1st, para. 125). However, in October 2014, the La Prensa newspaper reported that only US $10 million would be committed to CDLA, though the Project cost exceeded US $54 million.

(xi)    In late October 2014, INAC informed the Consortium that it was evaluating the legality of the CPPs that it had issued. Without a payment commitment from the Project's owners, the Consortium could not hire personnel or conduct work and incur new expenses. Further, the CDLA contract was due to expire in January 2015, and INAC had given no indication of willingness to sign a change order to extend time. This meant that payments for work generated by the recovery plan were going to be stopped.

(xii)   If, as Panama alleges, INAC conducted an informal review of the CDLA Project

69

in the middle of 2014 on the basis of which INAC decided to withhold payments to the Consortium, this demonstrates INAC's "extreme level of arbitrariness" (López 2nd, para. 42). Mr. López says that neither he nor the Consortium was ever informed about this alleged review. Moreover, if, as Panama alleges, an audit was conducted at the end of 2014, the Consortium was never informed about it.

(xiii)   INAC's failure to make payments caused physical work stoppages in November 2014. This did not, however, constitute Project abandonment by the Consortium. Key personnel as well as security personnel remained on the Project site until mid-2015.

(xiv)   By December 3, 2014, INAC had decided to terminate the Project contracts, based on the false allegation that the Consortium had not complied with its obligations.

(xv)   At a meeting in January 2015, the Office of the President was represented by a man named Mr. Rogelio Saltarín. Mr. López says that he later learned that Mr. Saltarín oversaw all matters related to INAC. Thus, in addition to INAC and the Comptroller General's Office, the Office of the President also sought to impede the progress of the CDLA Project and all other Consortium Projects.

(xvi)   On January 27, 2015, INAC posted a notice of termination on the Consortium's office door. INAC's decision to terminate the Contract came as a surprise to the Consortium, which in December 2014 had rebutted Sosa's previous accusations and in January 2015 had made it clear that it wished to move forward with the Project. On February 3, 2015, the Consortium sought reconsideration of the termination notice. However, this was futile as the Consortium's lawyer, Ms. Ana Graciela Medina, informed Mr. López that the Consortium was considered "a *persona non grata* to President Varela" (López 1st, para. 132).

### b.   *Panama's Position*

195.   Ms. Buendía's and Mr. Zarak's witness statements, in summary, made the following points.

(i)   Ms. Buendía was the Sosa Project Supervisor from November 2013, when Sosa began acting as INAC's Project Inspector, until December 2014, after the Consortium abandoned the Project.

(ii)   She inspected the Project on a daily basis and was in regular contact with Mr. Luis Pacheco. Sosa found serious deficiencies in the Consortium's Project performance

in early August 2014. There was a sharp decline in productivity and in work force numbers. Moreover, the Consortium had had a falling out with Arco, its main subcontractor, which led to the Consortium dismissing Arco in July 2014. The Consortium never explained why its relationship with Arco deteriorated. Urgent work remediation was needed, and this was not a mere matter of remedying ordinary construction site issues.

(iii)   Sosa worked with the Consortium to devise a recovery plan in early September 2014. However, the Consortium did not meet its commitments under the plan. Productivity and work force numbers kept declining and, by November 21, 2014, construction work had almost completely stopped; there were only administrative and security personnel on site.

(iv)   Sosa's responsibilities as Inspector included identifying contract breaches by the Omega Consortium, and it did so. Ms. Buendía states that, until this arbitration, she had never heard the accusation that Sosa was directed by INAC officials (who were appointed by President Varela) to prepare a case to justify INAC's decision to terminate the contract, and the accusation is false. Sosa was never directed to lie or fabricate and would have refused to accede to such a request. Sosa's financial self-interest was contrary to acceding to any such request or direction from INAC, as Sosa's own contract with INAC would have been obstructed. Sosa identified the Consortium's contract breaches because the Consortium was, in fact, in breach, and Sosa's obligations included reporting such breaches.

(v)   Ms. Buendía observes that Mr. Rivera claims that Mr. Tomás Sosa, Sosa company's Director, stated that there was no basis for INAC's termination of the contract for default by the Consortium. However, Mr. Tomás Sosa was not even copied on emails that Mr. Rivera relies on for his evidence. Moreover, regardless of what Mr. Tomás Sosa did or did not say, Ms. Buendía was the person involved in day-to-day Project management, and she affirms that the Consortium was in default and its contract was validly terminated.

(vi)   Mr. López's charge that Sosa stopped attending Project meetings once President Varela took office is false. Ms. Buendía continued to attend meetings after the change of Administration.

(vii)   When Ms. Nuñez became the new INAC Director in mid-2014, INAC began to review the entire Project, including Sosa's performance. This type of review is typical when there is a change in government. INAC then began to withhold approval of payment applications submitted by both the Consortium and Sosa. Again, there was nothing unusual in this. One of INAC's concerns was the very

71

large advance payment that the Consortium had received through an addendum to its contract. INAC's review concluded that the Project's progress did not reflect the large advance payment sum.

(viii)    Ms. Buendía acknowledged that, on a number of occasions, Sosa informed INAC that the Consortium's cash flow was adversely affected by the withholding of payment approvals, and the withholding should cease. Still, a temporary disruption in cash flow should have been manageable because of the large advance payment. The Consortium was significantly over-funded. Sosa kept working on the Project at a normal pace, and the Consortium should have done so as well. Ms. Nuñez told Ms. Buendía on many occasions that she wanted to see the Project through to completion.

(ix)    Ms. Buendía concluded that the Consortium's Project obstacles were not extraordinary, especially during governmental transition periods.

(x)    Mr. Zarak served as Vice-Minister of Economy in the Ministry of Economy and Finance ("MEF") from July 1, 2014, to December 31, 2017. His witness statement focuses on the budgetary process for construction projects in which the contractor provides financing (for the CDLA Project, the Consortium provided financing from Credit Suisse). He notes that in these instances, the MEF usually recommends that money be allocated to cover payments due for CPPs that have been endorsed by the Comptroller General and have a payment date falling within the relevant budgetary year. Since the State's budget is a projection made in July or August of governmental expenditures for the following year, and actual expenditures vary substantially from the projection, managing the budget requires continuing adjustment as the year progresses.

(xi)    With reference to the CDLA budget for 2015, which the Claimants contend was reduced at the direction of President Varela with the intent to harm the Consortium and sabotage the Project, Mr. Zarak made the following points:

- He never saw any evidence of hostility by the government, including President Varela, towards the Claimants or the Consortium or their Projects;

- The budget recommendation being lower than that requested by INAC did not mean that MEF sought to harm the Consortium;

- When MEF presented its budget recommendation to the National Assembly, MEF was aware that the CDLA Project was significantly behind

schedule and there were concerns about the Consortium's performance. MEF therefore considered CDLA to be a high-risk project;

- Accordingly, MEF estimated US $10 million as the projected CDLA budget for 2015. If additional funds were needed, the government would have used a budget line transfer (or possibly a general budget direct allocation). For the CPPs due to be paid on March 31, 2015, MEF cooperated with INAC to ensure the procurement of sufficient funds, as CPPs have the highest order of precedence out of the State's expenditures.

### c. *The Tribunal's Analysis of the CDLA Project Evidence*

1. The Tribunal's Decision on Disputed Facts

196. Mr. López (Omega Consortium), Ms. Buendía (Sosa) and Mr. Zarak (MEF) were cross-examined at the Hearing. For understanding what actually occurred during the CDLA Project, the Tribunal found Ms. Buendía to be a reliable guide: well-informed, competent in her field, direct and objective in answering questions. Indeed, she was the only reliable guide to the termination of the Consortium's CDLA Project contract. Her hearing testimony was very damaging to the Claimants' position, as she effectively described commercial reasons, rather than illegitimate or arbitrary conduct by INAC (or any State entity or official), as the cause of the Consortium's CDLA termination. Mr. López did not have direct Project experience, and while he says that he was kept regularly informed by Mr. Pacheco, we have no witness evidence from Mr. Pacheco and no Project reports from Mr. Pacheco. Mr. Zarak's recollection was insufficiently precise to assist Panama substantively. While the cross-examination of Mr. Zarak was meticulous and probing, it did not reveal him to be an unduly partisan or unreliable. Above all, the cross-examination of Mr. Zarak did not diminish the force and materiality of Ms. Buendía's Project account. The Tribunal briefly describes the hearing testimony of each of these three fact witnesses, and in doing so conveys its view of how disputed facts on material matters should be resolved.

197. Mr. López, as a longtime Omega US employee (2000-2016) as well as Omega Panama's Vice-President of Operations and resident in Panama from 2011-2015, was cross-examined at length on the State's theory in relation to the Six Projects, including

73

CDLA.[35]  In the CDLA segment of the cross-examination, Mr. López, was asked about R-44, a September 2, 2014, letter from Ms. Buendía to Mr. Pacheco, in which Ms. Buendía stated that Sosa was again asking when construction work will resume its necessary pace, as only 38 workers were on site. Ms. Buendía's concerns, Mr. López agreed, dated back to July 31, 2014; he discussed the termination of Arco, and repeated his witness statement evidence that Arco told the Consortium it did not wish to proceed because it had information that the new Administration was going to "persecute" the Project. Mr. López conceded that there was no documentary evidence reflecting this, but he said it was communicated by the Arco owner. He also testified that since Arco did not want to stay, it was mutually accepted that the Arco contract should be terminated. Mr. López resisted the proposition that the Arco termination created a staffing gap.

198.   Ms. Buendía appeared for examination on Day 4 of the First Week Hearing.[36] She was questioned on the August 2014 correspondence in which she corresponded with Ms. Nuñez about a significant reduction in the Project's workforce. She demonstrated[37] technical construction expertise while explaining the significance of Arco's complete departure from the Project by July 31, 2014 ("lethargy set in," Tr. Day 4 [764]). Ms. Buendía reiterated her witness statement evidence that Sosa asked why Arco was leaving, but never received a response.[38]

199.   Ms. Buendía was challenged on a Consortium payroll document showing a workforce number in September 2014 higher than that she had reported and testified to, but she was persuasive in describing her personal recollection of the reduced workforce and the contractual significance – the need to notify the bonding company – of the contractor's non-compliance with its obligations. Ms. Buendía was also very persuasive in resisting the proposition that Ms. Nuñez's delay in approving the Consortium's change order requests, based on scope changes initiated during Ms.

---

[35] Tr. Day 2 [293-307].
[36] Tr. Day 4 [749-822].
[37] Tr. Day 4 [762-763].
[38] Tr. Day 4 [764].

Herrera's directorship, prevented the Consortium from working: "That's not true. They would work – well, Ciudad de las Artes is a very large project, that there were many other things they could work on. I do recognize that it was necessary to provide an answer to those issues so that the Project could proceed in a more smooth manner, 100 percent" (Tr. Day 4 [777-778]).

200. Ms. Buendía was taken at several points during her cross-examination to the Consortium's September 5, 2014, recovery plan letter (R-45), in which the Consortium commented, *inter alia*, that it was owed US ███████. She was also shown a September 25, 2014, letter (C-0593), in which Sosa stated that INAC's delay in approving CPPs 13-15 was seriously affecting the Consortium's cash-flow. Further in the chronology, she was shown C-0524, an extract from the October 2014 monthly progress report, where Sosa comments on INAC's delays in blueprint and CPPs approvals. Ms. Buendía's explanation was, again, convincing, and was based on what she said she had repeatedly told Mr. Pacheco in her weekly meetings with him (Tr. Day 4 [786-790]):

   i.    It was usual for the State to take a long time to approve these items. Moreover, this type of delay was "very, very common" when there was a change in Administration.

   ii.   It was important to remind INAC of the pending items, as that was part of Sosa's job as well.

   iii.  But it was very important for the contractor to continue working, particularly when it had received a large advance payment and therefore was over-funded.

   iv.   At the same time that Sosa was pushing INAC, Sosa was also reminding the Consortium that it should not diminish the pace of the work.

   v.    Sosa was in the same financial situation as the Consortium; it had not been paid since April 2014, and it was only paid at the end of 2015. The State may be late, but it always pays.

   vi.   The Consortium's contract did not permit it to stop work or slow the pace of the work because of delays by INAC.

vii.   While the Consortium sought an extension of time, it never submitted its operational expenses to INAC (Tr. Day 4 [818-819]).

201.   Ms. Buendía was also questioned (including by the Tribunal) about the Project review that INAC undertook once President Varela came to power (Tr. Day 4 [806-815]; Ms. Buendía called it a "coming up to date"). She observed that CDLA was a design-and-build project, fast-track, with design and build being performed in tandem. Such a review was common with a new Administration, as are delays in payment approvals following the "coming up to date". Ms. Buendía commented that the advance payment to the Consortium was twenty percent of the contract amount, which was far greater than the payment requests awaiting approvals (US ███████ versus US █████████): "there was always going to be a balance in favor of the Contractor because it's only in the last billing that the advance finally is totally amortized. The important thing is that the Contractor go forward with the construction work so that the percentage can be discounted of the advance payment" (Tr. Day 4 [814-815]).

202.   Examination of Mr. Zarak occurred on Day 6 of the Second Week Hearing (Tr. Day 6 [1149-1307]). On cross-examination, Mr. Zarak accepted that INAC requested US ███████ for fiscal year 2015 for CDLA, which was the total contract amount for the Omega Consortium, but MEF estimated US ████████ as the projected CDLA budget in 2015, and US ████████ was the amount approved by the Assembly (US █████ million for Sosa and US ██████ for the Consortium). The Claimants sought to demonstrate that the amount budgeted for Sosa was in fact the full amount owed to Sosa under its contract with INAC, whereas the amount budgeted for the Consortium fell far short of what it could be expected to be owed in 2015. The Claimants' underlying point was that the budget for the Consortium was so low that INAC would not have been in a position to approve CPPs 13 and following in 2014, particularly in view of the payments (to Credit Suisse) still needed for CPPs 1-12.

203.   Mr. Zarak's resistance on this point was that MEF was concerned about budgeting for the CPPs already endorsed by the Comptroller General as opposed to the total amount that would only be a function of Project completion (Tr. Day 6 [1198]). Mr. Zarak

added (Tr. Day 6 [1199]): "So, if we know the Project is behind schedule and won't end in its original due date, then, yes, an amendment has to be made or the contract has to be terminated, or some sort of arrangement has to be reached". However, it was put to him that the first 12 CPPs – already endorsed by the Comptroller General – totaled approximately US $18 million,[39] whereas the budgeted US $10 million was not enough to pay the CPPs. Mr. Zarak acknowledged this but stated that MEF knew in 2014 that in 2015 it would need to "move money around, so that we had enough funds to pay the CPPs" (Tr. Day 6 [1217]).[40]

204.    On redirect examination (Tr. Day 6 [1303-1304]), Mr. Zarak was referred to a newspaper article, C-0231, September 10, 2014, which had initially been raised in his cross-examination. The article referred to six high-risk projects in the public works sector. Mr. Zarak was asked whether he knew which of the six were Omega Consortium contracts. He commented that he only remembered CDLA. However, it is apparent that CDLA was the only Consortium Project in the high-risk list (the other five were the Amador Convention Center, the Los Santos Tonosí Irrigation Project, the Manuel Amador Guerrero Hospital in Colón, and the Sport Cities of Colón and David in Chiriquí). The "high-risk" evidence, then, does little, if anything, to support the theory of a Varela Administration concerted plan to bring down the Omega Consortium Projects.

---

[39] As this was a contractor-financed project contract, and the financing body was Credit Suisse, when the Consortium had obtained a CPP endorsed by the Comptroller General, it would take it to Credit Suisse and ask for payment (minus the financing fee). Once the contract was completed (i.e., delivered within six months of its due date, March 31, 2015), the Panamanian Government was responsible for paying all of the CPPs to Credit Suisse (Tr. Day 6 [1190-1191]). As noted above, Panama considers an endorsed CPP to be an irrevocable obligation of the State, so Credit Suisse was going to be paid regardless of the termination of the contract. Mr. Zarak testified (Tr. Day 6 [1224-1225]) that Credit Suisse was in fact paid the US $18 million that was due in March 2015.

[40] The Claimants also presented an expert report from Professor Orlando J. Pérez, who was not called for cross-examination. Professor Pérez opined, inter alia, that President Varela was able to impose budget decisions on MEF. The Tribunal did not find the Professor Pérez's Report to be helpful in the Tribunal's assessment of the evidence.

2.   The Legal Basis of INAC's Termination Resolution

205.   The Parties debated, mostly in submissions,[41] whether INAC properly terminated the Consortium's contract, and whether such termination was also punitive (and intended to destroy the Claimants) by immediately precluding the Consortium from participating in any other bids for a three-year period.

206.   The Claimants' points are as follows:

- INAC failed to comply with pre-termination due process requirements (giving the Consortium a remedy period) pursuant to Law No. 22 (C-0280);

- INAC failed to give the Consortium proper notice and time (a five-day window) to prepare and submit an appeal;

- By terminating, INAC failed to comply with the requirements of "logical reasonableness" and "good faith," in view of its own contractual breaches; and

- INAC's administrative termination suspended the Consortium's right to bid on any new Government contracts for three years: this was clearly a sovereign act to undermine the viability of Omega Panama, in keeping with the Varela Administration's secret plan to destroy Mr. Rivera and his companies.

207.   The Respondent's points are as follows:

(i)    INAC terminated the CDLA contract by Resolution No. 391-14/DG-DAJ dated December 23, 2014 (C-0044) ("Termination Resolution"). The termination was based on the Consortium's default and abandonment of the contract and Project;

(ii)   Pursuant to Law 38 (R-0053) and general administrative procedure under Panamanian law, INAC was to notify the termination by edict. INAC, however, sought to effect hand-delivery (on January 23 and January 26, 2015), but the Consortium's personnel were not available. INAC therefore posted the edict on the front door of Omega Panama's office on January 27, 2015;

(iii)  The Claimants have acknowledged that they were aware of the Termination Resolution as early as December 29, 2014. They therefore suffered no prejudice

---

[41] Cl. Mem. paras. 79-80; Cl. Rej. paras. 204-234; Resp. C-Mem. paras. 107-113; Resp. Rej. paras. 345-366; *see also* Ms. Chen's witness statement, as noted above.

from the manner of the formal notification of the Termination Resolution. Moreover, the Claimants did not challenge the Termination Resolution under Panamanian law; instead, they later requested a certification of due execution of the Termination Resolution and filed (March 26, 2015) an application for administrative review under the general administrative procedure in Law 38. INAC subsequently denied the application;

(iv)   Law 38, not Law 22, was the applicable provision, but the State also met the Law 22 procedural requirements. For example, the Consortium had been on notice since August 21, 2014, that it needed to correct its productivity and workforce problems, but the Consortium did not do so. The Consortium had much more than five days to submit a response;

(v)   INAC's actions also complied with the principles of good faith and logical reasonableness, as demonstrated by the evidence of Ms. Buendía, Ms. Chen, and Mr. Zarak.

208.   While the Tribunal does not take a view on whether Law 22 or Law 38 was the appropriate governing provision for the Termination Resolution, it notes the significance, under either Law, of (a) Ms. Buendía's evidence that construction work had almost completely stopped by November 21, 2014 (with only administrative and security personnel on site); and (b) the Consortium's apparent reliance on Law 38 to apply, on March 26, 2015, for administrative review of the termination. In these circumstances, the Tribunal finds that the Claimants' procedural due process complaint cannot be accepted. As for the bidding suspension on new contracts, it would appear either to be justified or unjustified based on whether the termination of the Consortium's CDLA contract was justified or unjustified. That is, if the Consortium had effectively abandoned a major Project for INAC and termination was warranted as a commercial matter, it would be reasonable for INAC to ensure that the Consortium would not bid for and win new contracts, given its inability to complete a current, very substantial project.

### 3.   The Cause of the Consortium's CDLA Termination

209.   An evaluation of the CDLA evidence does not support the Claimants' case. Rather, the evidence weighs in favor of the commercial cause, particularly as described in the

written and oral testimony of Ms. Buendía as the reason for the Consortium's failed CDLA Project contract.

210. The Tribunal reaches this conclusion taking all evidence and testimony into account, and identifies the key points as follows.

(i)   In view of the 20% advance payment (approximately US ▮▮▮▮▮▮) and payment of another approximately US ▮▮▮▮▮▮ for CPPs 2-11 (together amounting to more than one-third of the total contract price), the Consortium was not in a cash-starved position in August 2014, especially in circumstances of slow Project progress, which showed no signs of increasing pace.

(ii)  There was nothing extraordinary about the new Administration undertaking a review of the Project in July/August 2014 and nothing nefarious in its designating CDLA to be one of six "high-risk" projects in September 2014. Mr. Zarak's evidence on 2015 budgeting did not manifest a plot, much less a bias, against the Consortium.

(iii) Arco's departure from the Project at the end of July 2014 was clearly a huge blow to the Consortium's fulfilment of its contractual obligations. The lack of an explanation to Ms. Buendía for Arco's departure in no way supports the Claimants' Varela-conspiracy theory. The Tribunal is not persuaded by Mr. López's recollection of this issue, which lacks necessary details and has no documentary support.

(iv)  In their opening statement in the First Week Hearing (Tr. Day 1 [29-33]), the Claimants commented that CDLA was the Consortium's largest project, representing nearly a third of the value of the contracts that the Claimants won. In view of the importance of CDLA to the Consortium's portfolio of Projects, it is remarkable that neither Mr. Rivera nor Mr. López personally sought to appear on site in August 2014 onwards and to direct additional, significant resources to the Consortium's operations as well as lead any discussions with INAC. The so-called "recovery plan" of September 5, 2014, should not have been dependent upon INAC's payment or change order approvals. The Consortium sought an extension of time but never even submitted the necessary operational expenses to support its change order requests.

(v)   The Tribunal considers Ms. Buendía's evidence to be both reliable and significant: payment delays, especially after any change in Presidential Administrations, were routine, and the Consortium was reasonably expected by INAC, as well as

contractually obliged, to carry on – at pace – with the works. The Consortium failed to do so. Mr. Rivera himself acknowledged (Rivera 2nd, para. 27) that "[i]n a change of administration, we were indeed told that all of the Projects were returned to the agencies by the Comptroller General's Office for review," though he immediately added in the same sentence, "but we were certainly not told that a formal audit of all the Omega Consortium's Contracts would ensue." A "formal audit," however, was not Ms. Buendía's evidence, and the distinction that Mr. Rivera sought to draw between a "formal audit" and a "review" does not assist the Claimants in any event; the relevant point is that the Consortium, like all Panamanian contractors, knew not only that payment delays were routine, but also that a change in Administrations would entail a review of Project contracts, which would inevitably mean further payment delays.  All contractors had to plan for such extended delays in the State's public works program.

(vi)     Mr. Rivera nonetheless went on to assert (Rivera 2nd, para. 27) that in his experience, no contractor would expect such lengthy delays to happen or that such delays were reasonable or to expect to finance such delays and keep working on those Projects in the interim. However, Mr. Rivera's asserted experience regarding extended cash-flow interruptions does not weigh heavily in the context of: (a) the routine review following the change in Administrations; (b) INAC's large advance payment, increased as requested by the Consortium, which substantially exceeded the amounts of unpaid CPPs in September/October 2014; (c) a Project that was already well behind schedule; and (d) the contractor's dismissal of the main subcontractor for reasons that the contractor repeatedly refused to divulge.  In this context, where a contractor refused to progress works with a reasonably sized work force, the Comptroller General and INAC responded in a rational commercial manner.

(vii)    The Claimants have not demonstrated that the lack of serious problems in the CDLA Project prior to July 1, 2014, and the existence of serious problems beginning in July 2014, is therefore due to arbitrary or illegitimate acts or omissions of the Varela Administration.

(viii)   The Tribunal finds the evidence of Ms. Buendía and Mr. Zarak persuasive on the lack of any instructions to harm or any indication that the Varela Administration intended to harm the Omega Consortium or to provoke the failure of its CDLA Project contract. There is also no basis to dismiss the evidence of Dr. Bernard and Ms. Chen, witnesses whom the Claimants chose not to test on cross-examination, that the CDLA Project was not singled out for harm by the Varela Administration

and there was not any direction or instruction to disrupt the Omega Consortium's Project contracts.

(ix)    The Claimants alleged in their opening statement at the hearing that CDLA was emblematic of the egregious treatment suffered by all Consortium Projects from every contracting agency once President Varela came to power. Thus, direct evidence of an intent to harm was not needed; the Claimants said that this type of sweeping attack could only be the result of a targeted sovereign campaign of harassment and destruction. There were no CDLA problems before President Varela, so what could have changed so quickly in mid-2014? Why did MEF slash the budget if it wanted quicker Project progress? The Tribunal considers the answer to the first question to be the unexplained (or unpersuasively explained) departure of Arco, combined with the large advance payment retained by the Consortium while reducing its workforce and construction activities. The answer to the second question is the State's understandable unwillingness to commit more budgeted funds, at least initially, to an already well-funded Project contractor[42] that was not proceeding with construction works that it could have and should have proceeded with.

(x)    Whatever ill-will President Varela may have harbored against Mr. Rivera for Mr. Rivera's alleged failure to contribute to his campaign for the presidency,[43] there is no persuasive evidence that President Varela directed MEF and/or INAC to deny CDLA Project funds to the Consortium. Moreover, there is no persuasive evidence that points to a targeted sovereign campaign of harassment and destruction as the cause of the termination of the Consortium's CDLA contract. There is, on the other hand, compelling evidence of a reasoned commercial basis for the termination of the Project contract by its terms. Given the absence of individual acts by INAC or Sosa or MEF representatives designed to damage the Consortium, the Claimants carry a heavy burden to demonstrate that the State executed a concerted plan to damage all Consortium Projects simultaneously, so that cash-flow interruptions in the CDLA Project could not, as a practical matter, be remedied, since the Consortium was facing shortages in all its Projects. The Claimants have not carried that burden, and the Tribunal concludes that the CDLA termination was a legitimate commercial termination and not an instance of sovereign misconduct under the Treaties.

---

[42] The Claimants' statement (Tr. Day 1 [32]) that the Consortium, as compared to Credit Suisse, was "entirely unpaid" is inaccurate; Credit Suisse eventually received payment precisely because it had already paid the Consortium in 2013-2014, upon presentation of CPPs that the Comptroller General had endorsed.

[43] *See* Section III.C.2 below for the Tribunal's further consideration of the Claimants' allegations regarding President Varela's animosity towards Mr. Rivera and Panama's corruption allegations regarding Mr. Rivera.

(xi)     As for the question that the Claimants raised regarding the legality of the Termination Resolution under Panamanian law and the severity of the bidding suspension imposed as part of that Termination Resolution, the Tribunal concludes that (a) the suspension was not draconian and did not manifest arbitrary or illegitimate conduct, since the Claimants failed to devote the necessary resources to complete a project that was immensely important to INAC's future activities; and (b) the Claimants' own reliance on Law 38 in March 2015 indicated that they were not prejudiced (for procedural due process purposes) by the State's application of the provisions of Law 38.

ii.     The MINSA CAPSI Project

211.   For the MINSA Project, the Claimants' principal witness was again Mr. López, in this instance supported by the witness statement of Ms. Karina Mirones,[44] whom Panama chose not to cross-examine. The Respondent's principal witness was Mr. Nessim Barsallo Abrego ("Mr. Barsallo"), who provided two witness statements.[45]   The Claimants conducted a cross-examination of Mr. Barsallo.  The Respondent's cross-examination of Mr. López included a segment on Mr. López's MINSA evidence.

212.   The MINSA Project comprised three contracts to design, construct, and finance three, primary care, health care facilities. The three contracts were executed on the same day, September 22, 2011. Mr. Rivera signed on behalf of the Consortium and Ciracet Corp. to serve as the main contractor.[46] MINSA was part of a program of twenty contracts (for the construction of twenty health care facilities; collectively, "Facility Program") that the Ministry of Health ("Ministry") put out for public bids, in two tranches of ten public works contracts in each tranche. The Consortium bid on nine facilities in the

---

[44] Ms. Mirones' witness statement was only two pages. She was director of Special Projects at MINSA from the end of 2013 until August 2014. She monitored contracts and evaluated change order requests. She commented that the Consortium worked on the construction of three clinics ("Capsis") for MINSA: in Rio Serena, in Puerto Caimito, and in Kuna Yala. She affirmed that the three contracts progressed normally and that she considered the Consortium to be a "good contractor," which would not abandon a Project. Her witness statement is of limited assistance to the Tribunal. The Claimants also relied on the information in the first McKinnon Report.

[45] The Respondent also relied on the Véliz witness statement to explain the role of the Comptroller General in examining payment requests.

[46] Mr. Rivera (1st, paras. 38-40) explained, *inter alia*, that Ciracet, a healthcare engineering firm, was included to cover the Consortium's lack of experience in medical equipment, which Rivera believed was the reason that the Consortium did not win any of the bids in the first tranche of MINSA public bids.

first tranche and had no success; it also bid for nine in the second tranche and won the three above-identified contracts.

213.  There was a contract template for the Facility Program, which included a 10% advance payment. However, the funds for this advance were not allocated to the Ministry's budget, and the Ministry instead issued payment certificates to the contractors, which then could present the certificates to their financing banks for payment. The banks would subsequently present the certificates to the Ministry for reimbursement. The Facility Program template also provided for phase payments, based on a detailed review of a contractor's progress reports, ultimately leading to the issuance of a Certificate of No Objection ("CNO") by the Ministry, which is then sent to the Comptroller General for final review and endorsement. The Comptroller General may return a payment request (or CNO) for clarification(s) by the contractor. In circumstances where a clarification is required (or the contractor seeks an extension of time and the contract completion date has passed), the contractor would need to have sufficient funding to continue working while the payment process continued.

214.  The Consortium obtained an increase from 10% to 20% in the advance payment for each of the three turnkey contracts. The total MINSA value was approximately US $30 million. The Order to Proceed was issued for each contract on October 27, 2011.[47]

### a.   *The Claimants' Position*

215.  Mr. López explained that the MINSA Project had experienced delays before President Varela came to power, though none were attributable to the Consortium. He noted, for example, that the Río Sereno contract was modified four times to extend its term and increase the work scope. The third extension led to a December 2013 completion date; in April 2014, the Consortium requested the fourth extension. In the meantime, the Consortium was not being paid. However, Mr. López's position was that the Ministry was acting in good faith during that time frame, and in May 2014 the

---

[47] This factual background, which the Tribunal adopts from the Barsallo Abrego First Statement, appears to be uncontested.

Consortium and the Ministry jointly prepared a change order for Río Sereno, extending the contract term to September 2014 as well as increasing the contract price by approximately US $5 million. However, the Comptroller General did not have sufficient time to endorse the change order before July 2014.

216. According to Mr. López, Kuna Yala was in similar delay circumstances, though in that case due to the difficult logistics in dealing with the indigenous community. Again, the Consortium and the Ministry signed a change order in May 2014 to extend the contract term to September 2014, adding US ▮▮▮▮▮▮. Again, the Comptroller General did not have the opportunity to sign it before the change in Administration. The Puerto Caimito contract experienced fewer delays, but was still not completed by December 30, 2013, so the Consortium submitted a change order in May 2014 (and obtained a CNO from the Ministry in June 2014), again seeking a contract extension to September 2014 and another US ▮▮▮▮▮▮ increase in price. And again, the Comptroller General did not have time to endorse this before the change in Administration.

217. Once President Varela came to power, MINSA change orders were never signed. Mr. López stated that the contracts had expired and therefore CNOs could not be issued, and the Consortium could not receive payments and continue working. The Consortium met with the Ministry's architect on July 22, 2014, to "discuss pending matters important to advancing and completing the Projects" (López 1st, para. 107). This meeting was unsuccessful, according to Mr. López, because the Comptroller General was "deliberately against us" (López 1st, para. 108). Later (2016), WhatsApp messages from Mr. Barsallo indicated that he believed that the Comptroller General's Office had been ordered by the Office of the Presidency not to endorse anything from the Consortium. The May 2014 change orders were all returned to MINSA in July 2014; the reasons for the returns mostly had to do with deficiencies caused by MINSA. The Consortium could do nothing to correct these deficiencies.

218. The inevitable outcome, Mr. López said, was that the Consortium was in a critical position by end of October 2014; it presented further payment applications and had to

"reduce physical work on" MINSA projects (López 1st, para. 109). The Ministry still seemed willing to extend the contract term (in September 2014 the Consortium had submitted a completion plan at the Ministry's request), but from October to December 2014 the Consortium was unable to find anyone at the Ministry to negotiate with. The Ministry was unavailable despite the Consortium requesting change orders for delays that were not attributable to the Consortium. In April 2015, the Comptroller unjustifiably refused to endorse the Puerto Caimito contract and soon afterwards refused to endorse the Rio Sereno change order for unfounded formalistic reasons. Although the Comptroller General approved some CNOs for Kuna Yala at the end of 2014, they could not be cashed immediately because of a tight expiration date. All work had to be stopped and bank guarantees could not be extended. The Consortium maintained its physical presence in Panama until August 2015, but could not survive after that, in these non-payment circumstances. Even in July 2016, when the Ministry seemed willing to arrange for completion of the MINSA Project, the Consortium was already on the "blacklist of Government contractors," as reported to Mr. López by the Consortium's lawyer Ms. Ana Graciela Medina, in July 2014 (López 1st, para. 117).

219.   Mr. López concluded his witness statement evidence concerning MINSA (López 2nd, paras. 10-32) by commenting that Panama, through the Comptroller General's Office, kept the Consortium in a vicious cycle: the Consortium could only collect payment for completed work if it had valid contracts, but without endorsements of extension-of-time change orders, there could be no valid contracts and the Consortium could not even submit payment applications for work that it had already completed.

### b.   The Respondent's Position

220.   At the time of the MINSA Project, Mr. Barsallo was first a lawyer for the Ministry and then Sub-Director of the Administration of Special Projects. He stated that he "was involved with each of Omega's MINSA CAPSI Projects from the beginning" (Barsallo 1st, para. 7). Initially, each of the three contracts was to be completed by January 28, 2013 (fifteen months from the date on which the Order to Proceed was issued). The Consortium duly received its 20% advance payment from its financing bank for each of the three contracts, totaling more than US ▄▄▄▄▄▄. The remainder of the

86

approximately US ███████ was to be paid based on progress (the Ministry would retain 20% of the amount owed on each payment certificate to cover work through completion). The Consortium also had to provide, like every MINSA contractor, a completion bond of 20% of the value of each contract, to be kept valid until three years after construction as insurance against any latent defects in the contractor's work, as well as bonds to secure the advance payments the Consortium received.

221.  Mr. Barsallo commented that the Consortium and the Ministry each bore responsibility for certain delays in the period before Mr. Varela came to power. The Consortium had subcontractor "issues," which delayed its works. The Ministry was slow in approving medical equipment for installation in the three facilities. For the Ministry's delays, the Consortium was allocated additional time for completion. The Ministry was also slow in approving extension of time requests, which resulted in periods in which the Consortium could not be paid, because the contract had technically expired. Even when the Ministry had agreed to extension-of-time requests, the Comptroller General would take as many as five months to issue an endorsement. However, in the case of Puerto Caimito, when the Ministry approved a contract addendum for an extension of time in 2013, it did not address the Consortium's requests for additional costs.

222.  Mr. Barsallo stated that the Ministry consistently worked with the Consortium to ensure that it had adequate time to complete the three health facilities, even though the extensions continually sought were substantial. Three addenda for further extensions of time for each of the three contracts had been sent to the Comptroller General on May 19, 2014. When the Martinelli Administration came to an end, these addenda had not been endorsed. Mr. Varela was sworn in as President on July 1, 2014; the Comptroller General, Ms. Torres, remained in office until December 31, 2014.

223.  Mr. Barsallo adamantly contended (Barsallo 1st, para. 41) that he knew of no evidence that President Varela targeted the Consortium's Projects and that circumstances changed for the Consortium once President Varela was sworn in: "The Health Ministry was not asked or instructed to terminate or hinder Omega's projects which

87

would be a completely illegal act and outside the scope of the Ministry's function". The slowness in endorsement of payments or addenda in the second half of 2014 were instead due to: (i) the administrative transition period and the illness of the outgoing Comptroller General and not to any change by the Ministry in its treatment of the Consortium; (ii) the Consortium's change in behavior in not cooperating with the Ministry; and (iii) complications in the Ministry's budget and the lack of valid contracts to substantiate the invoices.

224.    As to the first point, Mr. Barsallo commented that it is well-known by public works contractors that approvals typically slow during transition of Presidential Administrations. The typical slowness was probably increased by the illness of Ms. Torres. Under the Varela Administration, the Ministry did not change its previous, cooperative approach in working with the Consortium. On the other hand, as to the second point, the Consortium changed its approach in dealing with normal addenda and payment delays. The Consortium knew well that endorsements took time to obtain from the Comptroller General and additional information could be requested. The Consortium previously had been patient and kept working. However, at the end of October 2014, the Consortium announced that it would reduce personnel on the three contracts and would do so until the payment and addenda issues were resolved. In December 2014, the Consortium then announced that it was suspending work between December 20, 2014, and January 12, 2015, due to lack of valid contracts. The Ministry asked for revised completion plans, and the Consortium "responded with a revised work schedule for the Río Sereno Project with an extraordinary 368 days of additional time" (Barsallo 1st, para. 54).

225.    As to the third point, the Ministry's budgetary problems affected the Consortium and "many other contractors who were in the same situation" (Barsallo 1st, para. 57). The Consortium nonetheless received endorsed CNOs in May and November 2014 and in March 2015, totaling approximately US ▮▮▮▮▮▮. The new Comptroller General's (2015) request for further documentation was standard. Mr. Barsallo emphasized that each contractor on the MINSA CAPSI projects faced payment delays like those faced by the Consortium. Only the Consortium left Panama permanently.

226.  In his Second Witness Statement, Mr. Barsallo noted that most letters cited by the Claimants as examples of the Comptroller General's attack against Mr. Rivera and the Consortium "were actually drafted during the Martinelli Administration, dated in May and June of 2014" (Barsallo 2nd, para. 11). The three pending addenda that were submitted in May 2014 were later returned for corrections in keeping with normal practice. The Consortium was very familiar with several rounds of returns and corrections during the Martinelli Administration. It should also have been understandable to the Consortium that the Comptroller General in July 2014 would require more information about the addendum request for Rio Sereno, which included a request for US ███████ in additional costs. A month earlier, in a report drafted during the Martinelli Administration, the Comptroller General's Office had found that more than US ██████ requested by the Consortium in the Río Sereno addendum was unjustified. For Kuna Yala, the Consortium sought an additional US ████████ in May 2014, which was 84% of the total original contract price.

227.  Mr. Barsallo further observed (Barsallo 2nd, paras. 22-24) that the Consortium made large payment requests – totaling US ████████ – in October 2014, on the same day that it sent a letter to the Ministry, stating that it would be reducing personnel on the three Projects. The Consortium then stated expressly in December 2014 that it was suspending work. Thus, the Consortium's position was that "it was done with the Projects unless Panama signed the three pending addenda which included additional costs of more than US ████████ and paid Omega's unapproved payment applications for more than US ███████" (Barsallo 2nd, para. 34).

228.  Mr. Barsallo concluded his witness statement evidence (Barsallo 2nd, paras. 35-42) by commenting on WhatsApp messages that he exchanged with Mr. López in March 2016, used by the Claimants to show that President Varela sought to destroy the Consortium. Mr. Barsallo stated that he and Mr. López were friends who had socialized outside of work. His messages, Mr. Barsallo said, were made "solely on the basis of my prior conversations with Omega team members," who were suspicious about the Comptroller General's slowness in issuing endorsements (Barsallo 2nd,

para. 38). A further WhatsApp message was based on an erroneous newspaper article.[48]

### c. *The Tribunal's Analysis of the MINSA Project Evidence*

#### 1. The Tribunal's Decision on Disputed Facts

229.   Mr. López was cross-examined specifically on the MINSA Project (Tr. Day 1 [222-262]). He accepted, in relation to Río Sereno, that after December 2013, the Consortium was operating without a valid contract. He was then asked about payment applications that the Consortium submitted in February, April, and October 2014, when there had been no endorsements by the Comptroller General (and in February and April, when no addenda were signed by the Ministry). Mr. López accepted this, with some minimal resistance. He also accepted that the February and April applications were paid. When asked whether, in the case of Kuna Yala, payment applications submitted in August 2014 were paid, he eventually agreed, with the caveat that it took more than 24 months for payment to be made. He further accepted that all CNOs had an expiration date, after which they were no longer payable.

230.   Mr. López was also taken to several letters dated during the Varela Administration (but when Ms. Torres was still the Comptroller General) in which the Comptroller General stated that it was returning CNOs because of errors. Mr. López answered that the errors had to be addressed by the Ministry. He was then taken to Comptroller General letters back in the Martinelli Administration, where addenda were also returned because of errors. Mr. López accepted that these were legitimate requests for correction, though in certain cases he reiterated that the errors were made by the Ministry and had to be corrected by the Ministry. He also observed that after President Varela came to power there were no endorsements by the Comptroller General.

231.   Mr. Barsallo was cross-examined on Day 3 of the First Week Hearing (Tr. Day 3 [690-732]). After questions about his career background, he was taken to his WhatsApp

---

[48] Mr. Barsallo was cross-examined on these WhatsApp messages; see the discussion below.

messages with Mr. López. He was taken to the message where he writes in March 2016,[49] "Is it a conspiracy?", where the predicate is his question, "What's happening at the Comptroller General's Office?" (Tr. Day 3 [709]). It was put to Mr. Barsallo that he thought there was a conspiracy. Mr. Barsallo strongly resisted this interpretation: "I didn't think that. I'm asking Mr. Frankie López whether he had that information or not. If you look at it, it has a question mark. Is this a conspiracy – is it or not? It is just a question not an assertion of something I was thinking." Mr. Barsallo also emphatically testified that he was not suggesting to Mr. López that there was a conspiracy; he was asking a question. Mr. Barsallo also disagreed with the forensic use being made of the WhatsApp messages on the grounds that they were simply in the context of a conversation with a friend (Tr. Day 3 [730-731]): "My answer is within a conversation with someone who is a friend of mine, where we both had many frustrations with the Ministry of Health, personal ones, myself, and then with matters with the contracts."

### 2.   The Cause of the MINSA Capsi Project Failure

232.   The Tribunal first addresses one of the Claimants' main evidentiary bases – the Barsallo-López WhatsApp messages ("Barsallo messages") – in support of their position that the Varela Administration targeted the Consortium in the MINSA Project, subjecting it to arbitrary and illegitimate treatment to destroy Mr. Rivera and his business. The Tribunal finds that the Barsallo messages do not form any viable assistance for the Claimants. Although the Claimants tried to make much of the Barsallo messages, focusing the cross-examination of Mr. Barsallo on them, it is clear that Mr. Barsallo possessed no evidence of any alleged Governmental secret plan to squeeze the Consortium out of funding by directing the Comptroller General's Office to withhold endorsements. Moreover, leaving aside Mr. Barsallo's lack of direct or indirect knowledge of any plan, a reasonable forensic analysis of the Barsallo messages – between two friends using colloquial language, with Mr. Barsallo trying be supportive of Mr. López's frustrations – does not show that Mr. Barsallo either

---

[49] Later in the cross-examination, Mr. Barsallo was asked about messages in a December 2016 chain.

believed or suspected that a plan existed to damage the Consortium's role in the MINSA Project.

233.   Accordingly, the Tribunal rejects the Claimants' assertion (Cl. Rej., para. 269) that Mr. Barsallo "told Mr. López that he had concluded that there were orders coming from the Presidency to the Comptroller General's Office to interfere with the Omega Consortium's Contracts". The assertion is unsustainable. The cross-examination put the Claimants' case to Mr. Barsallo, and Mr. Barsallo showed that the Claimants' case in relation to the Barsallo messages had no substance. The Claimants chose not to cross-examine Mr. Barsallo on the many substantive points he made in his two witness statements regarding the Consortium's May through October 2014 efforts to obtain extraordinary price increases while failing to advance the Project's works. The Claimants' assumption that this strategy would have succeeded absent a change in Administration is nothing more than an assumption, and one that Mr. Barsallo's evidence showed to be implausible.

234.   The Tribunal also finds, along the lines of the Barsallo messages, that the July 2014 and May-July 2015 WhatsApp and email communications from the Consortium's lawyer, Ms. Ana Graciela Medina, to Mr. López (and occasionally Mr. Rivera) do not advance the Claimants' case (Cl. Rej., para. 270). Ms. Medina did not give evidence in the arbitration, so we are left with the texts of her communications. Those texts ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████. Ms. Medina's communications do not provide the type of detail about her sources that could give the Tribunal a reason to rely on them in assessing the Claimants' case. Moreover, the timing of her May 20, 2015 MINSA Project communication, C-0555, which the Tribunal quotes below, is divorced from the context that the Consortium had effectively ceased work on MINSA since October 31, 2014, and was seeking monies that the Comptroller General's Office under the Martinelli Administration had considered unjustified:



235.  In this exchange, Mr. López did not state that in addition to the US ▆▆▆▆▆ in the three MINSA Project addenda submitted in May 2014 (which amount, as noted above, a Comptroller General report during the Martinelli Administration refused to accept), the Consortium had pressed for another US ▆▆▆▆▆ in October 2014 while stopping Project work. The exchange does not, then, "confirm that the instructions to attack the Claimants' investment came from the highest levels of the Varela Administration" (Cl. Rej., para. 270). It also does not confirm that there was an "attack" of any sort on the Claimants' investment; rather, the information, apparently from the Comptroller General's Office (it is unclear to whom Ms. Medina spoke), appeared to be that endorsements would not be forthcoming; a reference to ▆▆▆▆▆ could easily have meant that a Project begun during the previous Administration had run into significant time and cost increases and would no longer be accommodated. The reference to Martinelli can be readily understood as something other than sinister when the history of the Project is considered in all dimensions – and when it is recalled that Mr. Barsallo's unchallenged evidence was that many contractors in the Facility Program faced the payment delays that the Consortium faced, but only the Consortium failed to proceed with its Project works.

236.  The Claimants adduced evidence regarding interference by the Varela Administration in the other four Projects at issue, which the Tribunal considers in its discussion of those Projects, below. There is also the overarching Varela Leaks evidence, discussed at the conclusion of this section of the Award, that demonstrates, according to the Claimants, President Varela's abuse of the authority of his Office to punish his perceived political enemies and to wrongfully influence the decisions of the Comptroller General (Cl. Rej., para. 277). Moreover, the Claimants point to President Varela's retention of Mr. Rogelio Saltarín, a private attorney, as a consultant to the Ministry of the Presidency, who met with the Ministry officials on several occasions

94

in the significant time frame from July 2014 through March 2015, with the apparent assignment of evaluating the progress of the Facility Program (Mr. Saltarín's general mandate was to investigate unlawful conduct over a wide array of Government agencies; Cl. Reply, paras. 88-94.) However, in the case of the MINSA Project, as Mr. Barsallo observed (Barsallo 2nd, para. 41), it is clear from the Activity Report "that the topic of these three meetings was the status of all of the hospital and MINSA CAPSI projects,"[50] a point that the Claimants do not contest.

237.   Lacking direct evidence of targeting or malign interference by the Varela Administration[51] for the reasons set out above, the Claimants' case principally turns on timing: it could not have been a coincidence that the Consortium's three MINSA contracts, like the CDLA Project, proceeded without any major problems before President Varela came to office, but suddenly experienced, upon President Varela taking office, an abrupt lack of cooperation from the Ministry and the refusal of the Comptroller General to endorse payments, price increases and extensions of time. The Claimants argued that this transformation could only have happened because of instructions from the Presidency; any other explanation for the Consortium's MINSA contracts difficulties beginning in July 2014 are pretextual.

238.   The Tribunal finds the "no coincidence" theory to be significantly flawed. Upon a review of the entire evidence in the record, including, importantly, the evidence tested

---

[50] Mr. Barsallo added (Barsallo 2nd, para. 42): "the Health Ministry had 20 MINSA CAPSI projects throughout the country worth nearly half a billion dollars. There is nothing suspicious or unusual about a new administration having a representative attend meetings with the head of a ministry to discuss and evaluate the progress of such a large government investment in healthcare. I participated in one of these meetings and Omega's projects were not targeted in that meeting". Similarly, Ms. Buendía testified (Tr. Day 4 [755-757]) as follows regarding Mr. Saltarín's attendance at INAC meetings regarding the CDLA Project: "I found out – now that we're in the arbitration process, I saw some emails that I was not copied on, but I saw that apparently he was in a meeting where all of the Parties were present in 2015. ... [Later] I consulted it with architect Sosa, because he was at the meeting, and what he said was that he had not played – that Mr. Saltarín had not played a very significant role at the meeting; that he was present, but nothing of any relevance that he could recall."

[51] In the Cl. Reply, para. 89, the Claimants assert that "behind the scenes, Mr. Saltarín targeted Claimants' two largest and most important projects in Panama – the three MINSA CAPSI Contracts and the [CDLA] Contract – as well as Claimants' Contract with the Ministry of the Presidency through the Secretary of Cold Chain. The combined value of the MINSA CAPSI and [CDLA] Contracts represented over 75% of the total value of all the Omega Consortium's Contracts. Attacking these four Contracts, which merely required the cooperation of two Government Ministries/Agencies and the Comptroller General, would virtually ensure the demise of Claimants' investment." There is no direct evidence of Mr. Saltarín working behind the scenes and "targeting" the Consortium's major contracts to ruin the Claimants' investment.

95

on cross-examination, the Tribunal determines that the relevant cause of the Consortium's MINSA failure was commercial, and considers Mr. Barsallo's evidence to be a reliable guide:

(i)     The Consortium received a 20% advance payment, which was a sizeable platform to work from. However, all three contracts experienced substantial delays and price increases during the Martinelli Administration, leading up to the May 2014 submissions of the three addenda. Through those addenda, the Consortium – with the Ministry's sign-off – sought massive time and price increases.

(ii)    In view of that background, and even before July 1, 2014, the Comptroller General's Office did not accept the addenda price increases.

(iii)   Accordingly, when President Varela came to power, it was not only reasonable but to be expected that there would be close scrutiny of the addenda and further endorsement delays and the need to provide sounder cost justifications. Mr. Barsallo's witness evidence, which was not dented in any respect on cross-examination, is compelling: the endorsement delays and the Comptroller General's return of CNOs were fully consistent with standard practice, which many MINSA contractors experienced. Mr. Barsallo, like Ms. Buendía, pointed to Presidential transition periods as typically slow periods for public works approvals, which the Consortium should have understood and planned for. The slowness during the transition was aggravated by the Consortium's unwillingness to proceed without payment or its lack of resources to continue working while endorsements were pending.

(iv)    The Claimants do not accept that the Comptroller General's return of applications for corrections or further information were valid administrative actions; again, they point to a different approach after President Varela came to office. But the timing issue works against the Claimants when the MINSA Project history is taken into account. A stringent approach was reasonable in view of a history of time and cost overruns. Moreover, there is no evidence that the Comptroller treated other contractors differently, that is to say less stringently, on this matter.

(v)     Finally, on the question of abandonment, Mr. Barsallo's evidence on the Consortium's actions on October 31, 2014 – the reductions in personnel until resolution of payment and time extension requests paired with an extraordinary

US ███████ further payment request – together with the Consortium's complete suspension of works in December 2014 established that the Consortium did, in fact, abandon the three contracts. Subsequent discussions with the Ministry in July 2015 about possible Project completion did not override the 2014 abandonment.

(vi)   For the forgoing reasons, the Claimants have not demonstrated that the relevant cause of the MINSA Project failure was arbitrary or illegitimate State action.

### iii.   The La Chorrera Project

239.   The La Chorrera Project was the construction of the Regional Courthouse of La Chorrera, one of the country's four judicial districts, located near Panama City. The Judicial Authority, headed by the Supreme Court, issued a request for proposals in September 2012. Following the report of the Judicial Authority's evaluation commission, the President of the Supreme Court, Justice Alejandro Moncada Luna, selected the Consortium[52] as the Project's contractor on October 17, 2012. Mr. López reported (López 1st, para. 58), that the Consortium's ranking was equal to that of another bidder, but the Omega Consortium "won the tender because we received a higher score since we offered the best price."

240.   The contract was signed on November 22, 2012; the Comptroller General endorsed it on December 27, 2013. Justice Moncada Luna issued the Order to Proceed on January 15, 2013. The contract amount was US $16,495,000, and the completion date was 540 days from the initiation date, *i.e.*, July 9, 2014. The Consortium received a 15% advance payment by check on April 3, 2013, in the amount of US ███████.

241.   The La Chorrera contract was procurement and construction; the Consortium was to supply all materials and perform all construction-related work. The Judicial Authority was to provide the design and plans for the courthouse (Ríos 1st, para. 13). The contract required that the Consortium provide a performance bond for 50% of the contract value and maintain the bond for three years following final acceptance (to

---

[52] The "Consortium-Main Contractor" in this Project included, in addition to Omega Panama and Omega US, Cielo Grande, S.A., a Panamanian company. *See* Cl. Mem., fn 109; C-0045.

97

cover any latent defects). The Consortium also was contractually required to provide a bond securing the full amount of the advance payment, which had to remain effective until thirty days after final acceptance of the works.

242. The Claimants presented their position on La Chorrera principally through the witness statements of Mr. López. The Respondent principally relied on the witness statements (1st and 2nd) of Dr. Vielsa Ríos. The Respondent's cross-examination of Mr. López did not directly touch on the conduct of either the Claimants or the State in the performance of the La Chorrera contract. The Claimants chose not to cross-examine Dr. Ríos. Instead the Tribunal was left with Mr. López's critiques of her two witness statements in his two witness statements (Mr. López gave witness statements dated May 27, 2019, and January 17, 2020; Dr. Ríos gave witness statements dated January 7, 2019, and November 18, 2019).

### a.   *The Claimants' Position*

243. Mr. López acknowledged Project delays before President Varela took office: "The Contract was signed on November 22, 2012, and was endorsed by the Comptroller General's Office on December 27, 2012.[53] The Contract experienced delays as well, but they were also delays typical of large construction contracts" (1st López, para. 60). He further acknowledged that the Consortium had difficulties in obtaining payments from the Judicial Authority and therefore reduced the Project workforce in April 2014 (*i.e.*, during the Martinelli Administration), but noted that in the following month the Judicial Authority paid "most of the outstanding accounts." Moreover, the Judicial Authority approved the Consortium's request for a time extension (Change Order No. 2) in May 2014, which would have added 260 days to the Project duration. However, the change in Administration from President Martinelli to President Varela occurred before Change Order No. 2 was endorsed.

---

[53] López 1st, para. 60 has the incorrect date. For reference, the correct date is in C-0048.

244.    The Claimants' narrative on the President Varela-induced problems in the execution of the La Chorrera Project are set out in López 1st, paragraphs 96-106, and López 2nd, paragraphs 47-56.  Mr. López made the following points:

(i)     Although Change Order No. 2 was signed in May 2014, the Consortium had to sign the Change Order for a second time in October 2014, after repeated delays by the Comptroller General, which only endorsed it after two more months passed, on December 23, 2014.  This reflected no generosity on the Judicial Authority's part; it only signed the extension request because it was responsible for the Project delays.

(ii)    The Consortium only received the endorsed Change Order in January 2015.  Since the contract had not been valid from July through December 2014, the Consortium's progress payment of approximately US ███████ was not accepted until January 2015, and then was not received because the Government applied it to cover an alleged fiscal (Social Security payment) debt.

(iii)   Contrary to the State's position that the Consortium never resumed work on the Project after December 2014, the Consortium had a workforce on site in February 2015.  The Consortium could not make physical progress, however, because of the cash chokehold applied by the Government.

(iv)    On the grounds that the contract was due to expire in March 2015 (given the long delay in the endorsement of Change Order No. 2, and the legal impediment in submitting a change order request while one is pending), the Supreme Court of Justice unilaterally announced its intent to terminate the contract on March 11, 2015.

(v)     The Consortium submitted a lengthy response on March 18, 2015, which only raised the possibility of bringing an ICSID case if a fair and equitable agreement could not be reach.  A week later, the Supreme Court of Justice suspended its termination decision, acknowledging that reconsideration was appropriate, and effectively conceding that the Consortium had not breached or defaulted on its obligations.

(vi)    The Consortium then tried to negotiate its pending issues with the Judicial Authority.  However, the Judicial Authority refused to address the existing budgetary, technical or physical problems.  It offered only an extension of time.  The Omega Consortium could not, therefore, sign the proposed Change Order

99

No. 3 or renew the security bonds. At that stage, Panama's debt to the Consortium exceeded US ▮▮▮▮▮▮. By the end of 2015, it appeared that the Judicial Authority was "finally coming around to our position" (López 1st, para. 105), but the Consortium could not then formalize the Change Order "because of the total uncertainty we had with respect to all the other Ministries" (López 1st, para. 105).[54] The entire Consortium operation "was paralyzed because of the lack of payment from the Panamanian Government on all projects" (López 2nd, para. 53).

### b.    *Panama's Position*

245.   Dr. Ríos began her career[55] at MEF, moved to the Inter-American Development Bank and then to the European Union, where she worked in the Project to Strengthen the Institution of the Judiciary. Since January 2007 she served as the Administrative Secretary of the Panamanian Supreme Court, in charge of directing the Administrative Departments.

246.   Dr. Ríos placed emphasis (Ríos 1st, para. 15) on the Judicial Authority's expectation that "Omega would use the funds advanced to it by the Judicial Authority solely on the La Chorrera Project. While we knew that Omega had secured contracts with other ministries, we expected that Omega would keep the money for each project separate and use the Judicial Authority's funds solely on the Judicial Authority's projects, regardless of the status of other projects, as each Entity or Ministry has an independent contract number, . . . as well as an independent budget."

247.   Dr. Ríos observed that during the Martinelli Administration, the Project experienced many delays, and regardless of fault for such delays, the Judicial Authority granted the Consortium extra time to ensure that the Project was completed, though in certain instances the Consortium remained responsible for the costs of delays (Ríos 1st, paras. 22-26). As for Change Order (or Addendum) No. 2, Dr. Ríos commented that the Comptroller General's "review process takes longer to complete" when there is a change in presidential administration (Ríos 1st, para. 20): "It is routine for most new

---

[54] Rivera 2nd, para. 39, also comments that Change Order No. 3 could not be signed because it did not address all of the problems that the Consortium was facing.

[55] Dr. Rios holds a doctorate in Business and Economics from the Universidad Latina de Panama.

administrations to conduct an audit of all ongoing public works projects that are still in progress from the prior administration, prior to approving invoices or contracts. The audit necessarily slows down the payment and approval process." Dr. Ríos added that because of the audit, the Comptroller General for the outgoing administration "typically slows or suspends the payment of invoices and approval of contract amendments in the period between election and inauguration" (President Varela was elected in May 2014 and inaugurated on July 1, 2014). The Comptroller General does so to enable the new administration to undertake its own review. All companies contracting on public works projects "well understood" this "common practice."

248.   The Comptroller General returned Change Order No. 2 on October 2, 2014, because the extension of time moved the Project end date into 2015; a budget transfer of funds from 2014 to 2015 would therefore be needed. After MEF's approval, the Change Order was resubmitted on October 27, 2014 and endorsed two months later. Neither the return nor the time involved in reviewing the documentation was unusual.

249.   However, the Consortium informed the Judicial Authority on December 17, 2014, that it was suspending work on the Project due to the alleged delay in approval of Change Order No. 2. The Consortium had no grounds for suspension of work: it was not approaching the completion date with only 161 days to go, and it had already been paid almost US ███████ for work on the Project. The Judicial Authority nonetheless proceeded to endorse Change Order No. 2, and on January 12, 2015, the Consortium stated that it had begun operations again.

250.   However, the Consortium never restarted work on the Project (Ríos 1st, para. 29). Instead, on January 15, 2015, it demanded another 310 days to complete the project (which would have meant a period of 1,100 days compared to the original 540 days). This led to the Judicial Authority's intention-to-terminate letter dated March 11, 2015. The Consortium threatened to bring an ICISD arbitration, and the then-President of the Supreme Court (Justice Prado Canals) agreed (March 25, 2015) to temporarily suspend the Administrative Resolution of the Contract and to grant an extra 202 days

for completion provided that the Consortium renewed the bonds.  However, the Consortium never did so and never returned to work on the Project.

251.    In subsequent 2015 negotiations, the Judicial Authority continued to offer additional completion days, but the Consortium continually sought more days than the ones offered and, in August 2015, the Consortium also claimed almost US ███████ in costs for work not originally in the contract (Ríos 1st, para. 34).  Since the bonds had expired and no work was being done on the Project, in January 2016, the Judicial Authority delivered a final notification to recommence construction to the Consortium's offices, which turned out to be empty.  The Judicial Authority concluded that the Consortium had abandoned the Project (and in fact had abandoned construction of the Project in December 2014; Ríos 2nd, para. 14).  The work was only 55% complete and the Consortium held US ███████ of the advance payment.

252.    Dr. Ríos rejected the allegation (Ríos 2nd, paras. 15-25) that the Judicial Authority's attitude towards the Consortium drastically changed after the Varela Administration took over.  She stated that the Judicial Authority always maintained a willingness to work with the Consortium, and the correspondence record supported this, together with the nearly US ██████ that remained for the Project in 2015.  She further stated (Ríos 1st, para. 38; Ríos 2d, para. 25) that "we in the Judicial Authority were never asked by anyone in President Varela's Administration to take any adverse action against the Claimants or to harm the Project in any way."  The "Judicial Authority worked very hard to have the Project completed even after President Varela took office in July 2014."

### c.    *The Tribunal's Analysis of the La Chorrera Project Evidence*

#### 1.    The Tribunal's Decision on Disputed Facts

253.    As indicated above, while Mr. López was asked questions (including by the Tribunal) about a land-development transaction that the Respondent related to Mr. Rivera's alleged involvement in a scheme to bribe Justice Moncada Luna (*i.e.*, the Tonosí land deal), the Respondent did not otherwise test Mr. López's witness statement evidence

102

regarding the performance of the La Chorrera contract. The Claimants chose not to cross-examine Dr. Ríos. The Claimants' decision not to cross-examine Dr. Ríos has naturally constrained the Tribunal's ability to assess whether an intent to harm by the Varela Administration can be inferred from Dr. Ríos's evidence. In their memorials, the Parties argue with each other at some length about what the La Chorrera evidence shows, but these back-and-forth arguments (*see, e.g.*, Resp. Rej., paras. 282-303; Cl. Rej., paras. 167-173), though helpful to a degree, are inevitably one large step removed from engaging with the individuals – in particular, Dr. Ríos – who had direct involvement in the performance of the contract.

254.   In this regard, the Tribunal observes that the Claimants did not adduce witness statements from any of the four Consortium Project Managers[56] whom Mr. López identified during his cross examination (Tr. Day 1 [162-165]) or any of the Consortium Project Engineers who were, according to Mr. López, actually on-site on a daily basis.[57] Mr. López identified Mr. José Mandarakas as the La Chorrera Project Manager, but we do not have further information from Mr. López about him or about the La Chorrera Project Engineer(s).

255.   The Tribunal is not questioning either side's strategic decisions in presenting their respective cases; the Tribunal is well aware of the complications in obtaining witness evidence, especially given the passage of time from the underlying events, possible employment changes, and the possibility of sensitive political issues. The Tribunal simply observes that in a case where the Claimants assert that an overarching State plan to harm them was deployed in individual construction Projects, the Tribunal's determination of the reason(s) why an individual Project contract failed is assisted by evidence – and the testing of that evidence – from witnesses directly involved in the conduct of the Project. Ms. Buendía and Mr. Barsallo were such witnesses for the Respondent in the CDLA and MINSA Capsi Projects, and they (particularly Ms.

---

[56] Mr. Pacheco was the Consortium's CDLA Project Manager; his role in the CDLA Project is discussed above.
[57] *See also* Resp. PHB, para.149: "It is noteworthy that Claimants failed to provide statements from any of the managers or engineers who worked directly on the projects, and instead rest their case on Mr. López, whose knowledge of the facts derives from documents reviewed in preparation for this arbitration and second-hand conversations with Omega's project representatives."

Buendía) were highly credible and helpful to the Tribunal (and, as it turned out, to the Respondent).  Mr. Pacheco did not appear, and neither did the MINSA Capsi Project Manager, Mr. Vega.  The Claimants presented the evidence of a very knowledgeable individual for all Projects, Mr. López, who did his best to assist the Tribunal. However, in many instances, Mr. López appeared to be assessing correspondence or documents from a distance.  His critiques of Dr. Ríos's witness statements are not readily distinguishable from the type of forensic examination carried out in the Parties' memorials.

### 2.   The Cause of the La Chorrera Project Failure

256.   The Claimants' have not advanced their overarching case against Panama on the basis of the La Chorrera Project for the following reasons.

(i)      The Project was already in substantial delay during the Martinelli Administration, though arguably not due to the Claimants' performance.  Moreover, in response to payment delays, the Claimants had also already reduced their workforce before July 1, 2014.  In view of this history, the particulars of Change Order No. 2 (agreed by the Judicial Authority during the Martinelli Administration), the typical Comptroller General delay accompanying a change of Administrations, and the further delay necessitated by a budget adjustment to account for the change in completion date, there does not appear to be a drastic change in attitude from the Martinelli to the Varela Administrations.

(ii)     Dr. Ríos's evidence asserting that she saw no change in approach from one Administration to the next, and that the Judicial Authority was never asked to take adverse action against the Consortium, was not challenged. Her evidence in this regard is accepted by the Tribunal.

(iii)    The Consortium was in a financial position to continue work on the Project despite the time taken for Change Order No. 2 (and the December 2014 payment going to the Social Security Fund), in view of the advance payment and progress payments already received by the Consortium.  However, the Consortium effectively stopped construction work in December 2014 and never restarted. The weight of the evidence is that the Consortium did not intend to restart work unless and until Change Order No. 3 was agreed and endorsed.

(iv)    The Judicial Authority's actions in March 2015 and its negotiation of Change Order No. 3 did not manifest bad faith. Instead, the Consortium, at least in the second half of 2015, sought to use the Judicial Authority's willingness to continue negotiations as the Consortium's opportunity to recover monies that it believed it was owed not only under the La Chorrera contract but also under its other Project contracts. However, as Dr. Ríos indicated, the Project contracts were separate and independent; there was no basis for the Consortium to use La Chorrera to resolve other disputes – which, in any event, involved large Projects such as CDLA and MINSA Capsi, where the Consortium's contracts had already been terminated or had otherwise ceased to work.

(v)    Although the Consortium arguably abandoned the Project in December 2014, it definitively abandoned the Project in January 2016, after almost a year of negotiations with the Judicial Authority, which clearly sought to find a way for the Project to be completed in a reasonable time frame at a reasonable cost, in view of the original contract.

(vi)    The only potentially plausible position that the Claimants have and can advance, given the evidence (and their decision not to cross-examine Dr. Ríos), is the timing issue: that is, why did this contract, like the others (particularly the largest Project contracts, CDLA and MINSA), come off the rails only when President Varela took office?  In the case of this Project, the evidence indicates that it was only when President Varela took office did the problems in the La Chorrera Project emerge with clarity, such that the Comptroller General's review, triggered in the normal course by the change of Administrations, led to delays that the Consortium was unprepared to manage.  The Consortium may well have counted on continual time extensions and cost increases, but the Comptroller General's close scrutiny of these issues after July 1, 2014, did not mean – based on the evidence presented (and untested, in Dr. Ríos's case) – that the Comptroller General was implementing a plan to harm the Consortium.

(vii)    For the above reasons, the Tribunal concludes that the Claimants have failed to show that the relevant cause of the failed La Chorrera Project was arbitrary or illegitimate State action.  Rather, the Respondent's position that the State behaved like an ordinary counterparty to a public works contract is accepted.[58]

---

[58] The Tribunal considers, below, Panama's allegations that the Claimants obtained the La Chorrera Project contract through participation in a scheme to bribe Justice Moncada Luna. Notably, neither Mr. López nor Mr. Rivera indicates that the corruption investigation of Justice Moncada Luna played any role in the performance of the La Chorrera Project contract.  Mr. Rivera says that the investigation commenced around October 2014; he learned on January 22, 2015, that he had been personally implicated.  Rivera 1st, paras. 83-

iv.   The Municipality of Colón Project (or The Municipal Palace Project)

257.   The Claimants again adduced evidence from Mr. López (1st, paras. 146-150; 2nd, paras. 67-73).  For this Project, uniquely, the Respondent did not adduce evidence from a witness directly involved in the Project.   The Respondent chose to not to cross-examine Mr. López on the Consortium's performance of the Municipal Palace Project; the Tribunal discusses Mr. López's evidence below.   The Parties set out their respective Project narratives and responded to the other side's narrative in Cl. Rej. at paragraphs 161-166 and Resp. Rej. at paragraphs 405-424.   These two memorial sections, one from each side, are particularly useful for the exposition of the key issues; the Tribunal focuses on them, below.

258.   The Project was the construction of a new office building for municipal employees. A request for proposals was issued in November 2012. The Consortium was the only contractor that submitted a bid. The Municipality accepted the Consortium's proposal and awarded the contract to it. The contract was executed on January 24, 2013; the Comptroller General endorsed it on July 1, 2013 (C-0051).  The Order to Proceed was dated July 31, 2013.  The contract duration was twenty-four months and the value was US $16,050,000. The Consortium obtained a 30% advance payment, in the amount of US ▮▮▮▮▮▮ (Resp. Rej. paras. 405-406).

259.   The original Project plan called for the Consortium to demolish the existing building and to construct the new Municipal Palace in its place. This meant that a temporary structure had to be built to house Municipal employees during the construction process.  The Consortium completed the temporary structure on April 30, 2014 (Resp. Rej., para. 407).

260.   The above facts regarding the Project before the Varela Administration came to power were not disputed by the Parties.

---

85; López 1st, paras. 96-106; López 2nd, paras. 47-56. As discussed above, the Consortium had arguably abandoned this Project by the end of December 2014.

a.    *The Claimants' Position*

261.   The Claimants argued that the Government's attitude towards the Consortium's work on the Project changed when Mr. Federico Policani became Mayor of Colón (May 2014).   Mayor Policani was unwilling to work with the Consortium.   Only after the change of Presidential Administrations did the Municipality complain about "bogus issues" with the Consortium's temporary office facilities (September 2015). The Municipality then informed the Consortium that the facilities were deficient and unsafe. But the allegedly deficient facilities were still in use as of January 2020 (albeit as a storage facility and a workplace for maintenance personnel rather than temporary offices, according to the Respondent).

262.   The Project contract simply died, because the Municipality "whipsawed" the Consortium: in July 2014, the Municipality began demanding changes to the original contract terms, asking for an alternative proposal for a new construction site.   The Consortium complied and delivered the proposal on August 27, 2014.   Not having received any response, the Consortium followed up in early October 2014, with a letter to the Mayor.   Again, having received no response, the Consortium sent a new relocation proposal in November 2014.   The Municipality finally responded in March 2015; it confirmed that a new Project site was needed and therefore a change order was also needed to extend the validity of the contract, which had already expired (January 2015).   Contrary to the Respondent's submission (see below), the Municipality rather than the Municipal Council requested the new site.   The Claimants' evidence is the Consortium's letter to Mayor Policani in June 2015, C-0180 resubmitted stated that the Municipality instructed the Consortium to build on a different plot of land.   The Claimants added that the distinction between the Municipality and the Municipal Council is "ultimately irrelevant, as the actions of both entities are attributable to Respondent" (Cl. Rej., para. 164).

263.   During the July 2014 through 2015 time-frame, the Municipality was uncooperative; it did not respond to the Consortium's communications apart from two letters and two meetings over ten months.   This was unlike the pre-Varela period, in which a dialogue between the Municipality and the Consortium had existed.   "Constant cooperation is

107

needed to successfully complete a public works project" (Cl. Rej., para. 165).  The Claimants concluded that the "only explanation for the change in the Municipality's behavior is the change of Administration" (C. Rej., para. 165).  Further evidence for this conclusion was the awarding of the contract in 2017 to a contractor that is building the Municipal Palace on the original construction site: the "Government simply did not want the Omega Consortium to work on the Project, just as Mayor Policani had informed Mr. López soon after the change of Administration" (Cl. Rej., para. 166).

264.  This last point, the Policani-López interaction, comes from López 2nd, paragraph 69: Policani, "who was just starting his term, informed me that the Office of the President had sent him instructions to cancel the project. I met with him on several occasions, and he commented to me that the pressure being put on him was heavy." Mr. López added that he believed, based on what Mayor Policani had told him about the instructions from the President's Office, that the alleged need for a site change was merely an excuse to render the Project unworkable.  According to Mr. López, a legal adviser to the Municipal Council, Mr. Victor Almengor, told him that President Varela had said that the contract had to be rescinded (C-0808).

### b.  *The Respondent's Position*

265.  The Respondent observed that the Claimants' "timing" argument – the Consortium only began experiencing (alleged) problems when President Varela took office – does not work: there was a January to July 2014 delay between contract-signing and the Order to Proceed (including more than five months from contract signing to endorsement by the Comptroller General), and another six months before the construction site could be accessed. The Claimants called these delays "typical" rather than politically motivated, and praised the Municipality for its responsiveness.

266.  The Claimants' complaint focused on the Municipal Council's decision to consider changing the site of the Municipal Palace and subsequent events.  According to the Claimants, Mayor Policani and the Council used the site issue simply to harm them, and Mayor Policani did so on instructions from the Office of the President. But the evidence refutes these allegations:

(i)     The Municipality's delay in making a site decision was not politically motivated. The Municipal Council, a local legislative body, asked the Consortium in July 2014 to submit a proposal for a new site, and it was the Municipal Council that in November 2014 was still undecided about the site.  The Respondent referred to C- 0616, a December 16, 2014, letter from the Consortium to Mayor Policani, which clearly identified the City Council, not Mayor Policani, as being in charge of the back-and-forth process.  A legislative debate, not any instructions from the Presidency to Mayor Policani, was the relevant issue.  Under the contract, the Municipality could make changes to the contract, and finally did so (choosing the new site) on March 2, 2015.

(ii)    Mayor Policani and the Municipality remained cooperative in the interest of the Project.  There were meetings with the Consortium in November 2014 and January 2015, in which the Project was discussed as well as a future addendum to the existing contract.  In March 2015, the Municipality also indicated its willingness to negotiate a contract addendum.

(iii)   When the news of the Claimants' involvement in the Moncada Luna corruption scandal came to light, the Municipal Council was understandably cautious in dealing with the Consortium.  Yet, in June 2015, the Municipal Council still indicated its willingness to work with the Consortium, but the Consortium did little to move the Project forward.  On September 2, 2015, Mayor Policani told the Consortium that the Municipality wanted to begin construction works as soon as possible, and asked the Consortium to renew its completion bond within five days.  The Consortium did not do so.  The Municipality therefore declined to engage in further discussions.

(iv)    The allegation that Mayor Policani and a legal counsel told Mr. López that that the Presidency told them to sabotage the Consortium's contract is belied by the evidence.   Both Mayor Policani and the Council clearly sought to have the Consortium proceed with the works.  Moreover, President Varela had no authority over the Mayor and the Council.

(v)     The temporary facilities are only being used for storage and a workshop for some of the Municipality's maintenance personnel.  The Municipality understandably retendered the contract to another company, and decided to refurbish the existing Municipal Palace.

(vi)    The Consortium was paid US ▮▮▮▮▮▮ as an advance payment as well as ▮▮
        ▮▮▮▮▮▮▮▮▮▮.  It suffered no prejudice and was left with a US ▮▮▮

109

███ balance.

c.   *The Tribunal's Analysis*

1.   The Cause of the Lapsed Municipal Palace Project

267.   Despite the Respondent's lack of a witness and its decision not to cross-examine Mr. López on his evidence regarding the Project, the Tribunal considers that the evidence presented by both sides does not support the Claimants' case on arbitrary or illegitimate State action in respect of the Municipal Palace Project. The salient points are as follows.

268.   First, the Respondent correctly observed that the delays during the Martinelli Administration – though not due to the Consortium – were lengthy. The Comptroller General took more than five months to endorse the signed contract, and once the Order to Proceed was issued the Consortium still could not gain access to the construction site for another six months. In this historical context, the delays caused by the Municipal Council and Mayor Policani from July 2014 to March 2015 were not suspiciously long. They were in keeping with the Council and Mayor's indecision on moving forward or on how to move forward from the outset.

269.   Second, the Respondent's argument that the City Council rather than Mayor Policani was in control of the (halting) progress in the July through December 2014 time frame is borne out by the evidence – specifically, C-0616, a document that the Claimants failed to address on this point. C-0616 is a December 2014 letter from the Consortium to Mayor Policani, which provides details of the Consortium's understanding that the City (or Municipal) Council was driving the decisions or indecision regarding the construction site. The Claimants relied on C-0180 resubmitted, but it is unhelpful to them: C-0180 resubmitted is a later-in-time (June 2015) argumentative document, written for the purpose of persuading the Municipality to take responsibility for delays and not to require anything further from the Consortium in advancing the Project. It does not have the same evidentiary value as the exhibit relied upon by the Respondent for understanding the role played by the City Council.

110

270. The issue is not whether the Municipality is ultimately responsible for the City Council's actions or whether the actions of both entities are attributable to the State, neither of which did the Respondent deny. The issue is whether, from July through December 2014, the City Council was principally in control of the construction site decision. If that was the case, and the Consortium certainly understood it to be the case in December 2014, Mayor Policani's alleged instructions from the Presidency to end the Consortium's Project involvement is less likely to be the explanation for the cause of the July through December 2014 delay. There is no reliable evidence that President Varela or his staff held any sway over the City Council's contractor relationships. As discussed below, the Tribunal is also unable to credit the evidence that the Claimants have adduced regarding President Varela's instructions to Mayor Policani to cancel the Project.

271. Third, the evidence further shows that the Municipality, including Mayor Policani, wanted to pursue the Project and was willing to continue to engage the Consortium for that purpose. When the Municipality finally decided on the new construction site in March 2015, it still sought to engage in negotiations with the Consortium. Moreover, the Consortium had received a substantial advance payment and had a balance in its accounts. The Municipality had compelling financial reasons to engage with the Consortium. However, the Consortium was no longer willing to pursue the Project in September 2015, which would have entailed renewal of the completion bond. The awarding of the Project contract to another contractor in 2017, long after the Consortium had left the Project negotiating table, said nothing about the success of a plan that the Varela Administration implemented, just as the Municipality's decision to revert to the original construction site did not demonstrate that the Consortium had been "whipsawed."

272. Finally, Mr. López's account of his conversations with Victor Almengor and Mayor Policani regarding alleged instructions from the Office of the President is simply too vague – and at odds with the Project facts, summarized above – to demonstrate that arbitrary or illegitimate State action was a contributing cause to the end of the Consortium's involvement in the Project. The only document adduced by the

Claimants in relation to these conversations is C-0808, which is the record of Mr. López's "chat" with Mr. Almengor, dated November 26, 2015.  However, nothing untoward can be gleaned from this exhibit; it is no support whatsoever for the assertions in López 2nd, para, 69.  As for Mr. López's account of his conversations, they are undated, vague, unclear, unsubstantiated by any document, much less a contemporaneous document, and the Tribunal cannot accord any weight to it, particularly in view of the factual record.

273.   The Tribunal finds that the Claimants have not demonstrated that arbitrary or illegitimate State action contributed to the end of the Consortium's role in the Municipal Palace Project.

v.   The Mercado Público de Colón Project ("Cold Chain Market" Project)

274.   The Parties agreed (López 1st, paras. 47-52; Mr. Fernando Duque witness statement) that the Cold Chain Market Project was a national project, administered by the Office of the President, to build a network of refrigerated, distribution, storage and retail centers across Panama to extend the life of perishable meats and produce.  As part of this national project, the existing public market in Colón was to be demolished and rebuilt ("Cold Chain Market" Project).  The Consortium won the bid for this Project on October 10, 2011, and signed the contract in August 2012.  The contract was also endorsed by the Comptroller General in August 2012; the Order to Proceed was issued in September 2012.  The Consortium received an advance payment in the amount of US ▮▮▮▮▮ on October 25, 2012.

275.   Prior to construction on the existing site, a temporary market had to be constructed, and the tenants or vendors from the existing market had to be relocated. The Consortium's construction works could not begin until all tenants/vendors had been moved.  The Ministry of the Presidency ("MoP") contracted with a third party to construct the temporary market. After substantial delay (for which the Consortium was not responsible), the Consortium was told (in November 2013) that the expected completion date for the temporary market and the relocation of the tenants and vendors was January 2014. During this period of delay, the MoP, in December 2012,

112

suspended the portions of the Consortium's contract that related to the physical construction of the Cold Chain Market, but asked the Consortium to continue with pre-construction activities. These activities chiefly concerned production of manuals and studies for the completion of the new market facility. The Consortium completed this pre-construction assignment, and the temporary market was completed around March 2014.

276.  The narratives of the Claimants and the Respondent diverge after this point (March 2014), and focus on the Claimants' seeking a new contract addendum, which would take into account the delays and associated costs. The competing narratives are discussed below.

277.  The Claimants' Cold Chain Market evidence and narrative are principally advanced in López 1st, paragraphs 47-52 and 154; López 2nd, paragraphs 74-79; and Cl. Rej., paragraphs 174-180. The Respondent's evidence and narrative are principally set out in the witness statement of Mr. Duque, who was the Executive Secretary of the Cold Chain (an office within the Ministry of the Presidency) from September 2009 to August 2014, as well as Resp. Rej., paragraphs 390-404. The Claimants chose not to cross-examine Mr. Duque. The Respondent cross-examined Mr. López relatively briefly on the Cold Chain Market Project (Tr. Day 1 [262-270], but this was not consequential for the Tribunal's purposes, since the questioning led to Mr. López simply reiterating his disagreements with certain statements made by Mr. Duque.

### a.    The Claimants' Position

278.  The Claimants' position turns on the negotiation and – they say – signing of a change order by the MoP. Mr. López stated that as November 2013, the MoP informed the Consortium that a change order for time extension and related costs would be formalized. The change order process continued in the first part of 2014, and in April 2014, the MoP confirmed that it had instructions to negotiate. In May 2014, the MoP confirmed that the time extension would be 41 months, starting from the Order to Proceed. During this period he met several times with Mr. Duque, to discuss maintaining the validity of the contract during the extension and a possible start date.

113

Mr. Duque attempted to finalize a change order and recognize the related costs before his departure, which followed the election of President Varela. The Consortium kept its insurance and bonds in place, extending the performance bond to the beginning of 2016.

279.    Mr. López explained that he signed the change order in May 2014, confirming the 41-month extension, and delivered all necessary papers to the MoP (López 2nd, para. 76), for submission to the Comptroller General.   However, the new Administration apparently never delivered the papers to the Comptroller General.

280.    Mr. López commented that not until late 2014 did the new Manager of the Secretariat of the Cold Chain Market (Mr. Andres Camargo) agree to meet him (López 2nd, para. 77). However, Mr. Camargo evinced no knowledge about the Project. Moreover, the Varela Administration had removed all technical employees of the Secretary of Cold Chain, with whom the Consortium had previously dealt. In June 2015 Mr. López again met with Mr. Camargo to negotiate resumption of the work. The Consortium needed a contract modification, to keep the economic equilibrium of the original contract (following the suspension), as well as expenses and an unconditional commitment that the MoP would timely approve Project plans. But in July 2015, the Consortium was threatened with termination unless it renewed the bonds, which were coming close to the expiration date.  Without a change order, renewal of the bonds was unreasonable. The Government neglected the Cold Chain Market Project, eventually threw the Consortium off the Project, and awarded the Consortium's job to Odebrecht.

281.    The Claimants therefore made four overarching points: (i) although some delays existed during the Martinelli Administration, there was good communication and cooperation; (ii) importantly, the MoP and the Consortium had reached a change order agreement in May 2014 (Cl. Rej., para. 177: "Viewed holistically, the email chain [C-0544] clearly shows that the parties had reached agreement"); (iii) the Government's approach changed to lack of cooperation in July 2014 when President Varela came to power; and (iv) the Varela Administration eventually removed the

Consortium from the Project and substituted President Varela's preferred contractor, Odebrecht.

### b. *The Respondent's Position*

282.   The Respondent made four main arguments (Resp. Rej., paras. 390-404; Duque Statement, paras. 18-22).  First, the problems with the Cold Chain Market Project began well before the election of President Varela.  This was not unusual in the context of the national Cold Chain Project.  Several of the national projects were either abandoned or unfinished as of November 2019.

283.   Second, the Consortium's contract expired in March 2014, and though a draft addendum or change order was prepared and discussed, the MoP never signed it. Discussions were ongoing in May 2014.  The email chain relied on by the Claimants, C-0544, "clearly shows that in May 2014 the Ministry of the Presidency and the Omega Consortium were still discussing how to compute the new completion date in order for the Omega Consortium to request an updated bond. … It is clear, therefore, that the Colón Public Market Project was still suspended with no valid contract and no addendum approved by the Ministry at the end of the Martinelli Administration" (Resp. Rej., para. 396).

284.   Third, the fact that no agreement was reached with the Consortium during the Varela Administration meant nothing more than the Project could not be restarted for commercial reasons. It should not be surprising that in July 2015 the Consortium was unwilling to renew the bonds and sign the addendum. According to Mr. Rivera (Rivera 1st, para. 129), "[a]s a result of the financial difficulties inflicted on me by Panama, we were left with no option but to abandon some projects in the country in October and the rest in late November 2014." Thus, by July 2015 the Consortium was no longer interested in pursuing any Projects.  It retained the Cold Chain Market advance payment of US ▬▬▬▬ (and only billed US ▬▬▬▬ for expenses, because there had been no construction work).

115

285.   Fourth, the Cold Chain Market Project never restarted; the Project that was awarded to Odebrecht was a Ministry of Housing project to renovate portions of Colón's old city (Duque, para. 22). The existing market was only one of the buildings that was renovated.

### c.   *The Tribunal's Analysis*

#### 1.   The End of the Consortium's Role in the Cold Chain Market Project

286.   The Tribunal finds, for the reasons presented by the Respondent and summarized above, that there is no compelling evidence that the Varela Administration ended the Consortium's role in this Project on illegitimate or arbitrary grounds. The Claimants' overarching "timing" argument – everything proceeded apace until President Varela took office – is not credible for the Cold Chain Market Project. The construction part of the Project – *i.e.*, the purpose of the Project – never began during the Martinelli Administration. Moreover, the change order that the Consortium was negotiating with Mr. Duque and the MoP in Spring 2014 was not signed by the MoP. The Claimants have failed to persuasively rebut Mr. Duque's evidence and the Respondent's position on this important point. Mr. López's witness statement was very careful to avoid stating that the MoP had signed the change order, and the email chain that the Claimants relied on (C-0544) cannot bear the weight that the Claimants wished to place on it. It is apparent that that no change order was sent to the Comptroller General's Office because there had not been an addendum that the MoP was prepared to sign (regardless of whether the Consortium had renewed the bond for another year) during the Martinelli Administration.

287.   In those circumstances, there is little that is nefarious in the MoP, under the Varela Administration, taking a lengthy period of time to review a Project that had previously been stymied for years. As the Respondent argued, it is also not surprising that, in July 2015, the Government was unwilling to meet the Consortium's demands, since, for example, the Consortium had retained the advance payment but was unwilling to continue to renew the bonds. At that stage, additionally, Mr. Rivera and Mr. López were no longer resident in Panama to direct the Consortium's operations.

288.  Finally, while Mr. López and the Claimants expressed their disagreement with Mr. Duque's contention that the Ministry of Housing project awarded to Odebrecht was different from the Cold Chain Market Project, the Tribunal is unable to credit the Claimants' position.  It appears that the Ministry of Housing project was not part of the Cold Chain Project, and the renovation of the Colón public market was only one aspect of Odebrecht's work.  Thus, the Tribunal cannot find illegitimate action in one arm of the Government declining to enter into a change order with the Consortium in July 2015 and another arm subsequently awarding a contract that included, but was not limited to, the renovation of the public market.

289.  In conclusion, the Claimants have not demonstrated that illegitimate or arbitrary State action contributed to the end of the Consortium's involvement in the Cold Chain Market Project.

vi.  The Markets Project

290.  The Markets Project entailed the design and construction of two public markets, Pacora and Juan Díaz in the Municipality of Panama, under one contract.  The contract was awarded to the Consortium in May 2013, while Mayor Roxana Méndez was in Office.  The Comptroller General endorsed it in September 2013, and the Notice to Proceed (September 18, 2013) was issued the same month.  The contract amount was US $1,955,650; the Consortium obtained a 20% advance payment in the amount of US ▮▮▮▮.  As discussed below, none of the Consortium's subsequent progress payment applications, from September 2013 through September 2014, were endorsed by the Comptroller General and paid.  The completion time frame was 300 days for the Pacora market and 360 days for the San Juan market.

291.  The Claimants again relied on the evidence of Mr. López, in addition to the documentary record.  The Respondent relied on the two witness statements of Mr. Eric Díaz ("Mr. Díaz"), as well as the documentary record.  The Respondent also cross-examined Mr. López on the Markets Project – Tr. Day 2 [281-293].  The Claimants chose not to cross-examine Mr. Díaz, a legal adviser to the Municipality of Panama, but Mr. Díaz only began work in that position on August 1, 2016, after the relevant

117

time frame.  He therefore had no direct involvement in issues or facts related to the dispute.

### a.   *The Claimants' Position*

292.   The Claimants' case[59] was again based on the argument that the contract was proceeding apace during the Martinelli Administration, but this quickly changed, through no fault of the Consortium, when President Varela took office on July 1, 2014. The same day, Mr. José Isabel Blandón took office as the new Mayor of Panama City. Mayor Blandón was in the same political party as President Varela, and therefore an ally.  Under Mayor Blandón, the Municipality quickly ceased cooperation with the Consortium and suspended the Juan Díaz part of the Project in September 2014 for reasons that were vague and pretextual. Mr. López ridiculed the argument, presented by Mr. Díaz, that the suspension was implemented because the Consortium was contractually required or required under applicable Panamanian regulations to obtain an easement to provide access to the Juan Díaz market, and had failed to do so.  At the time of the suspension, the Juan Díaz Project was more than 50% complete.

293.   The Municipality also prevented the Pacora part of the Project from going forward by failing to obtain a Soil Use Certificate, which only the Municipality could obtain, and was related to a zoning variance that, again, only the Municipality could obtain.  This Certificate was a condition not only for Project completion but also for the Consortium to receive progress payments.  The Municipality accepted that the Consortium was entitled to a 200-day extension for completion, which meant that the Municipality was responsible for obtaining the Certificate of Soil Use.

294.   As of April 15, 2015, the Consortium had ███ invoices pending for more than US ████, which the Comptroller General had not endorsed.

295.   Mayor Blandón told Mr. López that he did not want the Markets Project and instead preferred to build a warehouse at the Juan Díaz location.  The General Secretary of the Municipality also told Mr. López that he had instructions to wait for the results of

---

[59] *See* López 1st, paras. 133-145; López 2nd, paras. 57-66, 84; Cl. Rej., paras. 141-150.

the Justice Moncada Luna corruption investigation, and until then there should be no payments to the Consortium and no progress on the project.

296.   The Municipality's mistreatment of the Consortium was strictly for political reasons. The Consortium did not abandon the Markets Project.   It continued to seek an agreement to go forward until June 2015, and requested that the Municipality obtain the Certificate and sign the change order to extend the contractual term.   The Municipality ignored all the Consortium's requests and instead put the contract in default.  The Municipality terminated the contract in January 2017 for alleged breach by the Consortium.

### b.   The Respondent's Position

297.   The Respondent's position[60] focused on the terms of the Project contract.  Pursuant to the terms, according to the Respondent, the Consortium was responsible for obtaining all licenses and permits to construct the two public markets.  The Claimants' complaint that the Municipality did not cooperate in obtaining permits and licenses is wrong as a factual matter, even though the Municipality had no legal obligation to assist the Consortium.  Importantly, such assistance came not only from Mayor Méndez, but also from Mayor Blandón:  R-102 and R-103 (shown to Mr. López during cross-examination) demonstrate that Mayor Blandón in August and in October 2014 lobbied the Ministry of Housing to approve the Soil Use Certificate.  Moreover, after the Ministry of Housing still expressed doubts about issuing the Certificate, the Municipality convened a public meeting with Pacora-area residents to discuss the Certificate. The Ministry of Housing finally issued a resolution granting the Certificate in July 2015 – but the Consortium had already abandoned the contract.

298.   The contract clearly stated that payment applications were conditioned on approval of designs and blueprints.  There could be no approval without the requisite certificates. No blueprints and designs had been approved at any point between September 2013

---

[60] *See* Resp. Rej., paras. 203-233; Diaz 1st and 2nd; Tr. Day 2 [281-293] (Cross-examination of Mr. López).

and September 2014 – and this included the period during which the Martinelli Administration and Mayor Méndez held office.

299.   When Mayor Blandón took office in July 2014, he properly conducted a review of the Juan Díaz Project. The Project was contractually due to be completed in mid-August 2014, but only ▮▮▮ of the work had been accomplished. Moreover, the Municipality saw that the Consortium had not provided an easement in its design documents. This was a significant flaw. The Municipality properly suspended the Juan Díaz Project on September 2, 2014, and turned its attention to assisting the Consortium on completing the Pacora market.

300.   However, as noted above, despite the Municipality's efforts, the Ministry of Housing required further information. Mayor Blandón was willing to accord the Consortium a 200-day extension, even though it was the Consortium's responsibility to obtain the Certificate, because he wanted the Project to be completed. The Municipality came to an agreement with the Consortium on a change order in November 2014, which was sent to the Comptroller General. While the endorsement was pending, the Consortium abandoned the Project in April 2015; the Consortium's employees were nowhere to be found.

301.   Mr. Díaz stated that he was directly involved in the termination of the Consortium's contract in January 2017, and it was not in retaliation for the Claimants having started this arbitration. Mayor Blandón wanted to re-tender the Pacora market project. In 2018, he did so. The Juan Díaz market, on the other hand, was like two other market projects awarded by the Méndez Administration that Mayor Blandón decided to discontinue because of insuperable accessibility issues.

### c.   *The Tribunal's Analysis*

#### 1.   The Termination of the Markets Project Contract

302.   The Tribunal does not offer an assessment of the disagreement between Messrs. López and Díaz on the respective contractual obligations of the Consortium and the Municipality in obtaining the Soil Use Certificate; it need not do so, just as it need not

take a view on the question of an easement requirement regarding the Juan Díaz Market design. The question for the Tribunal is not which side is correct about the interpretation of the Project contract under Panamanian law, but instead whether the State entity – here, the Municipality of Panama – behaved in a reasonable commercial capacity or instead engaged in conduct that was illegitimate or arbitrary.

303. According to the Claimants, an important indication of illegitimate conduct were the comments allegedly made by Mayor Blandon and another Municipal official to Mr. López, regarding their dislike of the Markets Project and their instructions to not permit the Consortium to continue with the works until, perhaps, the results of the Moncada Luna investigation were available. However, there are three reasons why the Tribunal cannot credit this evidence from Mr. López: (i) it is not supported by any contemporaneous notes; (ii) the reported conversations are not situated in time or placed in detailed context, and the content that is given is vague; and (iii) the content is belied by the documented actions of Mayor Blandón in August, October, and November 2014 in seeking to work with the Consortium in proceeding with the Pacora Market Project.

304. The actions of Mayor Blandón in trying to push the Ministry of Housing to issue the Soil Use Certificate – regardless of whether the Municipality was obligated to obtain the Certificate – constitute persuasive evidence that the Municipality was acting as a normal commercial counterparty. The Consortium's failure to maintain a work-site presence after April 2015, even though the Municipality had signed the relevant change order, and giving the Consortium a further 200 days to complete the Pacora Project, further indicates that the eventual contract termination cannot be attributed to illegitimate State action.

305. The Municipality's conduct in suspending the Juan Díaz Market Project is not as clear as its Pacora Market actions. However, the weight of the evidence still favors the Respondent's position. First, the Consortium's progress of the works was very slow; as at the date of the suspension in September 2014, little more than 50% of the works

121

had been completed, even though the Project completion date was mid-August 2014. Suspension may have been justified on that ground alone.

306.   Moreover, even if *obtaining* an easement was not the Consortium's responsibility (a question that the Tribunal does not attempt to resolve), the Municipality nonetheless acted in a commercially reasonable manner by wanting to determine if accessibility issues had been properly dealt with in the Consortium's design plan – especially since the Project was still far from complete, and the Consortium had already overrun its contractual completion date, without any proffered justification.   Accessibility was clearly a concern in relation to the public markets; Mr. Díaz's evidence was that Mayor Blandón had discontinued other public market initiatives because of accessibility issues.

307.   For the above reasons, the Tribunal finds that the Claimants have not carried their burden to demonstrate that arbitrary or illegitimate actions of the Municipality of Panama were a relevant cause of the termination of the Consortium's Markets Project contract.   The weight of the evidence points to the Municipality's conduct as being commercially legitimate.

### (2)   The Tribunal's Conclusion: The Cause of the Consortium's Failed Project Contracts

308.   The Parties differ, as indicated above, on the international law test that should guide the Tribunal's assessment of Panama's actions in relation to the eight Project contracts.

309.   The Claimants put the test as follows (Cl. PHB, para. 24):

> *"Claimants bear the burden of proving that Respondent ceased to engage with Claimants fairly and in accordance with the Projects' Contracts, and that Respondent's arbitrary, capricious, unjustified and/or retributory actions were a cause of the circumstances that led to Respondent's termination of the Contracts and the prohibitions on the Omega Consortium's future public bidding.   Respondent, on the other hand, must prove its independent allegations that Claimants, and Claimants alone, breached the Contracts.   In other words, Respondent must prove its contentions that the termination of those Contracts and accompanying prohibitions on public bidding were entirely justified and*

> *based solely on Claimants' alleged failure to fulfill the Omega Consortium's contractual obligations."*

310.    The Claimants reiterated (Cl. PHB, para. 172) that the Tribunal need not find "a coordinated campaign against Claimants' investment to articulate a breach of the Treaties."    The Respondent's treatment of the Claimants, "even when assessed separately by project, agency, or incident," was still "arbitrary unreasonable, non-transparent, and obstructive, whether or not one finds proof of subjective bad faith" (Cl. PHB, para. 52).  For example, MEF's decision to "slash the [2015] budget for the CDLA Project" caused damage to the Claimants and was an "internationally wrongful act" (Cl. PHB, paras. 53, 172).

311.    The Respondent, on the other hand, relied heavily on formulations in *Impregilo v. Argentina* (ICSID No. ARB/07/17, CL-0083, paras. 275-283, concerning expropriation) and *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania* (ICSID No. ARB/05/22, CL-0054, paras. 460, 492), and argued (Resp. PHB, paras. 25-30) that:

- "International investment law does not impose liability on states when they act in a commercial capacity or their actions are contractually justified."

- If the Tribunal finds that reasons other than alleged political retaliation were sufficient to justify contract termination, the Tribunal must deny Claimants' claims, even if there was also evidence of political retaliation.

- Claimants can only succeed if they prove that political retaliation was the sole and proximate cause for contract termination.

- What is decisive is whether the reasons given for termination constituted a legally valid ground under the contract (*Impregilo v. Argentina*).

- If a sovereign party acting in its commercial capacity terminates a contract according to its terms, international liability may not attach.

- Only acts that exceed the normal course of conduct of a State could be characterized as acts of *puissance publique* (*Biwater Gauff v. Tanzania*).  If the State terminates a contract pursuant to the ordinary behavior of a contractual

counterparty, the act does not qualify as *puissance publique*.

- If the contractor grossly failed in fulfilling its contractual obligations and the State terminated the contract on this basis, termination could not be regarded as an act of expropriation (*Impregilo v. Argentina*).

312. In addressing the Tribunal's query about the termination of the CDLA Project contract (Resp. PHB, paras. 29-30), the Respondent emphasized that, pursuant to the approach taken in *Biwater Gauff v. Tanzania* and *Impregilo v. Argentina* (the latter in relation to expropriation, direct and indirect), INAC had the contractual right to terminate the CDLA contract, and the Termination Resolution identified the Consortium's many failures in carrying out its obligations. Thus, at the moment of contractual termination, a normal termination process was undertaken.  In doing so, INAC clearly acted in a commercial capacity and Panama could not be internationally liable, "notwithstanding any political impetus."

313. The Tribunal considers that each side has put the bar too high for the other, as a matter of international law. The Claimants assert that they merely have to show that the Respondent's actions were improper and "a cause of the circumstances that led to Respondent's termination of the Contracts," whereas the Respondent must prove that the Claimants breached the contracts, and the breaches were the only reason for the contract terminations (or failures). The Tribunal declines to adopt the Claimants' characterization of its burden (the Respondent's actions were "a cause of the circumstances that led"), because it is not grounded in international law; it does not engage with the central issue, which is whether the State's conduct is in exercise of sovereign as opposed to contractual powers. Further, the Claimants' characterization of the Respondent's burden would require that the Respondent prove, under Panamanian law in this arbitration, breach of eight Project while also proving the absence of any non-commercial motives. That approach would transform a treaty case into a contract case (as well as requiring proof of a negative concerning the Respondent's state of mind), and in this respect as well, the Tribunal declines to adopt the Claimants' proposed test.

124

314.    The Respondent's propositions, described above, come closer to providing a viable test, though the Respondent also set the bar too high for the other side.  There is no basis in the authorities relied upon by the Respondent for requiring the Claimants to prove that arbitrary or illegitimate action was the "*sole and proximate cause*" of the Project contract failures.  Moreover, the Respondent's approach suggests that if concurrent causes are present, the commercial cause <u>automatically</u> trumps the non-commercial, which is an approach the Tribunal also declines to adopt.

315.    In the Tribunal's view, the issue raised in relation to the eight Project contracts does not turn mechanistically on defining the investor's burden and whether the State, in responding, has embraced a burden, which then requires the Tribunal to determine which side has met its burden.  In this arbitration, the burdens are intertwined.  The task, instead, is to determine whether the weight of the evidence in each Project, considered on its own and in the light of the other Projects, supports the conclusion that the measures taken by the State entities were legitimate commercial measures *or* were illegitimate and unreasonable exercises of sovereign power.[61]  This is the task that the Tribunal has engaged in, with the substantial assistance of the Parties, their counsel, and the witnesses.  In doing so, the Tribunal has reached the conclusion that, for each Project contract, the weight of the evidence points to the relevant State entity as having a legitimate contractual basis for the actions it took.

316.    Here, the Respondent's citation of the *Impregilo v. Argentina* award is useful, as the tribunal in that case also made the following observations in the context of the claimant's "fair and equitable treatment" claim (Panama's PHB focused on the expropriation section of the award).  The *Impregilo v. Argentina* tribunal, quoting *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, commented that "a breach of fair and equitable treatment requires conduct in the exercise of sovereign powers" (*Impregilo v. Argentina*, para. 294).  The tribunal explained that in

---

[61] This precise formulation relates directly to the Claimants' FET claim.  However, as discussed above, the issue of 'commercial versus sovereign' capacity is also a foundational matter for the Claimants' indirect expropriation and umbrella clause claims.  The Claimants' FPS and FET claims are further considered in the context of the Claimants' criminal investigations, in the following section.

"the context of BITs, contractual rights and obligations must in principle be distinguished from treaty rights, **the relevant criterion being whether the State or its entities act as holder of sovereign power or as parties to a contract**" (*Impregilo v. Argentina*, para. 296, emphasis added).

317.   There may be cases, the *Impregilo v. Argentina* award continues, "where a state entity which has concluded a contract with an investor performs acts which do not only constitute a breach of the contract but are at the same time a misuse of its status as part of the State organization to the detriment of the investor and thereby involve the State's responsibility as party to a BIT" (*Impregilo v. Argentina*, para. 297). The tribunal stated (paras. 298-299) that many acts complained of by Impregilo concerned the contractual relationship between its company and the Argentine state entity, which required the tribunal "to examine whether the alleged contractual breaches, or any of them, could affect Argentina's responsibility under the BIT because they were a misuse of public power or reveal a pattern directed at damaging AGBA, and, indirectly, Impregilo, as one of its shareholders." Of relevance to this arbitration, the tribunal assessed the following aspect of the contractual relationship (*Impregilo v. Argentina*, para. 303, emphasis added):

> "In so far as Impregilo complains that work charges were not paid to AGBA [the investor's company], the Arbitral Tribunal notes that, according to Article 10 of Annex Ñ, a work fee was to be paid by customers at the time the public service was connected for the drinking water supply and sewage services. In Resolution 14/02, ORAB [the State entity] stated that it had repeatedly asked AGBA to provide information about the justification of these charges in some areas and that AGBA had failed to do so. ORAB therefore decided in the Resolution that AGBA must refrain, in these areas, from imposing work charges until ORAB, on the basis of information provided by AGBA, had analyzed the situation further. While the Argentine Republic argues that AGBA had not sufficiently demonstrated that it had carried out building work for which it was entitled to impose work charges, Impregilo alleges that the information requested by ORAB was excessive and unnecessary. **This appears as a typical contractual dispute which cannot involve responsibility under the BIT**."

318.   The above is simply an example of how another investment treaty arbitral tribunal has addressed the issue of whether a State entity has acted in a sovereign or in a contractual capacity.   The issue is more nuanced than the Respondent's position, summarized above, would suggest.   The Tribunal must ultimately determine whether the actions of the Panamanian State entities in dealing with the Consortium in the six Projects were a misuse of public power or were directed at damaging the Consortium.   A close examination of the evidence has led the Tribunal to conclude that the State entities acted in their commercial capacity and acted to protect their legitimate interests under the relevant contracts.

319.   This is not to reject evidence that comments manifesting a desire to do harm to the Claimants were made by certain State actors.[62]   It is rather to say that the evidence in the case record points to legitimate commercial reasons as the *relevant* cause of the Project contract failures, and the absence of evidence of concerted action by State organs and actors to destroy the Claimants' investments. Therefore, the Claimants' liability case in relation to the six Projects cannot succeed on any of their four heads of claims, under any international law standard – either the international minimum standard or (as the Claimants propose for FET and FPS) the "contemporary and autonomous" standard.

## IV.   THE CORRUPTION INVESTIGATION[63]

### A.   INTRODUCTION – THE RELEVANT ISSUE IN THIS ARBITRATION

---

[62] The Tribunal discusses the question of the alleged La Trona restaurant meeting between Mr. Varela and Mr. Rivera in the section below on criminal investigations.  On the record before it, the Tribunal assumes that such a meeting occurred and, as Mr. Rivera has testified (*see, e.g.*, Rivera 1st, paras. 64-68 – though not all details in those paragraphs can be accepted), Mr. Varela sought a campaign contribution from Mr. Rivera, who refused to provide it.  However, there is little else that the Tribunal can infer from that event.  The VarelaLeaks documents do not carry the matter of retributory motive any further, principally because the few messages that concern Mr. Rivera are from a time frame when President Varela was informed about the existence of this arbitration – and no messages manifest any role in the Omega Consortium's Projects.  The analysis of the six Project failures in this section does not sustain the Claimants' assertions of retribution arising from the La Trona solicitation or, absent a retributory motive, collective acts or of individual governmental acts that would otherwise attract the substantive protections of the BIT and TPA.

[63] "Corruption investigation" and "criminal investigation(s)" are used interchangeably by the Tribunal, which adheres to what the Parties also did.  The reason for the use of the plural "investigations" is that, according to

320.   The Claimants contend that Panama initiated "bogus" criminal investigations of the Claimants to harass and intimidate them.[64] In doing so, Panama denied the Claimants "fair and equitable treatment" and "full protection and security" for their investments, and also committed an indirect expropriation of their investments.  The Claimants summarise their position on the investigations into the Claimants' alleged role in bribing Justice Moncada Luna as follows: "The evidence shows that Mr. Rivera engaged in a real estate transaction – a *perfectly* legitimate land purchase – through PR Solutions S.A. and another corporate vehicle (Punela Development Corp.).  Once the investigation against Supreme Court President Justice Moncada Luna began [in October 2014], the Panamanian Government under President Varela's control latched on to coincidental and tenuous links between Mr. Rivera's real estate transaction and Justice Moncada Luna.  The Government then threw its full weight behind the pretextual investigation to frame Claimants as criminals."[65]

321.   Panama's position on the investigations is threefold: (i) the Tribunal lacks jurisdiction over claims relating to Panama's criminal investigation, since such claims do not arise directly out of an investment; (ii) Panama has proved, in this arbitration, that the Claimants procured the La Chorrera Project contract through corruption; and (iii) in any event, "the circumstances surrounding the investigations – *i.e.*, evidence that the real estate transaction relied on by the Claimants was a "false paper trail" –shows that

---

Panama, *see, e.g.*, Resp. C-Mem., paras. 317-321; First Witness Statement of Jorge Enrique Villalba (December 26, 2018), there was a first criminal investigation conducted by the Panamanian National Assembly into the accounts of Justice Moncada Luna.  As a result of that investigation, Justice Moncada Luna pleaded guilty on February 23, 2015, to unjust enrichment and making false statements (in exchange for his plea, the National Assembly agreed not to prosecute him further for corruption and money laundering).  As a result of the Assembly's investigation, and based on funds said (by Panama) to flow from Omega Panama's accounts to the eventual benefit of Justice Moncada Luna, two separate divisions in the Public Prosecutor's office commenced investigations into Mr. Rivera and Omega Panama: the Organized Crime division and the Anti-Corruption division.  Neither investigation led to an indictment against Mr. Rivera (or Omega Panama).  An attempt to extradite Mr. Rivera from the United States was rejected by the United States (based on lack of evidence in the extradition application).  The Claimants' bank accounts were frozen (and apparently remain frozen), certain of their documents were seized, and an Interpol red notice against Mr. Rivera was obtained by the Panamanian authorities.

[64] Cl. Reply, para. 235.

[65] *Id.* (emphasis in the original).

128

Panama's actions were nothing more than a legitimate exercise of its police authority – something not precluded by the full protection and security obligations."[66]

322.   As indicated above, the Tribunal does not consider Panama's first position to be a viable jurisdictional objection.   Panama's argument is based on the fact that the investigation's initial target was Justice Moncada Luna.  On this basis, Panama says, the specific investigation into the Claimants was a "byproduct" of the investigation of Justice Moncada Luna [Resp. Rej., para. 188].  However, the concept of "arising directly out of an investment" is not excluded by Panama's "byproduct" argument, which is more accurately characterized as a simple "origination" fact.  That is, while the origin of the investigatory process was the National Assembly's inquiry into Justice Moncada Luna's lifestyle, the investigation turned into a separate Public Prosecutor investigation of the Claimants and their investments (which were, in this instance, inextricably tied).  It was the Claimants' investment through, at the very least, Omega Panama, and Omega Panama's successful bid on the La Chorrera Project contract (and funds from Omega Panama that allegedly benefitted Justice Moncada Luna) which led to the Public Prosecutor's actions.  The "arising directly out of" test does not mandate that the State's measures must have originally targeted the Claimants' investments, and Panama has not adduced any authority which supports its "origination" theory.  Moreover, it is clear that the actions taken by the Respondent affected the investment as well as the investor.

323.   The Tribunal also does not entertain Panama's second position – its contention that it has proved[67] corruption in this arbitration.  The Parties have spent substantial time on

---

[66] *See, e.g.*, Resp. PHB, para. 125; Resp. Rej., paras. 186-90, 35-81; Resp.  Counter-Mem., paras. 317-321 (quotation from para. 317).  *See also* the First and Second Witness Statements of Mr. Jorge Enrique Villalba (Villalba 1st and Villalba 2nd), December 26, 2018, and November 14, 2019.

[67] Panama has argued (contrary to the U.S. Submission) that the standard of proof for corruption is "balance of probabilities" rather than "clear and convincing."  In the context of this arbitration, the correct standard for proof of corruption does not matter; it is a question that the Tribunal need not and does not reach.  However, as discussed below, the "balance of probabilities" standard is relevant in assessing the reasonableness of Panama's undertaking and pursuing the criminal investigations of Mr. Rivera and Omega Panama.  In assessing whether a treaty breach occurred (under any of the three claim heads), the question would be whether, on the balance of probabilities, there was no legitimate basis for suspecting that the Claimants had been conducting unlawful activities, rendering the investigations unjustified.

this issue; each side has proffered a money-laundering expert – Ms. Jiménez for the Claimants and Mr. Pollitt for the Respondent – and both experts were cross-examined extensively. However, this Tribunal does not sit as a quasi-Panamanian court and cannot adjudicate whether Mr. Rivera is guilty of committing the criminal offense of money-laundering (or any other criminal offense) under Panamanian law.

324. In any event, neither money-laundering expert is qualified in Panamanian law and neither was able to provide much assistance to the Tribunal because of their focus on the question whether corruption or money-laundering had been proved. Ms. Jiménez concentrated on bank transaction documents and concluded that the Respondent failed to prove corruption in the awarding of the La Chorrera contract, and, consequently, there could be no money-laundering offense – again, this is not under Panamanian law (Tr. Day 8 [1603-04]). Somewhat more usefully, Ms. Jiménez, upon questioning by the Tribunal, was willing to say that if the Tonosí land deal "was something that Panamanian investigators thought was perhaps a sham transaction, then it should have been investigated," (Tr. Day 8 [1741-1742]) though she quickly added that the actual investigation did not sound "very robust to her," and she was not an expert on Panamanian real estate. Although Mr. Pollitt acknowledged that his instructions were to consider whether there were indicia of illicit payments in connection with the award of the La Chorrera contract, he went further and opined that he believed that Omega Panama and Mr. Rivera engaged in a bribery and money-laundering scheme – though he has no Panamanian law expertise and became very confused on cross-examination about the applicable elements of money laundering and the applicable standard of proof.

325. Panama's third point, however, is the reverse of the Claimants' summary statement, and both Parties have thereby directed the Tribunal to the relevant issue raised by the criminal investigations under the three heads of claims. In the Claimants' way of expressing it, were the investigations "bogus" because an examination of the Tonosí land deal reveals that it was a "perfectly legitimate" transaction such that no further pursuit of Mr. Rivera and Omega Panama were justified; or, per the Respondent, were the investigations a legitimate exercise of police powers, because the Claimants'

130

evidentiary support for the Tonosí land deal was actually a "false paper trail" (Resp. PHB, para. 66).

## B.   THE BACKGROUND TO EXAMINING THE "TONOSÍ LAND DEAL"

326.  Justice Moncada Luna awarded the La Chorrera Project contract to the Omega Consortium on October 17, 2012 and signed the contract on November 22, 2012.[68] He signed the order to proceed on January 15, 2013.  The predicate for the examination of the Mr. Rivera and Omega Panama's Tonosí land deal was evidence developed during the National Assembly investigation that showed two payments originating from Omega Panama's account that indirectly were connected to payments made on apartments purchased by Mrs. Moncada Luna. See Villalba 1st, paras. 18-21. According to Mr. Villalba, the series of transfers, in summary, that the National Assembly investigation revealed was, regarding the first payment:

(i)    April 3, 2013, Omega Panama received an advance payment for the La Chorrera Project.

(ii)   April 25, 2013, Omega Panama transferred US $250,000 to an account in the name of PR Solutions S.A., a company owned by Mr. Rivera.

(iii)  April 25, 2013, PR Solutions S.A. transferred US $250,000 to an account in the name of Reyna y Asociados, a law firm owned by Ms. Mariela Gabriela Reyna López ("Ms. Reyna") and Rolando Adolfo Reyna Rodríguez. Ms. Reyna served as the intermediary for several transfers to companies later associated with the purchase of the Moncada Luna apartments ("the apartments").

(iv)   May 3, 2013, Reyna y Asociados purchased a cashier's check in the amount of US $125,000, payable to Sarelan Corporation, S.A., a company associated with the purchase of the apartments.

Mr. Villalba summarised (Villalba 1st, para. 22) that "funds in the amount of $125,000 went, indirectly, from the advance payment from the Judiciary" to Omega Panama and from the account of Omega Panama to make payment "on the mortgage-backed loan outstanding against Justice Moncada Luna's" apartment.  After another La

---

[68] Villalba 1st, para. 19; Resp. PHB, para. 61.

131

Chorrera advance payment deposited into an Omega Panama account on July 10, 2013, the second payment involved another Omega Panama transfer (July 12, 2013) of US $250,000 to PR Solutions, S.A. and then to Reyna y Asociados and then to Sarelan Corporation, S.A., leading to US $130,000 being traced to apartment payments (Villalba 1st, para. 23).[69]

327.    The theory of the investigation was that the Omega Panama payments to Ms. Reyna "contain several hallmarks of money laundering" (Villalba 1st, para. 26), ultimately connected to the Claimants' alleged bribery of Justice Moncada Luna to obtain the La Chorrera contract. As Mr. Villalba confirmed his view in testimony during the First Week Hearing,[70] Omega Panama took money from its La Chorrera contract with the Judicial Authority to pay Justice Moncada Luna. Mr. Villalba recounts that (Villalba 1st, paras. 30-35) in June-July 2015, the Public Prosecutor was seeking, as part of its investigation, information and testimony about the reasons for the Omega Panama transfers that went to Ms. Reyna. Omega Panama submitted materials to explain that the two suspect payments identified in the National Assembly's investigation were not directed to Justice Moncada Luna but instead were "part of a personal project by Mr. Rivera to develop a residential complex he referred to as 'Verdanza Residences.' The project purportedly was to be developed in Tonosí, in the Province of Los Santos. The Prosecutor's office reviewed the materials submitted by Omega and conducted its own investigation, which, according to Mr. Villalba, found no evidence to support the

---

[69] The Tribunal does not recapitulate the intricacies of the bank transfers and evaluate whether the monies that reached Ms. Reyna's account from Omega Panama could be traced to monies that benefitted Justice Moncada Luna. As the Claimants argue (Cl. PHB, pages 47-48, and Ms. Jimenez opines), since it appears that Ms. Reyna was commingling Omega Panama's funds for the Tonosí land deal with illicit funds from other transactions, she could have used Omega Panama's payments to pay off unrelated debts that she (or J.R. Bocas Investment, the Tonosí seller) had with respect to Sarelan. According to the Claimants, there is no way to prove (on the available evidence) that it was the funds originating from Omega Panama that went into the Sarelan account. However, the Respondent's PHB, paras. 90-95, argues persuasively that based on the insufficient funds in the Omega Panama, PR Solutions S.A. and Reyna accounts at the time of the transfers, it is clear that portions of the La Chorrera advance payments to Omega Panama ended up in the Sarelan account. In any event, proof or lack of proof on the money flow is not the issue for this Tribunal, which is not tasked with determining whether the La Chorrera funds could be definitively traced to Sarelan, though that was in large part the purpose of the reports of Ms. Jimenez and Mr. Pollitt, since they were seeking to establish (Pollitt) or deny (Jimenez) the crime of bribery (albeit not under Panamanian law).

[70] Tr. Day 3 [618].

Claimants' explanation.[71]  The investigations continued until September 2016 (when the money laundering investigation was declared a nullity by the Panamanian courts) and June 2018 (when the anti-corruption prosecutor requested the provisional dismissal of the bribery investigation, which was confirmed by the Panamanian courts in November 2019).[72]

328.  At the center of Panama's support, in this arbitration, for the legitimacy of the exercise of its police powers in pursuing the investigations of Mr. Rivera and Omega Panama is its position, noted above, that the Tonosí land deal was a sham: "Claimants argue that ▇▇▇▇▇▇ was transferred from Omega Panama to PR Solutions and onto Ms. Reyna as a deposit on the purported Tonosí land deal.  Panama has established in its written submissions why this argument fails and why the Tonosí land deal was a sham."[73]  The Claimants also observe that "Respondent's defense rests on the theory that the Tonosí Land Transaction for the purchase of land ▇▇▇▇▇▇ concluded through a Promise of Purchase and Sale Agreement (the "Promise Agreement") was illegitimate" (Cl. PHB, para. 92).  The Claimants emphasise that the hearing testimony "proves that Respondent's allegations are unfounded" *Id*.  The Tribunal now proceeds

---

[71] Villalba 1st, paras. 32-34 discusses the steps that the prosecutors took, which did little more than show that "Verdanza Residences" had no planning permit and had never been heard of by local residents. The Claimants have criticized these investigative steps as being "pretextual and half-hearted" (Cl. PHB, para. 93). The Tribunal would instead accept Ms. Jimenez's description that the investigation was not "robust" (Tr. Day 8 [1742]). The Claimants also contend that on cross-examination Mr. Villalba "admitted that he could not conclude that the Tonosí Land Transaction was illegitimate [citing Transcript references; see below]. (Cl. PHB, para. 93) This alone puts the lie to Respondent's case" (emphasis in the original). The Tribunal strongly disagrees with the Claimants' characterization of this aspect of Mr. Villalba's testimony on cross-examination.  Instead, he repeatedly stated that he was not the Prosecutor, and that the Prosecutor had not determined, at that stage of the investigation (November 2015), whether the Tonosí land deal was illegitimate or not. Tr. Day 3 [612]. The Claimants not only fail to refer to this Transcript reference, but, in fact, two of the Transcript page references cited by the Claimants have nothing to do with this point, and in the third Mr. Villalba simply reports [577] that "[w]ell, the statements by the appearing Parties indicated that it was a legitimate purchase" [based on the question he had just been asked by counsel, which was "regardless of any illegal activity that you may have uncovered on the part of Mr. Moncada Luna or others, no one ever testified in your investigation that the land purchased by Mr. Rivera's Company was anything other than legitimate, correct?"]. Properly understood and reported, Mr. Villalba's testimony on cross-examination did not put "the lie to Respondent's case" as Claimants allege.

[72] Panama's extradition request regarding Mr. Rivera was sent to the United States in December 2015.  The request was denied by the U.S. State Department in February 2016.  The September 2016 nullity ruling was still on appeal (submitted by the prosecutor) at least as of January 2021. *See* C-0008, C-0942, C-0900, C-0908.

[73] Resp. PHB, para. 79 (continuing through para. 95); Resp. Rej., paras. 35-61; for the Claimants' written submissions on this issue, *see* Cl. PHB, paras. 92-98; Cl. Reply, pages 142-151; Cl. Rej., pages 39-62.

to examine the evidence, focusing initially, as the Claimants suggest, on the hearing testimony. One particular document is also central to the consideration of the Tonosí land deal and the hearing testimony – the above-mentioned "Promise of Purchase and Sale Agreement" C-0078.[74]

## C.    THE TRIBUNAL'S ANALYSIS OF THE "TONOSÍ LAND DEAL" HEARING TESTIMONY

329.   The Tribunal first considers the hearing testimony of Mr. López and Mr. Rivera, then the testimony of the Claimants' real estate expert, and then the two legal experts.[75]

330.   **Mr. López's testimony** on cross-examination regarding the Tonosí land deal runs as follows: Mr. Rivera asked him in around February 2013 to become involved in formalizing a Promise Agreement with respect to a sale, a personal land deal on Mr. Rivera's behalf. Mr. López never saw the property; once Mr. Rivera identified the land, he gave Mr. López a file with owner-agent contact details. Ms. Reyna was the agent for the owner. Mr. Rivera gave Mr. López a price that he expected to pay, though he did not explain the basis for the price, and Mr. López did the negotiating. Mr. López understood that Mr. Rivera was being advised by Panamanian real estate specialists. Mr. López, having seen a list of comparables, tried to negotiate a lower price, but was unable to do so. Ms. Medina, Omega Panama's lawyer in Panama, was also involved – or specialists in her firm (IGRA) were involved – in the negotiating and papering of the transaction. For the purchase, money was transferred from Omega Panama to PR Solutions, S.A., a Panamanian company owned by Mr. Rivera.

331.   Upon questioning by the Tribunal, Mr. López gave further details. Ms. Medina, a lawyer, prepared the first draft of the Purchase Agreement, in which Mr. López told her (April 22, 2013) to put Punela Development as the buyer (Mr. Rivera also owned Punela). Ms. Reyna reviewed the draft and said it was poorly written and said she would amend it. Mr. López responded on April 24, 2013, saying to keep it short and

---

[74] The addendum to the Promise of Purchase, C-0374, was not signed by both Parties.

[75] Mr. López: Tr. Day 1 (176-192) and Tr. Day 2 [309-330]; Mr. Rivera: Tr. Day 2 [419-512]; Mr. Fidel Ponce: Tr. Day 6 [1312-1381]; Justice José A. Troyano: Tr. Day 7 [1398-1489]; Justice Adán Arjona: Tr. Day 7 [1493-1585].

to amend it herself, and it was needed quickly. Mr. Rivera was not happy with the timeline. Mr. López thought that the Purchase Agreement was signed at the end of April 2013. Mr. López was not at the signing; Mr. Rivera made a few additional comments on the Purchase Agreement and Mr. López sent those to Ms. Medina. The first payment was made almost simultaneously with the signing. It was pointed out to Mr. López that this did reflect a rush, because Mr. Rivera was still negotiating a contract on April 25, 2013, which only required a first payment within 10 days of signing, and payment was nonetheless made on April 25.

332. Mr. López was asked about the proposed addendum to the Promise of Purchase, and said that this was something that Ms. Reyna wanted, because she could not free up the lien on the mortgage. The addendum shows the Promise of Purchase being signed or dated on April 2, 2013, but Mr. López could not explain this date in view of his testimony about signing at the end of April. [The version of the Promise of Purchase contract in the arbitration is simply dated April 2013.] He recalled that in 2013 he knew about the lien, but he questioned the accuracy of Ms. Reyna's email to him in which she stated that she originally offered the real estate property in mid-2012. Mr. López affirmed that he checked the price of the original purchase of the land in April 2013 and accepted that it was for a much smaller amount than the price he was negotiating. His reaction to the question on whether he had been concerned about the significant price rise was that this how the real estate market works, and Mr. Rivera knew that the valuation of the area was increasing.

333. Mr. López was further asked about Mr. Nicholas Corcione (another bidder on the La Chorrera contract), and Ms. Reyna's statement that Mr. Corcione introduced Ms. Reyna to Mr. López in mid-2012 concerning the property. Ms. Reyna further stated that Mr. Corcione did so because a buyer could pay the seller's – J.R. Bocas Investment – debt to Mr. Ricardo Calvo. Mr. López disputed this: he says he met Ms. Reyna once in 2012, and he approached her in 2013 about the property based on information that Mr. Rivera had. Mr. López agreed that Mr. Calvo was implicated in the Justice Moncada Luna investigation. He knew Mr. Corcione, but not well.

135

334.    The Tribunal notes some troubling aspects to Mr. López's testimony. Understandably, the Tonosí Land Deal was a distant event for Mr. López to recall the details of this transaction. But Mr. López was Mr. Rivera's close lieutenant, invested with enormous responsibility by Mr. Rivera. He had difficulty explaining the rush to purchase, which he likely would have discussed with Mr. Rivera, and he had difficulty explaining the contract date discrepancies. As the chief negotiator, he had little knowledge of the Panamanian real estate market, little knowledge about the price ceiling initially set by Mr. Rivera, and little interest in the lien. He was willing to accept whatever terms that the seller – a seller about whom he knew nothing – had established, apparently based on Mr. Rivera's belief, allegedly supported by real estate experts, that the Tonosí land value was increasing and the asking price was appropriate. It is a rather unpersuasive account, especially when put together with other testimony, to which the Tribunal now turns.

335.    **The following salient points emerged from Mr. Rivera's cross-examination.** Mr. Rivera denied knowing Ms. Reyna. He accepted that between April and July 2013, ███████████ was transferred from his wholly owned companies to Reyna y Asociados, but he denied that these were payments to Ms. Reyna: he said that these monies were supposed to be deposited in an escrow account. However, he accepted that he never saw an escrow executed by Ms. Reyna other than the Promise of Purchase contract. Mr. Rivera agreed that Mr. López negotiated the Promise of Purchase (C-0078). The instructions that Mr. Rivera gave to Mr. López were that he was willing to pay one million dollars for the purchase of the Tonosí land. Mr. Rivera says he obtained price advice from many people, but he never spoke to the seller, J.R. Bocas Investment, or to Ms. Reyna.

336.    Mr. Rivera accepted that he transferred US ███████ pursuant to the Promise of Purchase requirement of a 50% down payment, but he did not accept that 50% is an extraordinarily high closing advance in Panama. He confirmed that he had not made any inquiries on the usual pre-closing advance percentage. He also did not know what the seller had paid for the land, and he did not get an appraisal or a topological study. He walked the site. He accepted that there was a major typo in the Promise of

136



Purchase (the difference between US ███████ and US ███████ in one provision), which he and his lawyers did not detect when he signed the contract.

337.   At the time of his testimony, Mr. Rivera accepted that he had not sought to recover the US ███████ in advance payments on the Promise of Purchase contract. [He later did file suit to recover those funds.]

338.   Upon questioning by the Tribunal, Mr. Rivera re-affirmed that he did not know Ms. Reyna. She somehow came to know of his interest in purchasing land, and she sent information to him. That led him to visit the Tonosí site (apparently on his own, without authorisation from the seller or its agent), but he did not contact her afterwards. Instead, he told Mr. López to move forward with the purchase. He accepted that Ms. Reyna visited Omega Panama's offices to meet with Mr. López. He denied that an engineer associated with Mr. Corcione was involved with Omega Panama's projects and he denied any involvement of Mr. Corcione in the Tonosí land deal.[76]

339.   The Tribunal finds at least four aspects of Mr. Rivera's testimony to be troubling. The first is that he had done very little research (that he was able to recall) and, more significantly, appeared to have had no discussions with his lawyers or Mr. López, about arguably important purchase matters such as the pre-closing advance percentage, the relatively low price that J.R. Bocas Investment had paid for the land, any relevant comparables, and whether an appraisal or topological study should be obtained in view of a relative lack of detailed public information.

340.   Second, Mr. Rivera appeared to be uninterested in retaining local real estate expertise and local guidance on cost projections for his intended tourist development, and for example, whether an 8-hectare plot was either too small or too large in view of what

---

[76] As the Tribunal pointed out in questions put to Ms. Jimenez, Tr. Day 8 [1735-1736], Mr. Rivera's account conflicts with a statement made by Ms. Reyna (to Panamanian investigators), discussed above in the context of Mr. López's examination concerning how the Tonosí land was brought to Omega Panama's attention. Ms. Reyna focuses on the involvement of Mr. Corcione and she commented that Mr. Corcione even received the "Real Estate Sales and Purchase Agreement" (presumably, this is the Promise of Purchase Agreement), before it was signed in April 2013.

he was prepared to spend for the future development and the likely size and quality of competitor developments. It is unclear what Mr. Rivera expected to learn and actually learned from simply "walking the site."

341. Third, Mr. Rivera was prepared to put in escrow a substantial sum, US ▮▮▮▮, and eventually pay a total of one million dollars,[77] to purchase land for a resort development, but he did not even seek to determine whether his US ▮▮▮▮ was actually going into a proper escrow account or to review an escrow agreement (or to

---

[77] As indicated above, an apparent typo in the Promise of Purchase (C-0078.resubmitted.2; Clause 2 quoted below) cast some uncertainty on whether the final purchase price was US ▮▮▮▮. The agreed price in Clause 2 is US ▮▮▮▮. The two advance payments total US ▮▮▮▮. However, while Clause 2(c) reports, in words, that the balance to be paid is US ▮▮▮▮, the parenthetical in numbers states US ▮▮▮▮. As a matter of Panamanian contract law, the Tribunal was informed by the Panamanian legal experts that words prevail over numbers in the case of a discrepancy. Still, it is a rather odd typographical error, given that sophisticated lawyers were reviewing a very short, two-page document, and Mr. Rivera, an experienced businessman, also missed the error. At the very least, as the Tribunal suggested to Mr. López, Mr. Rivera seemed to be in a rush to close the transaction, though no reason was given by Mr. López or Mr. Rivera for any such rush (apart from Mr. Rivera apparently commenting to Mr. López that the process of identifying the land and accomplishing the transaction had already taken two months).

"**TWO**: The **PROMISSORY SELLER** declares that it has agreed to sell the **PROPERTY** to the **PROMISSORY BUYER** and the latter has agreed to buy the **PROPERTY** from the former, at the agreed and adjusted price of ▮▮▮▮, legal tender of the United States of America, payable by the **PROMISSORY BUYER** to the **PROMISSORY SELLER** as follows:

    a.    An initial payment of twenty-five percent (25%) of the total price of the **PROPERTY**, that is, the sum of ▮▮▮▮, payable within ten (10) days following the signature of this agreement. The payment in question shall be paid through certified check or cashier's check payable to the Reyna & Asociados law firm, which shall act as the Depository Agent custodian of the funds.

    b.    A second payment in the amount of ▮▮▮▮, payable within sixty (60) business days following the first payment date.

    c.    The sum of ▮▮▮▮, legal tender of the United States of America, payable once the document is duly recorded with the Public Registry of Notarial Deeds, containing the final purchase and sale contract whereby the **PROMISSORY SELLER** transfers the **PROPERTY** to the **PROMISSORY BUYER**."

In order to guarantee payment of the remaining balance described in subpart "b" above, the **PROMISSORY BUYER** shall make the payment of the balance through an Irrevocable Letter of Credit issued by a licensed local bank acceptable to the **PROMISSORY SELLER**, to be delivered by the **PROMISSORY BUYER** to the **PROMISSORY SELLER** within sixty (60) days after this agreement is signed."

138

ask Ms. Medina, his lawyer, to do so) – in circumstances where he professed to know nothing about Ms. Reyna, the escrow holder.  He was willing to just accept the Promise of Purchase provision that Ms. Reyna would be the deposit holder.

342.    Finally, Mr. Rivera's apparent lack of determination, until late in the arbitral process, to seek to recover the ▮▮▮▮▮▮▮ is difficult to understand, particularly in circumstances where he says he had been ruined financially by the Panamanian authorities.

343.    In view of the troubling aspects of the testimony of both Mr. López and Mr. Rivera, it is particularly important to see whether the testimony of the three most relevant experts – the Claimants' real estate experts and the Parties' respective legal experts – can assist in clarifying some of the questions relating to the *bona fides* of the Tonosí land deal.

344.    **Mr. Fidel Ponce, the Claimants' real estate expert**, gave evidence on Day 6 of the hearing (Second Hearing Week).  In his direct presentation, Mr. Ponce, who had submitted two expert reports, concentrated on three points: (i) the price for the Tonosí plot, ▮▮▮▮▮▮, "was within the average market price at the time." Mr. Ponce noted that the Azuero Península is home to "some of the most unique and attractive attributes for investors and travelers in Panama"; developers at the time "were subdividing parcels of larger pieces of land, making very substantial margins." (ii) Without the release of the mortgage or the "finalization of a transaction of ▮▮▮▮ ▮▮▮▮, it would have been impossible to create a final deed of sale and register it with the Public Registry." (iii) Some of the Respondents' criticisms of the Promise of Purchase Agreement reflect a misunderstanding of Panamanian real estate practices (Tr. Day 6 [1313-1314]).

345.    The following important points emerged from the cross-examination of Mr. Ponce. Mr. Ponce accepted that there can be a bid-ask differential, though initially he referred to this as a "possibility" and then agreed that real estate "is not fixed, and there are variable numbers in general" (Tr. Day 6[1332]). When asked whether it is "pretty rare" for a buyer to simply pay the asking price, Mr. Ponce was determined to say,

139

"[s]ometimes it happens." He followed up with "sometimes" [he would not accept "often"] the buyer negotiates a lower price than the asking price. Mr. Ponce accepted that actual real estate data in Panama is not readily available, and that most people will not disclose the actual price for which they sold or brought property (a comment of his in one of his reports).

346.   It was suggested to Mr. Ponce that in his Reports he relied primarily on asking prices. Mr. Ponce would not accept the word "primarily." He accepted (though with a caveat) that in one instance he had reported a 40% reduction in the sales price from the asking price. When shown several other examples in his Reports, he accepted that these were asking prices, but he said he also asked some of his friends about sales prices. He wished to emphasise that he had not seen residential lots in the Canas and Venoa region being sold at a significant reduction in the asking price, because Panama was a hot market at that time. He gave other comparables information, in which certain sales payments were due to be made in 2009. Mr. Ponce considered that sales prices in 2009 are reflective of sales prices in 2013-2014: prices in the region had not changed dramatically in that period.

347.   Mr. Ponce was asked about the unexecuted addendum (C-0374) to the Promise of Purchase Agreement, and offered his "intuition" as a realtor that the Parties wanted to amend the initial agreement. However, he conceded that he could not get into the minds of the Parties. When asked about the Promise of Purchase Agreement, Mr. Ponce acknowledged that the contract was sloppily written and not properly reviewed before it was executed. But it was not rare for him to see this: "I've seen plenty of contracts that are not looked into properly and that have terrible mistakes" (Tr Day 6 [1370]). Mr. Ponce would not agree that a 50% advance purchase price was unusual in Panamanian real estate practice. But, of some significance, he was only able to point to a "comparable" prepayment of 20%.

348.   On questioning from the Tribunal, Mr. Ponce acknowledged that he had no idea whether J.R. Bocas Investment had asked for a higher price than the one agreed to with Mr. Rivera. However, he said he had seen developers "not necessarily be so

140

aggressive in terms of lowering the price, because they understood that they wanted to do was sell finished products at such higher margins" (Tr. Day 6 [1379]).

349.    Unfortunately, the Tribunal considers that Mr. Ponce, despite his experience and apparent expertise about the Panamanian real estate market in the Azuero region veered to much in the direction of partisanship to be of much assistance. To be sure, the lack of reliable public information made his task difficult. However, his testimony about the bid-ask differential, to the extent that it had any coherence at all, was not sufficiently supported, and the Tribunal is not in a position to simply accept what his friends told him without documentary evidence. Mr Ponce's attempt to explain away the quite large 50% prepayment in the Tonosí land deal lacked plausibility, and raise real partisanship questions.[78] Similarly, his attempt to explain away the sloppiness of the Promise of Purchase Agreement, without taking into account the participation of sophisticated lawyers and businessman, is difficult to accord any weight to.

350.    Mr. Ponce was not asked at the hearing about the massive change in value from what J.R. Bocas Investment paid in 2008 versus the ▮▮▮▮▮▮ agreed price in 2013. However, he did opine, as noted above, that prices did not change drastically between 2009 and 2014, which would much seem to run directly against the completely speculative justifications that he offered in his Second Report (page 26):

> *"Respondent and its expert Justice Arjona also look at the difference between what the Public Registry states was the sales price paid by seller*

---

[78] Mr. Ponce's position is effectively that even though the Promise of Purchase Agreement provided for two advance payments totaling 50%, since the first one was only 25%, and he found one other instance of a 25% prepayment (though without showing whether it also had a second tranche), there was nothing unusual. The full explanation is given at page 31 of his Second Report, which the Tribunal considers to be unhelpful and unreliable:

> "While Justice Arjona and Respondent state that the usual percentage of initial deposits is 10% to 15%, Mr. Ponce's experience in the field indicates that this range can be as high as 20% to 30% of the purchase price. This is often the case for off-market property owners with the intention of motivating the sale of an "off the market asset," meaning those properties that are not being publicly offered for sale but which a buyer has an interest in purchasing. In addition, upon further review, it is evident that the initial deposit was ▮▮▮▮▮ and constituted 25% of the purchase price, *not* 50% as Justice Arjona suggests. This is in line with the 20 to 30% range that Mr. Ponce has observed in the field. A second payment of ▮▮▮▮▮ was required to be paid *sixty days after* the first payment, during which time the seller was to have provided several items, including proof that the mortgage was paid and the minutes stating that Ms. Reyna had the authority to sell the land."

> *JR Bocas Investments for* ▮▮▮▮ *in 2008* ▮▮▮▮ *and compare it with the price agreed by Punela Development Corp. in the Promise of Purchase and Sale Agreement in 2013* ▮▮▮▮ *, and conclude that an increase of over* ▮▮▮ *in 5 years is not credible. This is incorrect, and shows Respondent and Justice Arjona's lack of knowledge of the Panamanian real estate market.*

> *As explained above, the information in the Public Registry is not a reliable indicator of the value of a property or even the actual price for which the property was sold. As such, looking at the difference in price between the Public Registry and the Agreement is simply wrong. Even if there is a notarized contract stating that the transaction was made for* ▮▮▮▮ *, there may have been a separate private agreement between JR Bocas and the original owner with a substantial difference in the actual price paid. Moreover, it is not uncommon that a Buyer 1 does not have a bank account and therefore accepts payments in cash, leaving no trace of the possible transaction. Further, and as discussed, it was not uncommon to see large increases in price in a hot and emerging market. This was the case with the Azuero region during the 2004-2014 period. At the time, sales between Buyer 1, 2, and 3 types were taking place and there was a significant amount of speculation as well."*

As the above passage richly demonstrates, particularly when read together with Mr. Ponce's Hearing testimony on relative price stability, and in the absence of any explanations from Mr. Rivera or Mr. López regarding the massive price increase from the J.R. Bocas Investment 2008 purchase to the Punela 2013 promise to purchase, the Claimants' real estate expert can only speculate on the cause, using expressions such as, "there may have been," "it is not uncommon," and "it was not uncommon."

351.    Regrettably, then, the Tribunal finds that Mr. Ponce's description of anything Mr. Rivera and Omega Panama did or did not do in the Tonosí land deal as being routine does not provide any comfort that this was a genuine transaction.

352.    **Justice Troyano's testimony** and his Report do not take the matter much further, given Justice Troyano's focus on legal validity of the Promise of Purchase Agreement. Justice Troyano repeatedly opined that minimum requirements for a valid contract were present in the Promise of Purchase Agreement, though Justice Arjona did not opine otherwise. He did not appear to want to address instances where omissions in the Promise of Purchase "or deviations from typical practices … may call into question

the underlying transaction." Justice Troyano was unwilling to consider the implications of a missing date or of a US ███████ typographical error beyond the obvious fact that such mistakes occur and Panamanian law provide correctives.

353.   The following exchange underscored that Justice Troyano, like Mr. Ponce, tried too hard to explain certain troubling aspects of the Tonosí land deal. He was asked whether he had heard Mr. Ponce testify that between 2008 and 2014 the Azuero real estate market was slow and that prices had not changed drastically. Justice Troyano affirmed that he recalled this testimony. The next question was as follows: "And despite this, despite the relative stability of the prices in that region, the price that was agreed to in the Promise of Purchase and Sale Agreement was roughly ███████ higher than the price at which the same property sold in 2008; isn't that true?" (Tr. Day 7 [1475-1476]). Justice Troyano agreed that it was true, but he wished to explain his view, though not as a real estate expert (which he is not), and the Tribunal permitted him to do so. Justice Troyano stated: "Perhaps in connection with realty we can have different perceptions, but us lawyers just look at the demand of the market, what is the purpose of the property that is going to be purchased by the client, and of course prices fluctuate. And in the Public Registry, sometimes you find values for pieces of property that are lower, much lower than the actual price. Here in Panama you cannot follow what the Registry says. There are properties registered in the Public Registry for 20 balboas, but their Actual Value, commercially speaking, is 500,000 balboas. And that happens all the time. It is very frequent." (Tr. Day 7 [1476-1477]). The question that followed was, "Just to be clear, though, you have no firsthand knowledge as to what the actual value of this property is, do you?" His answer: "That is right." (Tr. Day 7 [1477]). Regrettably, Justice Troyano's determination to provide an explanation for a matter on which he had no expertise and the explanation itself are of no assistance to the Tribunal.

354.   **Justice Arjona,** on the other hand, stated in his hearing presentation the question that the Tribunal considers to be the relevant for the legal experts (Tr. Day 7 [1495]):

>*"In my opinion, the question is not whether the Contract is valid or legal since, in general terms, I have indicated that this complies with the*

143

> *minimum requirements under the Panamanian law. The key point is whether the Contract complies with [what] one would expect to see in a situation that involves an experienced and sophisticated merchant in a transaction for a significant amount.*
>
> *And in my opinion, this Contract does not comply with that standard since the Contract did not include the basic protections that, in practice, are usually implemented to limit the property in connection with the Promissory Buyer and also to facilitate the possibility to request compliance"*

Among the missing basic protections, according to Justice Arjona, were lack of Notary-certification of signatures; lack of registration in the Public Registry; a highly unusual 50% prepayment without any certainty that the sales contract would be executed; lack of a date of execution; lack of respective corporate authorizations; lack of topographical studies or any property valuation. Justice Arjona also noted his opinion that the lawsuit recently filed by Punela against J.R. Bocas Investment in the Panamanian courts was outside the limitations period. The cross-examination raised questions about the actual need for a valuation or topographical study in Mr. Rivera's circumstances, but did not take matters forward on, for example, the 50% prepayment or the lack of a date of execution.

### (1)    The Parties' Written Submissions on the Tonosí Land Deal

355.    Having reviewed the hearing testimony, the Tribunal briefly summarises the points that the Parties have made in their written submissions on the Tonosí land deal. The relevant references to the memorials and post-hearing briefs are set out above.

356.    The Claimants criticize the Villalba investigation as focusing on non-issues such as the lack of a construction site or permit and Ms. Reyna's lack of a real estate broker's license. The investigation did not develop any evidence about J.R. Bocas Investment or verify that the mortgage caused the breakdown of the transaction. Justice Troyano and Mr. Ponce showed that the transaction was lawful and contracting errors were "not uncommon." Mr. Rivera did not need a topographical study or appraisal, and

Justice Arjona admitted that Mr. Rivera had hired a good law firm to represent him in the transaction. Mr. Ponce confirmed that the purchase price of US $1 million was reasonable, and the initial advance payment constituted 25%, not 50%, of the purchase price. Ms. Reyna, who incriminated herself, nonetheless twice absolved Omega Panama and Mr. Rivera of any wrongdoing.

357. Panama contends that apart from internally inconsistent testimony of Mr. Rivera and Mr. López, the Claimants have only produced the Promise of Purchase Agreement (and the unexecuted addendum) to support the legitimacy of the land deal. However, these documents are "replete with holes" -- *e.g.*, a material discrepancy in the price terms, no escrow set up, lack of date, title never passed, no registration, no action by Mr. Rivera to recover the funds until 7.5 years later, a 50% down payment, no apparent negotiation of the price even though it was much greater than the previous sale in 2008. The Claimants are left with asserting an implausible series of coincidences, but Panama's case is that so many red flags "call into question the legitimacy of the underlying transaction," and thus the "Claimants have not met their burden of proving that the Tonosí land deal was legitimate" (Resp. PHB, para. 84).

### (2) The Tribunal's Decision: The Tonosí Land Deal and the Corruption Investigation

358. In its questioning of Ms. Jimenez,[79] the Tribunal set out some of the questions it faced in determining whether the Tonosí land deal was a genuine transaction (according to the Claimants) or a false paper trail and a sham (according to the Respondent). Those questions were quoted in Panama's PHB (at para. 80), and the Tribunal includes them here as well as issues to be considered.

(a) The origins of the land deal are unclear. Mr. López and Mr. Rivera's testimony contain curious gaps if not contradictions. Ms. Reyna, who incriminated herself but absolved Mr. Rivera and Omega Panama, is at odds with Mr. Rivera's account

---

[79] Tr. Day 8 [1729-1752].

and brings Mr. Corcione into the narrative – and it is unclear why she would lie about Mr. Corcione's involvement.

(b) Mr. Rivera states that he has done his own research as well as obtained assistance from Mr. Chevalier (and perhaps others) on valuation, but no details are relayed to either Mr López – his negotiator – or to the Tribunal. That is extraordinary. Moreover, no business plan or any plan for the alleged Verdanza tourist development has been disclosed.

(c) Mr. Rivera uses information provided by Ms. Reyna, but never speaks to her after he visits the Tonosí site – and the date of the visit has not been disclosed.

(d) No details of any negotiations with the seller have been disclosed – Mr. López says he tried to negotiate but was unsuccessful. He does not report Mr. Rivera's interest, if any, in the negotiation details. Again, the Tribunal finds this to be extraordinary behavior, in the circumstances.

(e) Mr. Rivera retains a reputable law firm for the land deal, but the lead lawyer is someone with whom he has a personal relationship.

(f) The Promise of Purchase Agreement is so poorly drafted by Mr. Rivera's reputable law firm that Ms. Reyna seeks to make revisions. Even with the revisions, huge, unexplained errors and omissions remain, in a two-page document. Mr. Rivera, an experienced businessman, reviews the document but misses the errors and omissions. This is extraordinary.

(g) Mr. Rivera was clearly in a rush to close a deal, though no reasons are given by him or Mr. López for why he was in a rush. There is no persuasive evidence that the purchase price was reasonable, in view of evidence (from the Claimants' expert) that prices since 2008 had been stable, but J.R. Bocas Investment bought the property for ███████ and sold for ███████.

(h) Among the omissions is the lack of a date in April 2013 for the execution of the Promise of Purchase Agreement. The evidence shows that the date cannot be before April 25, 2013. Mr. López can only recall that that execution is virtually simultaneous with the first advance payment, which is odd in circumstances where Mr. Rivera (or Punela) had ten days after execution before having to make the payment. Indeed, given the chronology, it appears that Mr. Rivera (Punela) paid the first deposit of ███████ even before the Promise of Purchase Agreement was executed.

146

(i) The lack of a precise date is especially curious when other provisions in the agreement depend on a specific contract execution date.

(j) The unexecuted addendum (C-0374) refers to the Promise of Purchase date as April 2, 2013, but that clearly is incorrect. The first La Chorrera advance payment is dated April 3, 2013.

(k) There is an extraordinary typographical error in Clause 2(c) of the Promise of Purchase Agreement, casting doubt on the actual purchase price. There is no prudential step taken to authenticate signatures.

(l) Mr. Rivera (Punela) is paying a very high deposit of US ███████ to Ms. Reyna as the deposit holder, someone he professes not to know, but, inexplicably he does no checking on where the funds are being held and evinces no interest in an associated escrow agreement.

(m)No prudential steps are taken by Mr. Rivera to register the Promise of Purchase in the Public Registry.

(n) Mr. Rivera uses the PR Solutions S.A. bank account for transfer funds from Omega Panama to Ms. Reyna's law firm, but PR Solutions S.A. is not exclusively used for his personal business dealings.

(o) The property was encumbered, but as of 2015, no efforts had been made to remove the mortgage, though Mr. Rivera had been in a rush to close the deal in April 2013. There is no explanation of his complete inaction in pursuing his tourist development plan, to the extent that such a plan existed.

(p) Punela was created in January 2013, but there was no record of Mr. Rivera's ownership in the Public Registry.

(q) It took seven-and-a-half years, on what was the final day of the longest, possible (though not necessarily applicable) limitations period, for Mr. Rivera to bring suit to seek to recover the advance payments. His lack of interest in doing so points to an unwillingness for further scrutiny of the transaction (and of the Reyna-J.R. Bocas Investment-Corcione network of relationships) by the Panamanian authorities.

(r) The lack of basic diligence on Mr. Rivera's part in the deal transaction strongly suggests that executing a land deal for the purpose of developing a tourist resort was not Mr. Rivera's genuine interest. Moreover, the close connection between

147

the dates of the La Chorrera advance payments and the transfers to the Reyna firm are striking, and there is at least plausible evidence (*see* Resp. PHB, paras. 90-95) that some of the monies transferred from PR Solutions S.A. to Ms. Reyna ended up in the Sarelan account, even if a dollar-to-dollar tracing has not been proved.

359.   The Claimants accept that it is their burden to show, on the balance of probabilities, that the Respondent's actions were illegitimate (Cl. PHB., para. 72).  They ask the Tribunal to find that the investigation (including freezing bank accounts for years, detention orders, public disclosure of allegations) "was inconsistent with a competent *bona fide* law enforcement action and with due process."

360.   The Tribunal finds, however, that the Claimants have not carried their burden.  The striking series of circumstances set out above at least demonstrate a strong possibility that the Tonosí land deal was not a genuine transaction.  Accordingly, it is clear to the Tribunal that the Claimants have not established that a criminal investigation of Mr. Rivera and Omega Panama – even one that was not "robust" and did not lead to an indictment – was an illegitimate exercise of Panama's police powers.  The Claimants have not demonstrated that the steps taken by Panama in pursuing its investigation, whether freezing of bank accounts, travel restrictions, Interpol notices, extradition requests, seizure of documents – were illegitimate steps in the circumstances set out above.  These may have been aggressive investigative steps, but the Claimants have not shown that Panama's attempts to obtain Mr Rivera's evidence – when he was unwilling to return to Panama and voluntarily appear to assist with the investigation – manifested improper use of police powers.

361.   In short, the Claimants have not shown that the investigation was "bogus" on the basis that the land deal was simply a land deal and had no plausible links to monies that ended up in the Sarelan account.[80]  The Tribunal nonetheless addresses, briefly, the Claimants' foundational allegation that the investigation was an outgrowth of President Varela's plan to harm Mr. Rivera and his companies because Mr. Rivera

---

[80] The Claimants rightly observe that Panama has not established that the Claimants participated in a scheme to bribe Justice Moncada Luna to win the La Chorrera bid.  However, winning the contract was not the only potential benefit – there is, for example, the issue of the size of the advance payment and other contract particulars.

was a political enemy.  As noted above, the Tribunal accepts, on the balance of the evidence (and in view of President Varela's non-appearance at the hearing), that the La Trona restaurant meeting occurred, and that Mr. Varela sought a campaign contribution and was rebuffed by Mr. Rivera.  On this basis, President Varela may have considered Mr. Rivera to be a political enemy, though there is no direct evidence of this and very weak circumstantial evidence.  The VarelaLeaks documents, given the timing and President Varela's knowledge that the Claimants had brought this arbitration when he made comments about Mr. Rivera, do not advance the matter very far. In any event, possible animosity from President Varela does not render the criminal investigation a pretext for President Varela's plan to harm an adversary.  The circumstances of the Tonosí land deal, the centrality of Ms. Reyna's role in that deal and in Justice Moncada Luna's wrongdoing, and the troubling transfer of monies from Omega Panama to Ms. Reyna and possibly to Sarelan are more powerful explanations for Panama's pursuit of investigations against Mr. Rivera and Omega Panama than the desire of President Varela for revenge.  Moreover, there is no evidence that President Varela in some way managed to direct either the National Assembly's investigation or the Public Prosecutor's investigation.

362.   For the above reasons, and, in particular, the Claimants' failure to carry its burden to show that the investigation was illegitimate, the Tribunal finds that the FET, FPS, and indirect expropriation claims based on the allegation of a bogus investigation cannot be sustained and must be denied.

## V.   RESOLUTION OF THE RESPONDENT'S JURISDICTIONAL OBJECTIONS AND THE CLAIMANTS' CLAIMS

363.   Based on the findings set out above, the Tribunal resolves the Respondent's four jurisdictional objections and the Claimants' four heads of claims as follows.

### A.   PANAMA'S JURISDICTIONAL OBJECTIONS

364.   As a preliminary matter, the Tribunal notes, as stated above, that Panama has not challenged jurisdiction *ratione personae* or *ratione temporis*.  As a *prima facie* matter, the

Claimants have satisfied the requirements of *ratione materiae* and *ratione voluntatis*, since their "investments" meet the definition of the term in the BIT and the TPA, and the two Treaties contain Panama's standing offer to consent to arbitration. Panama's four jurisdictional objections, however, call into question whether jurisdiction *ratione materiae* and *ratione voluntatis* have in fact been satisfied, either on the grounds that the Claimants' conduct have stripped the purported investments as qualifying as such under the Treaties or because the nature of the Claimants' claims take them outside the dispute resolution provisions of the two Treaties.

### (1)    Corruption precludes treaty relief

365.    The Respondent's objection is based on the proposition that corruption deprives the Tribunal of jurisdiction over the Claimants' case. Panama relies on, *inter alia*, *World Duty Free v. Kenya* (RL-0003), *Plama v. Bulgaria* (RL-0008), and *Phoenix Action v. Czech Republic* (RL-0005) for international law support, and asserts that the Claimants' alleged payments to Justice Moncada Luna to obtain the La Chorrera Project contract "violated Panamanian law and, thus, caused Omega to breach its various agreements" (Resp. C-Mem., para. 200), rendering the investments illegal. Panama further refers to such payments being in violation of international public policy.

366.    **The Tribunal dismisses this objection, both as a matter of jurisdiction and admissibility**.

367.    Panama has not proved that the Claimants obtained the La Chorrera Project contract through bribery under Panamanian law. There was neither a domestic law conviction of the Claimants nor an indictment. Panama did not present expert evidence on Panamanian criminal law in this arbitration or otherwise prove bribery or corruption according to Panamanian law. To the extent that Panama seeks to invoke international public policy, the Tribunal considers that proof of bribery under domestic law would still have to be shown. That is in fact what two of the principal cases relied on by Panama, *Phoenix Action v. Czech Republic* and *Plama v. Bulgaria*, required: the investments were deemed illegal according to the law of the host States (the Czech

Republic and Bulgaria), and therefore the tribunal in those cases would not grant treaty protection to the investments.

368. Based on the above conclusion, the Tribunal need not decide other points that the Parties have argued regarding this objection. For example, the standard of proof for corruption need not be determined (The United States and the Claimants argue that the standard is "clear and convincing", while Panama argues that it is "balance of probabilities") because, as a predicate matter, the elements of Panamanian anticorruption law have not been adduced.

369. The Tribunal also need not consider whether the objection also would have failed since neither the BIT nor the TPA require, expressly, that investments accord with host State law as a precondition to arbitration.

370. Further, the Tribunal need not consider whether corruption in procuring one investment of the Claimants violates their other investments, or a finding of corruption should implicate questions of contributory fault in assessing liability/damages rather than questions of jurisdiction or admissibility.

**(2)    The Claimants Have Asserted Commercial Claims That Are Not Protected by the Two Treaties**

371. Panama bases this objection on the well-established investment treaty principle that "whether there has been a breach of the BIT and whether there has been a breach of contract are different questions" (*Vivendi Annulment* (RL-0019); Resp. C-Mem., para. 223). Panama develops this principle (though not in its section on jurisdictional objections; see Resp. Counter-Mem., para. 255) by relying on, *e.g.*, *AWG v. Argentina* (CL-0011), where the tribunal observed that in "investor-State arbitrations which involve breach of contracts, tribunals have made a distinction between *acta iure imperii* and *acta iure gestionis*, ... It is the use by a State of its sovereign powers that gives rise to treaty breaches, while actions as a contracting party merely give rise to contract claims not ordinarily covered by an investment treaty." Panama states that this principle is relevant not just for the Claimants' umbrella clause claims, but also for their other claims: treaty protection will only attach when the respondent State acts in its

151

sovereign capacity, whereas the Claimants have presented a series of commercial claims.

372. **The Tribunal dismisses this objection**.

373. This jurisdictional objection is inextricably tied to the merits and cannot be resolved without an examination of the merits – *i.e.*, each of the eight Project contracts must be assessed, as the Tribunal has done in this Award, to determine whether Panama was in fact acting in a commercial or in its sovereign capacity.

374. Notably, Panama for purposes of its merits defenses relies on *Parkerings v. Lithuania* (CL-0041; *see, e.g.*, Resp. C-Mem., para. 288). In that case, the tribunal also faced a jurisdictional objection based on commercial rather than sovereign action by the State, and observed, *inter alia* (paras. 259, 265):

> *"… the Claimant is alleging treaty violation and there is nothing convincing in the record that may lead to the suspicion of the Claimant having disguised contract claims with Treaty claims for the benefit of jurisdiction. Whether the Respondent did in fact violate the Treaty (or the international law) is a matter of substance and merit rather than of jurisdiction. … The Tribunal emphasizes that the substantive justification of the Claimants' claims is not a matter of jurisdiction but of merit."*

375. The *Parkerings v. Lithuania* tribunal also noted (para. 263) the comment by the *ad hoc* committee in *Vivendi Annulment* that the conduct alleged by claimants, if established, could have breached the BIT, and was not reducible to a civil law claim.

376. The point here is that the Claimants have sufficiently alleged Treaty claims based on sovereign conduct by Panama (both for non-umbrella and umbrella-clause claims). Whether the Claimants have demonstrated sovereign conduct is a matter for the merits. Thus, the objection based on the commercial actions of the State implicates the merits and cannot be resolved as a matter of jurisdiction.

**(3)     The BIT Claims Must Be Resolved Under the Project Contracts' Dispute Resolution Provisions**

377.    The basis for this objection is the provision in Article VII(2) of the BIT, stating that "the dispute shall be submitted for settlement in accordance with the applicable dispute-settlement procedures upon which they have previously agreed."  ·The five Project contracts that are covered by the BIT (though, as the Claimants note, the dates of disputes arising out of these contracts would also put them under TPA coverage) have non-ICSID dispute-settlement clauses.  The Respondent states (Resp. C-Mem., paras. 237-238) that the plain meaning (under Article 31 of Vienna Convention on the Law of Treaties) of this provision is that the obligation is mandatory to use the previously agreed contractual dispute resolution procedures.

378.    **The Tribunal dismisses this objection**.

379.    The Respondent has referenced Article VII(3) of the BIT (Resp. C-Mem., para. 235) but has omitted to consider the relevant text of Article VII(3) (amended and entered into force, 2001, CL-0002, emphasis added), which, pursuant to Vienna Convention Article 31, must be read together with Article VII(2)[81]:

> **"3.(a) At any time after six months from the date upon which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute:**
>
> (i) to the International Centre for the Settlement of Investment Disputes ("Centre"), established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 ("ICSID Convention"), for settlement either by conciliation or binding arbitration;
>
> (ii) to the Additional Facility of the Centre, if the Centre is not available, for settlement either by conciliation or binding arbitration; or
>
> (iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL Rules"), for settlement by binding arbitration.

---

[81] Article VII(2) is quoted in full at paragraph 112, above.

153

Once the national or company concerned has so consented, either party to the dispute may institute proceedings before the Centre, the Additional Facility or in accordance with the UNCITRAL Rules, **provided the dispute has not, for any reason, been submitted for resolution in accordance with any applicable dispute settlement procedures previously agreed to by the parties to the dispute, and the national or company concerned has not brought the dispute before the courts of justice, administrative tribunals or agencies of competent jurisdiction of either Party**.

(b) Each Party hereby consents to the submission of an investment dispute in accordance with the choice of the national or company under paragraph 3(a)(i), (ii), and (iii). This consent and the submission of the dispute by a national or company under paragraph 3(a) shall satisfy the requirement of:

(i) Chapter II of the ICSID Convention (Jurisdiction of the Centre) and the Additional Facility Rules for written consent of the parties to the dispute; and

(ii) Article II of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards done at New York, June 10,1958, under the auspices of the United Nations for an "agreement in writing."

380.  The only way to make sense of Article VII(2) and VII(3), read together, is that the national or company of the home State (for convenience here, the "investor") has an option ("may choose") in the event of an investment dispute: the investor may completely follow the VII(2) path, which immediately leads to negotiation and then the previously agreed dispute-settlement procedures, or the investor may choose to veer away from the Article VII(2) path, six months after the dispute has arisen, to initiate ("consent in writing to") ICSID arbitration, "provided the dispute has not, for any reason, been submitted for resolution in accordance with any applicable dispute settlement procedures previously agreed to by the parties to the dispute, and the national or company concerned has not brought the dispute before the courts of justice, administrative tribunals or agencies of competent jurisdiction of either Party."

381.  It is clear that Article VII(3) is referring to the same "dispute" referenced in Article VII(2).  It is also clear that the investor need not follow the previously agreed dispute-settlement procedure if the investor has not pursued it (or the national courts) and consents in writing either to ICSID, the Additional Facility, or UNCITRAL.

382.   To summarise, in the event of an investment dispute, the investor, pursuant to Article VII(2) shall initially seek to resolve it by negotiation.  Pursuant to Article VII(3), after six months, the investor may consent in writing to ICSID arbitration, provided that the investor has not submitted the dispute for resolution in accordance with any previously agreed dispute-settlement procedures with the host State.  The Claimants aver, in paragraph 58 of their Request for Arbitration that they sought negotiation when the dispute arose, and after six months, they initiated ICSID arbitration.  It is not disputed by the Parties here that the Claimants did not submit their dispute to any previously agreed dispute-settlement procedures for resolution.

383.   Even apart from the above interpretation of Article VII(2) and Article VII(3), the Tribunal notes that the objection is due to be dismissed solely upon a reading of Article VII(2).  The Claimants correctly point out that there has been no previously agreed dispute-settlement procedure in relation to a dispute under the BIT, as opposed to a dispute under the Project contracts.  As discussed above, it is a matter for the merits, not jurisdiction, to determine whether the Claimants have established sovereign conduct by Panama regarding the eight Project contracts.  Moreover, the relevant phrase in Article VII(2) is "in accordance with the **applicable** dispute-settlement procedures upon which they have previously agreed" (emphasis added).  The contractual dispute-settlement procedures, at least those providing for resolution of contractual disputes under Panamanian law, are not applicable to alleged *international law* violations under the BIT.

### (4)   There Is No Jurisdiction Over Claims Relating to Panama's Criminal Investigation of Mr. Rivera

384.   This objection rests on Panama's contention that the claims relating to the criminal investigation of Mr. Rivera do not arise directly out of an investment, whereas the BIT and the TPA only cover investment disputes, and the ICSID Convention (Article 25) also requires a close connection between the investment and the dispute.

385.   **The Tribunal dismisses this objection**.

386.    As discussed above (paragraphs 320-325), the Tribunal has determined that, in fact the criminal investigation claims do arise directly out of the Claimants' investments under the BIT or the TPA, which also satisfies Article 25 of the ICSID Convention.

B.    THE CLAIMANTS' FOUR HEADS OF CLAIMS

(1)    **Unlawful (Indirect) Creeping Expropriation**

387.    The Claimants seek compensation pursuant to Article IV of the BIT and Article 10.7 of the TPA, which prohibit indirect expropriation.  They do so on three principal grounds: (a) Panama's destruction of the Omega's Consortium's commercial value through unjustified termination of Project contracts (including failure to issue payment approvals and withholding payments and permits) and imposition of bidding bans on future public works contracts; (b) interference with the Claimants' distinct, reasonable investment-backed expectations; and (c) Panama's initiation of baseless criminal investigations, which also contributed to the destruction of the Omega Consortium's business.

388.    **The Tribunal dismisses this claim**.

389.    For the Claimants to succeed on their expropriation claim, they must show that Panama acted in its sovereign rather than commercial capacity.  *See, e.g.*, TPA Annex 10-B(4)(a)(iii) ("the character of the government action");[82] *Parkerings v. Lithuania* (CL- 0041), para. 443.  The Claimants have failed to show that Panama's actions were taken in its sovereign capacity in relation to the Omega Consortium's six Projects (comprising eight Project contracts).

---

[82] *See also* TPA Annex 10-B(a)(4)(i): "the fact that an action or series of actions by a party has an adverse effect on the economic value of an investment, standing alone, does not establish that an indirect expropriation has occurred."

390.   Also in relation to the Project contracts, the Claimants have not established "distinct, reasonable investment-backed expectations" or that any such expectations that may have existed were interfered with by Panama acting in its sovereign capacity.

391.   Further, the Claimants have not carried their burden of showing that the criminal investigations of Mr. Rivera and Omega Panama were illegitimate exercises of Panama's police powers.

### (2)   Denial of Fair and Equitable Treatment

392.   The Claimants seek damages pursuant to Article II(2) of the BIT and Article 10.5(1) of the TPA, which requires that Panama shall accord fair and equitable treatment to covered investments.  They do so on four principal grounds:  (i) Panama arbitrarily and unreasonably altered the legal framework which had induced the Claimants to invest in the public works sector, thereby undermining the Claimants' "legitimate expectations"; (ii) in relation to the six Projects (individually and/or as a unit), Panama acted arbitrarily, inconsistently, unreasonably, and without transparency and due process, and thereby destroyed the Claimants' investment; (iii) Panama arbitrarily frustrated the Claimants' legitimate expectations that the Project contracts would be performed by Panama in good faith; and (iv) Panama's criminal investigations were illegitimate, arbitrary, and shocked the conscience.

393.   **The Tribunal dismisses this claim**.

394.   For the Claimants to succeed on their FET claim in relation to the six Projects, they must show that Panama acted in its sovereign rather than commercial capacity.  *See, e.g.*, *Impregilo v. Pakistan* (RL-0030), paras. 268-269; *Duke Energy v. Ecuador* (CL-0037), paras. 343-348.

395.   The Claimants have failed to show that Panama's actions were taken in its sovereign capacity in relation to the Omega Consortium's six Projects (comprising eight Project contracts).

396.   In terms of "legitimate expectations" and "good faith," the Tribunal considers that the Claimants have not pleaded anything more specific than an expectation of *pacta sunt servanda*, which is not a sufficient basis for establishing an FET claim (even under the FET standard outlined by the Claimants in response to the U.S. Submission, discussed above).   In any event, as a factual matter, the Claimants have not demonstrated a violation by Panama on the grounds of good faith or "legitimate expectations" in Panama's conduct as a Party (through its agencies) to the Project contracts.

397.   Further, the Claimants have not carried their burden of showing that the criminal investigations of Mr. Rivera and Omega Panama were illegitimate exercises of Panama's police powers.   The Claimants therefore cannot prevail on their FET claim in relation to the criminal investigations

### (3)   Denial of Full Protection and Security

398.   The Claimants seek damages pursuant to Article II(2) of the BIT and Article 10.5(1) of the TPA, which requires that Panama shall accord full protection and security to covered investments.   They do so on two principal grounds: (a) the criminal investigations of Mr. Rivera and Omega Panama were bogus (*i.e.*, they were not a legitimate use of police powers; and (b) Panama lodged an assault on the Claimants' Project contracts by withdrawing the entire legal framework that was intended to protect the Claimants' investments.

399.   **The Tribunal dismisses this claim**.

400.   See the reasons for dismissal given under the FET claim head, above, which apply here, to the extent that an FPS claim is not limited to protection of the "physical integrity of an investment against interference by the use or force" (*Saluka v. Czech Republic*, CL-0038, para. 484).   The Tribunal need not resolve the applicable FPS standard, because of the Tribunal's determination that the Claimant has not proved its case under the Claimants' proposed "expanded" standard of protection. However, the Tribunal notes that, as indicated, under the Claimants' proposed standard an FPS claim is not distinguishable from an FET claim, which is a development that other

158

investment treaty tribunals have cautioned against (*see, e.g., Spyridon Roussalis v. Romania*, RL-0035, para. 320; *Enron v. Argentina*, CL-0094, para. 286).

### (4)     Umbrella Clause

401.   The Claimants seek damages pursuant to Article II(2) of the BIT and Article 10.4 of the TPA (MFN), read together with Article 3(4), of the Panama-Netherlands BIT (CL- 0163), under which Panama "shall observe any obligation it may have entered in with regard to investment of nationals or companies of the other Party." They do so on the grounds that they are not seeking to transform a breach of contract into a treaty breach; rather, "Respondent's failure to honor its obligations to Claimants cannot be read in isolation and constitutes far broader and far deeper sovereign mistreatment than a garden-variety breach of contract" (Cl. Rej., para. 304).

402.   **The Tribunal dismisses this claim.**

403.   In resolving this claim, the Tribunal assumes (but does not find) that the Claimants can use the TPA's MFN clause to import the umbrella clause in the Panama-Netherlands BIT.

404.   To the extent that the Claimants have pleaded a coherent standard for breach of the umbrella clause, the Tribunal observes that the Claimants have not demonstrated that Panama breached any obligations under Panamanian law (the law applicable to the Project contracts), or under (undefined) international law obligations.

### (5)     No Recovery of Economic or Moral Damages

405.   In view of the Tribunal's liability determinations, set out above, by which the Claimants have failed to demonstrate a breach of the BIT or TPA, the Claimants are not entitled to recover any damages that they have sought. Accordingly, the Tribunal does not address the damages heads submitted by the Claimants, and denies the Claimants' claims for economic and moral damages.

## VI.   ALLOCATION OF COSTS

### A.   THE APPLICABLE RULES

406.   ICSID Convention Article 61(2) states as follows:

> *"In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."*

407.   The costs allocation rule applicable to this proceeding is ICSID Arbitration Rule (2006 edition) 28(1), which provides as follows:

> *"Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:*
>
> *(a)  at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;*
>
> *(b)  with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties."*

408.   The BIT does not expressly refer to costs allocation.  The TPA, Article 10.26, states that:

> *"1. Where a tribunal makes a final award against a respondent, the tribunal may award, separately or in combination, only:*
>
> *(a) monetary damages and any applicable interest;*
>
> *(b) restitution of property, in which case the award shall provide that the respondent may pay monetary damages and any applicable interest in lieu of restitution.*

> *A tribunal may also award costs and attorney's fees in accordance with this Section and the applicable arbitration rules."*

409.   Although not applicable to this proceeding, the Tribunal notes that the recently amended ICSID Arbitration Rules (2022) contain guidance on costs decisions. The ICSID Arbitration Rule 52(1) (2022) provides as follows:

> *"(1) In allocating the costs of the proceeding, the Tribunal shall consider all relevant circumstances, including:*
>
> *(a) the outcome of the proceeding or any part of it;*
>
> *(b) the conduct of the parties during the proceeding, including the extent to which they acted in an expeditious and cost-effective manner and complied with these Rules and the orders and decisions of the Tribunal;*
>
> *(c) the complexity of the issues; and*
>
> *(d) the reasonableness of the costs claimed."*

New Rule 3(1) is also relevant to costs decisions: "The Tribunal and the parties shall conduct the proceeding in good faith and in an expeditious and cost-effective manner."

## B.   THE PARTIES' POSITIONS IN THEIR RESPECTIVE COSTS SUBMISSIONS

410.   The Claimants' Costs Submission makes the following points:

(i)   There are two basic approaches to costs allocation in ICISD cases: the traditional, "each to bear its own costs, and the more recent, "costs follow the event." One approach does not clearly prevail over the other.

(ii)   In this arbitration, given the absence of a party agreement on how costs shall be allocated, the Tribunal has broad discretion in making an allocation determination.

(iii)   Regardless of the approach followed, the Tribunal should take procedural conduct into account.

161

(iv)    In doing so, the following improper or inappropriate conduct by Panama should be considered:

    a.  corruption allegations unsupported by credible evidence;

    b.  withholding relevant evidence;

    c.  jurisdictional objections unsupported by evidence;

    d.  adducing witness evidence from individuals lacking first-hand knowledge of events;

    e.  failure to produce President Varela for cross-examination at both hearings;

    f.  failure to produce witness evidence from INAC Director Nunez; and

    g.  failure to produce witness evidence from MINSA's Minister.

    Because of this improper conduct, Panama caused the Claimants to incur unnecessary and significant expenses, and a costs award against Panama is therefore warranted "irrespective of the approach followed by the Tribunal, and irrespective of the identity of the winning party" (Cl. Costs, p. 5).

(v)    The Claimants' state that they have incurred US ▮▮▮▮▮▮ in legal fees, and other arbitral costs in the amount of US ▮▮▮▮▮,[83] totaling US ▮▮▮▮▮. Of this amount, the Claimants incurred US ▮▮▮▮▮ in preparation for President Varela's testimony.

411.    Panama's Costs Submission makes the following points:

(i)    Under the ICSID Convention and Arbitration Rules, the Tribunal has discretion to allocate costs.

(ii)    The factors that the Tribunal should considering in exercising its discretion are: the reasonableness of the costs presented; the prevailing party on an issue; and the parties' procedural conduct. Panama seeks its entire costs, based on these factors.

---

[83] The Tribunal notes that this amount does not include the final ICSID advance payment request.

(iii)     Panama's costs are reasonable in view of the number and complexity of the issues it had to address, which involved multiple construction contracts, a criminal investigation, and complex jurisdictional objections arising from the Claimants' decision to accumulate multiple disputes in an ICSID proceeding.  The Claimants' sought massive and needless discovery, only a small part of which was granted by the Tribunal.  Further, the Claimants' Reply submission was accompanied by irrelevant witness statements and expert reports, causing Panama to incur additional fees and costs.  The Compass Lexecon report increased costs by failing to address the valuation standard required by the BIT and TPA.

(iv)     Panama should be the prevailing party in all phases – jurisdiction, merits, and quantum.  It proved its jurisdictional objection based on the Claimants' alleged corruption in procuring their investment.  Even if the Tribunal finds that the entire investment was not procured through corruption, the criminal investigation of Mr. Rivera and Omega Panama was justified by the bribery of Justice Moncada Luna.  Further, Panama says it demonstrated that the Claimants are not entitled to any relief because their claims: (a) are commercial (rather than investment disputes), (b) should have been presented in other fora; and (c) were predicated on wrongful actions toward the Claimants rather than their investments.  Thus, even, if the Claimants were to prevail on a small portion of their claims, Panama should be deemed the prevailing party and awarded its costs.

(v)      As a matter of procedural conduct, the Claimants needlessly increased the costs of the arbitration through discovery fights and submission of irrelevant evidence.  Panama observes that the Claimants themselves have not funded their ICSID claims, this contributed to their disregard for efficiency.  Panama, on the other hand, conducted itself in an efficient and cost-effective manner.

(vi)     In the event of the potential complexity in determining the prevailing party for purposes of costs allocation, Panama requests that the Parties be given the opportunity to submit brief statements of their specific positions after the Tribunal has issued its award.

(vii)    Panama states that its costs are broken down as follows: US ▮▮▮▮▮▮ in legal fees; US ▮▮▮▮▮▮ in expenses; US ▮▮▮▮▮▮ in expert and witness fees/costs; and US ▮▮▮▮ in ICSID costs (not including final costs); totaling US ▮▮▮▮▮.

### C.   THE TRIBUNAL'S ANALYSIS AND DECISION ON COSTS

412.   The Parties agree that the Tribunal has broad discretion in making its costs allocation determination.   While both sides propose that the question of procedural conduct should be a central consideration, they differ on the importance to attach to other factors.   The Claimants argue, in effect, that procedural conduct is the only significant consideration in this case; thus, based on Panama's alleged misconduct, the Claimants should be awarded their costs, regardless of the prevailing party or the "traditional" or "more recent" approach to ICSID costs decisions.   Panama, on the other hand, argues, without proposing the more recent "costs follow the event" approach, that the "prevailing party" should be a consideration.   Panama makes the further observation that the Claimants did not fund their own arbitration fees and costs.   The Tribunal notes that there is a difference of approximately US ███████ in the costs incurred by the Parties.

413.   The Tribunal's analysis starts with the question of the starting presumption for its costs decision.   The Parties' Costs Submissions include mention of four different presumptions (a) "each side to bear its own"; (b) "costs follow the event"; (c) "procedural conduct" (the Claimants' proposal); or (d) "modified procedural conduct" (Panama's proposal, which is closer to the new ICSID Rule 52(1) multi-factor approach).   However, as the Parties recognize, the Tribunal is not bound to follow any of these four presumptions.

414.   In selecting a starting presumption in this case, the Tribunal considers it significant that, in the absence of any agreement between the Parties on the approach that should be taken, neither Party has expressed a *reasonable expectation* as to the costs allocation approach that would be adopted in view of costs practices in ICSID cases.[84]   Instead, the Parties have simply accepted that the Tribunal can exercise its discretion in awarding costs, and then list (in limited detail) alleged pleading or evidentiary failings

---

[84] The only reasonable expectation that the Parties could have, in view of the agreed five-page costs submissions length (with summary fee/costs annexes), is that the costs allocation decision would **not** be an "arbitration within an arbitration"; *i.e.*, there would not be the type of detailed "costs assessment" procedure that is undertaken in some national courts.   There would simply be a broad, general view given as to the appropriate allocation.

that are said to have unnecessarily increased costs. Panama goes further, in arguing that the Claimants' claims included commercial disputes that did not belong in ICSID arbitration and that this was inefficient and a "misguided decision" (Resp. Costs Submission, para. 2). Panama also goes further, in presenting a mini-brief on why it should prevail on its jurisdictional and merits positions. Notably, however, neither Party accuses the other of bad faith or egregious misconduct.

415. Indeed, that is the Tribunal's starting question in making an allocation decision in this case: is it apparent, from the outset of the arbitration, that the Parties have acted in good faith in complex circumstances in preparing and presenting their respective cases? Relatedly, was there substance to the claims and defenses presented, such that the Tribunal's determination of the prevailing Party required sustained factual and legal analysis? If the answer to both questions is yes, did one side nonetheless consistently advance frivolous procedural or evidentiary positions that were significantly at odds with the objectives of time and cost efficiencies? If the answer to this third question is no, the Tribunal may still decide that it is appropriate to exercise its discretion to take into account the identity of the prevailing party and the costs that it incurred, and whether there would be compelling reasons to award all or a percentage of the costs it incurred to that party.

416. The Tribunal considers that this was a properly prepared and presented ICSID arbitration from both sides. The Tribunal does not accept Panama's assertion that the Claimants made a misguided decision to bring all their disputes into this forum. That was a reasonable decision based on the public works projects that constituted the Claimants' investment, and, pursuant to the Claimants' position, that Panama's sovereign conduct caused the failure of the Projects.

417. The Claimants' claims had substance. As the text of this final Award indicates, their resolution entailed the Tribunal's close analysis of complex factual matters, international law concepts, two investment Treaties (the BIT and TPA) and their relationship, and certain investment treaty awards. The Tribunal considers that the

extensive memorials and briefs that the Parties filed were largely needed to assist the Tribunal in assessing the positions advanced by the Parties.

418.    While each side has taken issue with certain procedural and evidentiary applications and responses filed by the other during the course of this ICSID proceeding, the Tribunal considers that there was nothing consistently untoward in the conduct of either side.   The applications and responses were, for the most part, part of the routine process in a complex, lengthy, and vigorously contested (by very able counsel) investment treaty arbitration. Neither side was disruptive (or consistently successful) in lodging or defending against applications.   The Tribunal has not discerned anything inappropriate in the Claimants' tenacious search for evidence -- or in Panama's resistance to that search.   Although the Claimants' Redfern schedule was long and many requests were denied, the requests were not abusive.   Notably, the Claimants were successful in their applications to obtain the documents that Mr. Roy Pollitt reviewed as well as the VarelaLeaks documents.

419.    Some evidence in the record that the Claimants adduced did not assist the Tribunal in reaching its determination on liability, and Panama has correctly commented that the Claimants' quantitative analysis was flawed due to a confusion of the entity to be valued (Omega Panama, not the Omega Consortium).   However, the Tribunal does not view these matters as having significantly increased the costs of the arbitration, and they did not cause Panama to incur, for the most part, expenses outside the typical adversarial give-and-take in a complex arbitration.   On the other hand, while Panama has given plausible explanations for the unavailability of President Varela to appear for examination, Panama submitted a witness statement from President Varela, and his absence from the hearings clearly created procedural complications and caused the Claimants to incur additional expenses.   Among the procedural costs issues discussed by the Parties in their respective Costs Submissions, the Tribunal considers President Varela's non-appearance to be among the more noteworthy.

420.    While the above considerations, taken as a unit and on balance, would support the position that each side should bear its own costs, there is still the overarching question

whether, in the circumstances of this case, Panama, as the prevailing Party, should nonetheless be entitled to an award of all or part of the costs that it incurred. The Tribunal considers that the "prevailing party" factor is compelling in this particular case. This was a lengthy arbitration in which Claimants vigorously advanced serious allegations of sovereign misconduct. Those allegations did not result in a finding of liability against Panama. Moreover, the nature of the allegations entailed time-consuming and labor-consuming efforts by Panama in defending itself, which Panama accomplished at a much lower cost level than the Claimants' expenditures. As indicated above, the Claimants spent approximately US █████████ – of funds other their own – in pursuing unsuccessful claims, whereas Panama's costs were approximately US ██████. In relative terms, Panama was efficient in mounting a successful defense under the BIT and TPA, which gives further weight to the factor of overall victory. Thus, even though the Respondent was not compelled to incur unreasonable costs in view of the complexity and substance of the case brought against it, there is still a basis for awarding at least part of the costs that Panama incurred, because it prevailed in an expensive, lengthy ICSID arbitration, in which its costs were significantly lower than the Claimants' and in which its conduct of the proceeding (like that of the Claimants) was proper. In the totality of the circumstances, the Tribunal finds that it would be unfair to Panama if were not awarded a significant percentage of its costs in successfully defending the case brought against it.

421.   However, the Tribunal also finds that Panama is not entitled to recover all of its costs, since it did not prevail on its four jurisdictional objections. The reduction should not be substantial, because Panama did not seek a separate, preliminary jurisdictional phase in the arbitration; jurisdiction and merits were merged in one composite phase. Still, the Parties and the Tribunal had to devote time and resources to assessing objections that the Tribunal ultimately has rejected. The Tribunal finds that a 15% reduction of Panama's total claimed costs of US ██████ would therefore be appropriate.[85]   The Tribunal determines that a further US ██████ should be

---

[85] The Tribunal notes that the Parties' claimed costs do not include a final ICSID request for an advance payment of US $75,000 from each party.

subtracted from Panama's costs recovery, as this is the amount reasonably claimed by the Claimants to have been spent on preparation for cross-examination of former President Varela, who did not appear as scheduled at either the First or the Second Week Hearing.

422.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in US $):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Mr. Laurence Shore, President | US ███████ |
| Prof. Horacio Grigera Naón, Co-arbitrator | US ███████ |
| Prof. Zachary Douglas, Co-arbitrator | US ███████ |
| ICSID's administrative fees | US ███████ |
| Direct expenses (estimated) | US ███████ |
| **Total** | **US ███████** |

423.    The above costs have been paid out of the advances made by the Parties in equal parts. ICSID received the following advances on costs from the Parties: US ███████ from the Claimants and US ███████ from the Respondent.[86]

424.    The costs recovery calculation for Panama is as follows: 15% of US $5,953,920.91 = US $893,088.13.   US $5,953,920.91 minus (US $893,088.13 + US $220,746.00) = **US $4,840,086.78.**

425.    Accordingly, the Tribunal concludes that the appropriate costs allocation in this arbitration is for Panama to recover to **US $4,840,086.78** from the Claimants.

---

[86] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID. The final financial statement for this case will be sent to the Parties separately.

## VII.   AWARD

426.   For the reasons set forth above, the Tribunal decides as follows:

- The Tribunal has jurisdiction (a) over the Parties in this case, and (b) to judge the Claimants' claims.

- The Tribunal rejects the Claimants' claims.

- The Claimants shall bear their own costs.

- The Claimants shall pay to the Respondent a portion of the Respondent's costs, in the amount of **US $4,840,086.78**.

Dr. Horacio Grigera Naón
Arbitrator

Professor Zachary Douglas KC
Arbitrator

Date: 10/04/22

Date:

Mr. Laurence Shore
President of the Tribunal

Date:

170

_____

Dr. Horacio Grigera Naón
Arbitrator

Date:

Professor Zachary Douglas KC
Arbitrator

Date:  9 October 2022

_____

Mr. Laurence Shore
President of the Tribunal

Date:

171

| | |
|---|---|
| _____ | _____ |
| Dr. Horacio Grigera Naón<br>Arbitrator | Professor Zachary Douglas KC<br>Arbitrator |
| Date: | Date: |

Mr. Laurence Shore
President of the Tribunal

Date: 4 October 2022

172